# 25-2623-cr

*To be Argued by:*
ALEXANDRA A.E. SHAPIRO

# United States Court of Appeals

*for the*

# Second Circuit

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

SEAN COMBS, AKA Puff Daddy,
AKA P. Diddy, AKA Diddy, AKA PD, AKA Love,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR DEFENDANT-APPELLANT

ALEXANDRA A. E. SHAPIRO
THEODORE SAMPSELL-JONES
JASON ANTHONY DRISCOLL
CHRISTOPHER D. JOHNSON
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
    17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................... iv

INTRODUCTION ............................................................................... 1

JURISDICTIONAL STATEMENT ........................................................ 4

ISSUES PRESENTED .......................................................................... 4

STATEMENT OF THE CASE ............................................................... 4

    A.    Indictment And Trial ........................................................ 5

    B.    The Government Focused Principally On Its RICO Conspiracy
          And Coercion Allegations But Failed To Prove Them ...................... 6

          1.    Ventura's Testimony And Communications ........................... 7

          2.    Jane's Testimony And Communications ...............................11

          3.    The Evidence Demonstrated The Sex Was Part
              Of A Voyeuristic Swingers' Lifestyle .....................................14

          4.    The Government's Mann Act Case Was Peripheral ..............15

    C.    The Jury Rejected The Government's Tale Of RICO
          Conspiracy And Threats, Fraud, Or Coercion .................................16

          1.    RICO ...............................................................................16

          2.    Sex Trafficking .................................................................17

          3.    Mann Act .........................................................................18

    D.    Sentencing ........................................................................18

SUMMARY OF ARGUMENT ...............................................................23

STANDARDS OF REVIEW ...................................................................25

ARGUMENT ........................................................................................25

I.  THE DISTRICT COURT ERRONEOUSLY RELIED ON ACQUITTED CONDUCT AND MISAPPLIED THE GUIDELINES ..................................................................25

    A.  The District Court Misinterpreted And Misapplied The New Guideline ..................................................................26

        1.  "Acquitted Conduct" May No Longer Be Considered For Sentencing Guidelines Purposes ..............26

        2.  The Amendment's Narrow Exception Doesn't Apply ..................................................................27

        3.  The Evidence The District Court Used To Enhance The Sentence Was Not Relevant Conduct Anyway ..................................................................33

    B.  The District Court Impermissibly Relied On Acquitted Conduct To Analyze The 3553(a) Factors ..................................................................34

        1.  Sixth Amendment And Due Process Violations ..................34

        2.  Double Jeopardy Violations ..................................................37

        3.  The District Court's Heavy Reliance On Acquitted Conduct Was Unfair And Unjust ..................................................................39

    C.  The District Court Violated The Acquitted Conduct Guideline By Applying The Fraud/Coercion Enhancement ..............41

    D.  The District Court Violated The Acquitted Conduct Guideline By Applying The Leadership Enhancement ....................43

    E.  The District Court Misapplied The Grouping Enhancement ..............45

II.  COMBS IS ENTITLED TO ACQUITTAL BECAUSE THE MANN ACT MUST BE LIMITED TO A NARROW CLASS OF CONDUCT ..................................................................48

    A.  The Act Must Be Limited To Avoid Constitutional Problems ..........49

        1.  Vagueness ..................................................................50

ii

|  | 2. | Substantive Due Process ................................................ | 55 |
|  | 3. | First Amendment ........................................................... | 56 |
|  | 4. | Federalism ................................................................... | 56 |
| B. | | The Act Should Be Construed To Exclude Voyeurs, Requiring Acquittal ..................................................... | 57 |
| C. | | The District Court's Reasoning Fails .............................. | 59 |
| III. | | THE CONVICTIONS VIOLATE THE FIRST AMENDMENT ............... | 61 |
| A. | | Combs Was Engaged In Protected First Amendment Activity ........................................................................... | 61 |
| B. | | Upholding The Convictions Would Violate The First Amendment ................................................................... | 62 |
| C. | | The District Court Misconstrued The Record And Misapplied The Law ...................................................... | 65 |
| CONCLUSION | | ...................................................................... | 69 |

## TABLE OF AUTHORITIES

**Cases**                                                          **Page(s)**

*303 Creative LLC v. Elenis*,
  600 U.S. 570 (2023) ..................................................................66

*Arcara v. Cloud Books, Inc.*,
  478 U.S. 697 (1986) ..................................................................67

*Ashcroft v. ACLU*,
  542 U.S. 656 (2004) ..................................................................65

*Ashcroft v. Free Speech Coal.*,
  535 U.S. 234 (2002) ..................................................................66

*Ashe v. Swenson*,
  397 U.S. 436 (1970) ..................................................................38

*Barnes v. Glen Theatre, Inc.*,
  501 U.S. 560 (1991) ..................................................................66

*Blakely v. Washington*,
  542 U.S. 296 (2004) ............................................................34, 36

*Brathwaite v. Garland*,
  3 F.4th 542 (2d Cir. 2021) ........................................................60

*Braxton v. United States*,
  500 U.S. 344 (1991) ..................................................................30

*Burks v. United States*,
  437 U.S. 1 (1978) ......................................................................37

*Caminetti v. United States*,
  242 U.S. 470 (1917) ........................................................51, 52, 59

*Carpenter v. People*,
  8 Barb. 603 (N.Y. 1850) ...........................................................51

*Ciminelli v. United States*,
  598 U.S. 306 (2023) ............................................................56, 57

*Clark v. Cmty. for Creative Non-Violence,*
  468 U.S. 288 (1984) ..................................................................66

*Clark v. Martinez,*
  543 U.S. 371 (2005) ..................................................................49

*Cleveland v. United States,*
  329 U.S. 14 (1946) ..............................................................52, 60

*Cleveland v. United States,*
  531 U.S. 12 (2000) ..................................................................56

*Commonwealth v. Bleigh,*
  586 A.2d 450 (Pa. Sup. Ct. 1991) ........................................54, 55

*Free Speech Coal., Inc. v. Paxton,*
  606 U.S. 461 (2025) ..................................................................65

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston,*
  515 U.S. 557 (1995) ..................................................................66

*In re Winship,*
  397 U.S. 358 (1970) ..................................................................40

*Jones v. United States,*
  574 U.S. 948 (2014) ..................................................................31

*Joseph Burstyn, Inc. v. Wilson,*
  343 U.S. 495 (1952) ..................................................................66

*Kisor v. Wilkie,*
  588 U.S. 558 (2019) ..................................................................46

*Kolender v. Lawson,*
  461 U.S. 352 (1983) ..................................................................50

*Koon v. United States,*
  518 U.S. 81 (1996) ..................................................................26

*Lawrence v. Texas,*
  539 U.S. 558 (2003) ..................................................................56

*Masterpiece Cakeshop v. Colorado Civ. Rights Comm'n,*
  584 U.S. 617 (2018) ................................................................65

*McClinton v. United States,*
  143 S. Ct. 2400 (2023) ......................................................passim

*McDonnell v. United States,*
  579 U.S. 550 (2016) ................................................................49

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,*
  547 U.S. 71 (2006) ................................................................60

*Metwally v. City of New York,*
  215 A.D.3d 820 (2d Dep't 2023) ..........................................54

*Obergefell v. Hodges,*
  576 U.S. 644 (2015) ................................................................56

*People v. Cummons,*
  23 N.W. 215 (Mich. 1885) ....................................................51

*People v. Freeman,*
  758 P.2d 1128 (Cal. 1988)................................................63, 68

*People v. Greene,*
  110 Misc. 2d 40 (N.Y. Crim. Ct. 1981) ..........................54, 64

*People v. Paulino,*
  2005 N.Y. Misc. LEXIS 3430 (N.Y. Sup. Ct. Aug. 4, 2005) ........54, 63

*Reno v. ACLU,*
  521 U.S. 844 (1997) ................................................................65

*Rumsfeld v. FAIR,*
  547 U.S. 47 (2006) ................................................................67

*Sable Commc'ns v. FCC,*
  492 U.S. 115 (1989) ................................................................65

*Schacht v. United States,*
  398 U.S. 58 (1970) ................................................................66

vi

*Skilling v. United States*,
  561 U.S. 358 (2010) .........................................................................................50

*Snyder v. United States*,
  603 U.S. 1 (2024) .......................................................................................50, 56

*Stanley v. Georgia*,
  394 U.S. 557 (1969) .........................................................................................65

*State v. Burgess*,
  669 S.W.2d 637 (Mo. Ct. App. 1984).................................................................55

*State v. Mayfield*,
  900 P.2d 358 (N.M. Ct. App. 1995).................................................................55

*State v. Smoot*,
  729 S.E.2d 416 (Ga. Ct. App. 2012).................................................................55

*State v. Taylor*,
  808 P.2d 314 (Ariz. Ct. App. 1990).................................................................55

*State v. Theriault*,
  960 A.2d 687 (N.H. 2008).................................................................................63

*State v. Thuna*,
  109 P. 331 (Wash. 1910) .................................................................................51

*State v. Turnpaugh*,
  741 N.W.2d 488 (Wisc. Ct. App. 2007).............................................................55

*Stinson v. United States*,
  508 U.S. 36 (1993) ...........................................................................................46

*Texas v. Johnson*,
  491 U.S. 397 (1989) ....................................................................................66, 68

*Thompson v. Clark*,
  596 U.S. 36 (2022) .........................................................................................2, 36

*Townsend v. Burke*,
  334 U.S. 736 (1948) .........................................................................................31

*United States v. Aloba*,
  2025 WL 1248827 (9th Cir. Apr. 30, 2025).......................................................47

*United States v. Baylor*,
  97 F.3d 542 (D.C. Cir. 1996)...........................................................................32

*United States v. Bell*,
  808 F.3d 926 (D.C. Cir. 2015)..........................................................................31

*United States v. Bitty*,
  208 U.S 393 (1908) ..........................................................................................59

*United States v. Bongiovanni*,
  2025 WL 2886336 (W.D.N.Y. Oct. 10, 2025)...................................................27

*United States v. Booker*,
  543 U.S. 220 (2005) .........................................................................................35

*United States v. Brown*,
  892 F.3d 385 (D.C. Cir. 2018)....................................................................31, 40

*United States v. Broxmeyer*,
  616 F.3d 120 (2d Cir. 2010) .............................................................................45

*United States v. Canania*,
  532 F.3d 764 (8th Cir. 2008) ............................................................................32

*United States v. Castillo*,
  69 F.4th 648 (9th Cir. 2023).............................................................................47

*United States v. Certified Env't Servs., Inc.*,
  753 F.3d 72 (2d Cir. 2014) ...............................................................................30

*United States v. Cole*,
  158 F.4th 113, 117 (2d Cir. 2025) ....................................................................38

*United States v. Concepcion*,
  983 F.2d 369 (2d Cir. 1992) ........................................................................32, 40

*United States v. Dupree*,
  57 F.4th 1269 (11th Cir. 2023) .........................................................................47

viii

*United States v. Faust*,
   456 F.3d 1342 (11th Cir. 2006) ...................................................................32

*United States v. Flucas*,
   22 F.4th 1149 (9th Cir. 2022) ......................................................................49

*United States v. Frias*,
   39 F.3d 391 (2d Cir. 1994) ..........................................................................32

*United States v. Genao*,
   343 F.3d 578 (2d Cir. 2003) ........................................................................29

*United States v. Gonzalez*,
   110 F.3d 936 (2d Cir. 1997) ..................................................................30, 45

*United States v. Holte*,
   236 U.S. 140 (1915) ....................................................................................52

*United States v. James*,
   151 F.4th 28 (2d Cir. 2025) ....................................................................25, 45

*United States v. Lasley*,
   832 F.3d 910 (8th Cir. 2016) .......................................................................31

*United States v. Mackey*,
   143 F.4th 129 (2d Cir. 2025) .......................................................................25

*United States v. Martinez*,
   769 F. App'x 12 (2d Cir. 2019) ...............................................................31, 40

*United States v. Mendoza*,
   2022 WL 894700 (2d Cir. Mar. 28, 2022) ...................................................31

*United States v. Mercado*,
   474 F.3d 654 (9th Cir. 2007) .......................................................................32

*United States v. Nasir*,
   17 F.4th 459 (3d Cir. 2021) .........................................................................46

*United States v. O'Brien*,
   391 U.S. 367 (1968) ....................................................................................64

*United States v. Och*,
  2025 WL 1836632 (D. Mass. July 3, 2025) ......................................................27

*United States v. Olmeda*,
  894 F.3d 89 (2d Cir. 2018) ..........................................................................25

*United States v. Omotayo*,
  132 F.4th 181 (2d Cir. 2025) .......................................................................29

*United States v. Playboy Ent. Grp.*,
  529 U.S. 803 (2000) ....................................................................................65

*United States v. Riccardi*,
  989 F.3d 476 (6th Cir. 2021) .......................................................................47

*United States v. Sabillon-Umana*,
  772 F.3d 1328 (10th Cir. 2014) ..............................................................32, 40

*United States v. Settles*,
  530 F.3d 920 (D.C. Cir. 2008).....................................................................32

*United States v. Singh*,
  877 F.3d 107 (2d Cir. 2017) ........................................................................26

*United States v. Tapia*,
  2023 WL 2942922 (2d Cir. Apr. 14, 2023).................................................31

*United States v. Vaughn*,
  430 F.3d 518 (2d Cir. 2005) ........................................................................35

*United States v. Watts*,
  519 U.S. 148 (1997) ..............................................................21, 31, 35, 38

*United States v. White*,
  551 F.3d 381 (6th Cir. 2008) .......................................................................32

*Wisconsin Central Ltd. v. United States*,
  585 U.S. 274 (2018) ....................................................................................51

*Wooten v. Superior Court*,
  113 Cal. Rptr. 2d 195 (Cal. Ct. App. 2001) ...........................................53, 54

*Yeager v. United States*,
  557 U.S. 110 (2009) ................................................................................37

**Statutes**

18 U.S.C. §1589....................................................................................43

18 U.S.C. §1591..................................................................................... 5

18 U.S.C. §1962..................................................................................... 5

18 U.S.C. §2421..............................................................................4, 5, 50, 57

18 U.S.C. §2422....................................................................................43

18 U.S.C. §2429....................................................................................47

18 U.S.C. §3231.................................................................................... 4

18 U.S.C. §3553..............................................................................passim

18 U.S.C. §3771....................................................................................47

28 U.S.C. §1291.................................................................................... 4

**Other Authorities**

'A lot of bad things happened': the most shocking moments from the Diddy
  docuseries, *The Guardian* (Dec. 2, 2025),
  https://www.theguardian.com/music/2025/dec/02/sean-combs-the-reckoning-
  netflix-50-cent ......................................................................................18

1953 U.S. Attorneys' Manual,
  https://www.justice.gov/archive/usao/usam/1953/title2criminaldivision.pdf. .....53

1961 U.S. Attorneys' Manual,
  https://www.justice.gov/archive/usao/usam/1961/title2criminaldivision.pdf. .....53

2023-2024 Amendment Cycle: Proposed Amendments/Public Comment 52 (Feb.
  22, 2024),
  https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-
  comment/202402/88FR89142_public-comment.pdf...........................................31

45 Cong. Rec. 1040 (1910) (statement of Rep. Mann) .......................................51

Black's Law Dictionary (12th ed. 2024) ........................................................29, 36

Black's Law Dictionary (7th ed. 1999) ...............................................................47

Brief of 17 Former Federal Judges as Amici Curiae in Support of Petitioner,
    *McClinton v. United States* (21-1557) ...................................................32

CALCRIM (Cal. Model Jury Instructions) No. 1154 ...........................................54

David J. Langum,
    *Crossing Over the Line: Legislating Morality and the Mann Act* (2006) ............52

H.R. Rep. No. 47, 61st Cong., 2d Sess. 9-10 (1909)................................................51

https://www.ussc.gov/about/news/press-releases/april-17-2024 ...........................37

Jessica R. Pliley,
    *Policing Sexuality: The Mann Act and the Making of the FBI* (2014).................52

Petition for Writ of Certiorari,
    *McClinton v. United States*, 21-1557 (June 10, 2022)........................................32

*Prison Time for Something Diddy Didn't Do*, Wall St. Journal (Oct. 9, 2025) ......41

Public Hearing on Proposed Amendments (Feb. 24, 2023)
    (Commission Chair and Judge Reeves),
    https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20230223-24/0224_Transcript.pdf ..................................38

Public Hearing on Proposed Amendments (Feb. 24, 2023)
    (Commissioner and Judge Claria Horn Boom) ...................................................40

Public Hearing on Proposed Amendments (Mar. 6, 2024)
    (Commissioner John Gleeson)........................................................................33

Public Hearing on Proposed Amendments (Mar. 6, 2024),
    https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20240306-07/transcript_20240306.pdf........................................28

Stephanos Bibas,
    *Transparency and Participation in Criminal Procedure*,
    81 N.Y.U. L. Rev. 911 (2006) ........................................................................40

The Oxford English Reference Dictionary 1609 (2d. ed. 1996)..............................47

USSG §1B1.2 ...................................................................................................30

USSG §1B1.3 ...........................................................................................passim

USSG §2A2.2 ...................................................................................................47

USSG §2B1.1 ............................................................................................29, 47

USSG §2G1.1 ...............................................................................20, 41, 46, 48

USSG §2H4.1 ...................................................................................................47

USSG §3B1.1 ..............................................................................20, 43, 45

USSG §3D1.2 ...................................................................................................48

USSG App. C amend. 826 ...........................................................33, 34, 36, 37

USSG Ch. 5 Pt. A ............................................................................................21

Webster's New World College Dictionary 497 (5th ed. 2020) ............................29

**Rule**

Fed. R. Evid. 401 ...........................................................................................30

## **INTRODUCTION**

Sean Combs is an extraordinarily successful self-made businessman, artist, and philanthropist, and one of the most accomplished black men in this country. In September 2024, the government accused him of heinous crimes and arrested and detained him. It said he was a trafficker who coerced and defrauded two long-term girlfriends into having sex against their will and ran a vast criminal organization.

None of that was true. At Combs's trial, the prosecutors failed to prove the inflammatory allegations because their own evidence revealed the truth to the jury: Combs and his girlfriends sometimes invited a third party—a paid professional adult male entertainer—into their private sex life. Combs watched and filmed while his girlfriend had sex with the other man, and afterwards he and his girlfriend would have sex with each other. His girlfriends and the third parties were adults who willingly and enthusiastically participated.

Twelve attentive jurors heard all the evidence. They heard the testimony of Combs's girlfriends. They saw thousands of text messages, emails, and videos of the sexual encounters. Those twelve citizens diligently applied the law to that evidence and unanimously rejected the government's sordid tale of coercion and racketeering. The verdict could not have been clearer or more consistent. The jury found Combs *not guilty* of forcing, coercing, or defrauding Casandra Ventura. The jury found Combs *not guilty* of forcing, coercing, or defrauding Jane (a pseudonym

for trial). And the jury found Combs *not guilty* of RICO conspiracy. That verdict is an "affirmative indication of innocence." *Thompson v. Clark*, 596 U.S. 36, 45 (2022).

The jury did find Combs guilty of two lesser counts—prostitution offenses that didn't require force, fraud, or coercion. Defendants typically get sentenced to less than 15 months for these offenses—even when coercion, which the jury didn't find here, *is* involved.

But Combs got a sentence more than three times as long, despite the acquittals. He sits in prison today, serving a 50-month sentence, because the district judge acted as a thirteenth juror. The judge defied the jury's verdict and found Combs "coerced," "exploited," and "forced" his girlfriends to have sex and led a criminal conspiracy. These judicial findings trumped the verdict and led to the highest sentence ever imposed for any remotely similar defendant—even though most others, unlike Combs, ran prostitution businesses that exploited poor or undocumented women or minors.

The district court flouted the new sentencing guideline prohibiting the use of acquitted conduct to enhance a sentence. And it ignored all the constitutional problems that led to the amendment. The court should have sentenced Combs for what he was convicted of—interstate transportation of adults for voluntary prostitution. It was unlawful, unconstitutional, and a perversion of justice to

2

sentence Combs as if the jury had found him guilty of sex trafficking and RICO. When announcing the new guideline, the Sentencing Commission's Chair, Judge Carlton Reeves, was crystal clear: "Not guilty means not guilty." The district court defied this directive.

This appeal has been expedited because Combs has already served almost 16 months—more than the average sentence—as of this writing. If this Court does not overturn Combs's conviction, it should release him immediately and instruct the district court to resentence him only for the conduct of which he was convicted.

Sentence aside, the conviction should be reversed. Taken in the light most favorable to the government, the offense conduct involved transporting Combs's girlfriends or a paid male escort interstate so they could have sex with each other while Combs watched and filmed, creating typical amateur pornography. The encounters were highly choreographed performances involving costumes, lighting, and other staged effects. Later, Combs and his girlfriends often watched the films together. Such conduct is protected by the First Amendment. To avoid these First Amendment and other constitutional concerns, the term "prostitution" in the Mann Act should be interpreted narrowly, to exclude such voyeuristic and expressive activity. That requires a judgment of acquittal.

3

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 18 U.S.C. §3231. Judgment was entered on October 16, 2025. Combs filed a notice of appeal on October 20, 2025. This Court has jurisdiction under 28 U.S.C. §1291.

## ISSUES PRESENTED

1. Whether Combs should be released and the case remanded for resentencing because the district court illegally and dramatically increased the sentence based on acquitted conduct, in violation of the Sentencing Guidelines and the Constitution.

2. Whether Combs is entitled to a judgment of acquittal because "prostitution" in 18 U.S.C. §2421(a) must be narrowly construed to exclude conduct that involves paying others to have sex, to avoid constitutional problems.

3. Whether Combs is entitled to a judgment of acquittal because producing and viewing amateur pornography is protected by the First Amendment.

## STATEMENT OF THE CASE

The government accused Sean Combs of leading a racketeering enterprise used to conduct his personal sex life with his long-term girlfriends. Its case focused principally on inflammatory accusations that Combs was a serial sex trafficker who "coerced women…to fulfill his sexual desires," and based on these allegations Combs was detained pending trial. Dkt.92 at 2.

4

But the trial evidence revealed a very different picture. Accordingly, after hearing from 34 government witnesses and reviewing thousands of text messages, videos, and other documents over the course of seven weeks, the jury acquitted Combs of racketeering conspiracy and sex trafficking. It convicted him only of two lesser prostitution charges—because, as the government emphasized, "these counts are totally separate from the sex trafficking counts" and do "not require force, fraud or coercion." A-366.

## A. Indictment And Trial

Count One alleged a RICO conspiracy, 18 U.S.C. §1962(d), from 2004 to 2024. The purported "Combs Enterprise" was allegedly designed to "[f]ulfill[] [Combs's] personal desires,…related to [his] sexual gratification," and "[e]nabl[e] Combs to engage in…sex trafficking; forced labor; interstate transportation for purposes of prostitution; coercion and enticement to engage in prostitution; narcotics distribution; and other crimes." A-72. Counts Two and Four charged sex trafficking, 18 U.S.C. §1591(a)(1), as to Casandra Ventura, Combs's girlfriend from 2007 to 2018, and "Jane," a girlfriend from 2021 to 2024. Counts Three and Five alleged violations of the Mann Act, 18 U.S.C. §2421, for allegedly transporting Ventura and Jane, and "commercial sex workers," "with the intent that they engage in prostitution." A-81-82.

5

On May 5, 2025, a jury trial commenced before the Honorable Arun Subramanian.  On July 2, after two days of deliberations, the jury acquitted Combs of the RICO conspiracy and sex trafficking charges but convicted him of the Mann Act charges.

### B. The Government Focused Principally On Its RICO Conspiracy And Coercion Allegations But Failed To Prove Them

In its opening statement, the government promised to prove Combs ran a vast criminal conspiracy with "an inner circle of bodyguards and high-ranking employees who helped him commit [these] crimes and helped him cover them up." A-85.  It said Combs "used his inner circle and his company's resources to sexually exploit multiple women, including women he forced and manipulated into having sex with male escorts."  A-88.  It said "[t]he evidence w[ould] show that the sexual conduct…was coercive," A-89, and that Combs "used lies, drugs, threats, and violence to force and coerce, first, [Ventura], and later Jane, to have sex with him in front of male escorts," A-90.  It said the two alleged victims would explain "how the defendant tried to control their lives," and "how the defendant used his control over them, his lies, his drugs, his threats, and his violence to force and coerce them into having sex with male escorts."  A-101.

The defense argued Combs was no racketeer and the sexual activity was not coerced but entirely consensual, and simply the way the adult couples conducted their private sex lives.  The defense told the jury:  "This case is about voluntary,

adult choices made by capable adults and consensual relationships." A-106. The defense also acknowledged Combs's domestic violence towards Ventura, emphasizing "[i]t happened," but "[t]hat's not charged," explaining the evidence did not reveal any link between violence and the sexual activity at issue. A-370, 111. It said while Combs was a "very flawed individual," the evidence would "not show" he was "a racketeer [or] a sex trafficker." A-115.

The jury ultimately agreed with the defense.

### 1. Ventura's Testimony And Communications

Ventura and Combs had a serious eleven-year adult relationship. They met when she was an artist making $250,000 per year. A-219-20. By that time, she was a celebrity in her own right with her first album. She had been modeling for years and was dating her producer who was ten years her senior. A-205-06. Two years later, after a trip to Miami, when Ventura was 21, she and Combs fell in love. A-161, 221. They dated for a decade and did not live together. A-196-99. In fact, they "often had long breaks from each other." A-198. They remained together until 2018, when Ventura ended the relationship after seeing Combs with another woman. A-192, 211-12, 213. Ventura testified that throughout these eleven years, she was in love with Combs, the relationship was "filled with love and passion," and she came to know a side of Combs nobody else knew. A-195-97.

7

A mutual aspect of the relationship was sex, and an "integral part of [their sexual] relationship" was "freak-offs," in which Ventura would have sex with another man while Combs watched. A-204. Ventura testified she agreed to participate in her first freak-off because she "loved" Combs and "just wanted to make him happy." A-167, 157-58. She testified she "didn't want him to think that [she] thought anything bad of him for it," "didn't want to make him angry and regret having told [her] about this experience that was so personal," that "his trust meant a lot to [her]," and that she "felt a sense of responsibility with him sharing something…like that with [her]." A-167, 157-58, 170-71, 202-03. She said she "really didn't want to make him think I didn't want to do it anymore." A-174.

Ventura felt time during freak-offs was "special because not a lot of people got that kind of time with [Combs]." A-159-60, 172-73. Part of the reason Ventura continued freak-offs was because she cherished this special time with him, A-210, and "had fallen in love with him and cared about him very much." A-199-201. She testified they "were in a relationship" and Combs's sexual preference was freak-offs, and she didn't want to lose the relationship. A-216-17. Ultimately, her testimony confirmed she participated because "when you really care about somebody and you're in love with them, you don't want to disappoint them." A-173, 218.

8

The jury also saw thousands of text messages and other communications from Ventura to Combs throughout their relationship, which revealed that Ventura participated in freak-offs voluntarily and often enthusiastically. She frequently texted or emailed Combs that she wanted to participate in freak-offs, was preparing a freak-off, volunteered to plan the freak-off, and was "always ready to freak off." A-486-87; *see also* A-472-85, 492, 683-714, 729-62. Indeed, when Combs texted "Wanna freak off 1 last time tonight?," Ventura replied "What???????...I don't want to freak off for a last time. I want it to b the first time for the rest of our lives." A-730.

Other messages included, for example:

- Ventura messaged Combs, "I can't wait to stare at some big black dick." When Combs responded with, "I can't wait to watch you," she replied, "Me too, I just want it to be uncontrollable." A-489.

- Ventura messaged Combs, "I can't wait to have my legs cocked back behind my head to feel some dick tease my pussy raw." A-490.

- Ventura messaged Combs, "I'm thinking about licking those dicks from the balls to the head, then slowly lowering my mouth down on it to let it hit the back of my throat and choke me." A-491.

- When Combs messaged "[m]ay be 1 of those nights?," Ventura replied, "Yessssssssss." A-650. When Combs later asked Ventura "What you wanna do? Or should we not fuck up our week," she replied "I worried to fuck up your week…BUT…I'm feeling myself and I've been really horny." A-655.

- When Combs messaged "I was thinking about a fo for tonight…Bad idea?," Ventura responded, "Not a bad idea. I've been stressed. Lol." A-675-76.

- Ventura messaged Combs "Soooo it was so hot because my high hit perfectly right before so I was salivating. When I was sucking his

9

dick it was so wet and messy. All of the spit kept it coming so it was just juicy. I was fiending for it as soon as I sucked it and I knew you couldn't take it so you slid up behind me right at the right time. Both of your dicks were sooooo hard, like the hardest I've ever felt. I was just so hot and everything was perfect timing." A-764.

- She wrote, "I know it was crazy but even when it's not SUPER hot I always have fun. The last round was pretty hot to me though. If you want to do another party before we leave with new ppl, lmk so I can hit the guy." A-444.

- In anticipation of a freak-off, Ventura texted "I can plan but who [s]hould we get." A-684.

Ventura sent additional messages like "[w]ish we could have fo'd before you left." A-446. And after freak-offs, she sent messages like "I love you!!!!!! Had so much fun with you." A-418. Or, "I liked those times…The last time was soooooooooo good." A-722-23. After one freak-off, Ventura wrote Combs: "You are truly the most extraordinary man. I love you so much. You make me a better woman, daughter, sister, person. I hope you always know how much I love and appreciate you. Thank you for always showing me love and happiness the way it's supposed to be." A-670.

The jury also saw messages in which Combs clearly respected Ventura's requests when she did not want to freak-off. *E.g.*, A-459-66 ("All good we don't have to" / "What you wanna do for fun?…I'm following your lead."). And instances in which Combs asked Ventura what she wanted to do. *E.g.*, A-655 ("What you wanna do?..I need guidance").

10

Finally, the jury saw videos of freak-offs, which showed consensual sex, not coercion.  A-129.

### 2. Jane's Testimony And Communications

Jane was 35 when she began dating Combs.  A-299.  ███████████

███████████████████████████████████████████████

███████████  She fell in love with Combs after a trip to the Caribbean, and they started dating in February 2021.  She lived in New Jersey for the first few months of their relationship, then moved to Los Angeles, but maintained her own residence.  A-302-03.  Although the two broke up in late 2023, they rekindled in 2024 and remained together until Combs's arrest.

From the beginning, their relationship was incredibly sexual, and after several months of dating, Jane and Combs had their first "hotel night" (her term for freak-offs).  Jane testified she agreed to it during a "fantasy conversation" while they were watching pornography together, and Combs stated "I can make this fantasy a reality.  If you'd like to have that happen."  A-243-46.  Jane testified she agreed because "my partner was excited," the night made her feel "exhilarated," "excited," and "happy," it was "taboo" and "fun," and she "had a good time with [her] partner."  A-246, 249-50.  Jane "figured" it was "maybe" something they would do "on a random other night;" "maybe we would do it again, just something taboo."  A-250.

11

Jane testified she was "really madly in love and wanting to please [Combs]" and "appease him," and "agreeable" to "hotel nights." A-323-24. Jane was a willing participant because she "just wanted to make [Combs] really happy," "knew it turned him on," and wanted "to satisfy [her] partner" and "our time to be special every single time"—"[a]nd if that made him happy, I was willing to make him happy." A-251-52.

Jane ultimately testified she was "hooked from the beginning" and "fell in love with somebody [she] didn't understand." A-291-93. "In the context of these rooms," she testified, "I felt that my partner was trusting me in a very vulnerable moment,…this was something really special…and I really took that on very strongly, and I really wanted to just go along with these things because I felt like if I can be my partner's escape, then I would be." A-295-96. She said she "would have done anything" to spend time with Combs because she "loved spending time with my partner," A-294, and Combs was "the most affectionate during these nights," A-307. The nights made her feel "loved." A-297.

Jane testified she personally planned multiple hotel nights as a surprise to Combs, and herself brought up the idea to invite multiple entertainers. A-276, 325-27. Jane also proposed asking actors from her favorite pornography to participate and herself reached out to them to arrange these gatherings. A-261-64, 265-68, 313-16. ███████████████████████████████████

12

██████████████████████████████████

██████████████████████████████████

She started an OnlyFans career in early 2024.  A-304-06.

As with Ventura, the jury also saw many text messages between Jane and Combs that demonstrated her consent and enthusiasm.  For example:

- When Combs asked if Jane wanted to have a "Freak fest birthday celebration," she responded "Sounds like a bloody good time…Have you hard as a rock watching.  Play w yourself while u watchin ur baby fuck all that big dick."  A-493-98, 317-20.  She continued: "Slappin it left n right [eggplant emoji] while I watch."  A-505; *see* A-927-54.

- On another occasion, she messaged Combs: "I wanna suck Paul's dick while you gimme that strong stroke game."  A-522, 321-22, 955-57.

- "Well atl[1] is the treat for when album is finished…U wanna invite a girl.  Let's play we can do whatever.  Wanna peak into a sex party lol."  A-549-51, 981-94.

- She wrote: "Everything was hard…wet…sexy…erotic…deep.. Did u love it baby?"  A-614-15, 1030-49.

Jane's messages showed she "love[d] [Combs's] intensity" and their "freedom w one another," which was "a whole other level of eroticism."  A-576, 1001-10.  And just like Ventura, after hotel nights, Jane would message Combs reiterating her love for him and thanking him for his "love and care."  A-329-30, 632-33, 1065-66.  For example, on one occasion, she told him their night was "the perfect balance of love passion n the freakiest nastiest moments."  A-639, 1072.

---

[1] "Atl" was Jane's nickname for a porn star from Atlanta.

13

The jury also saw multiple videos of Combs and Jane participating in hotel nights, which again revealed fully consensual encounters.

### 3. The Evidence Demonstrated The Sex Was Part Of A Voyeuristic Swingers' Lifestyle

In contrast to any RICO or sex trafficking conspiracy, the evidence showed that Combs and his girlfriends participated in these sexual encounters as a voyeuristic kink. The freak-offs were part of Combs's "swingers lifestyle," which "was a turn-on." A-190. The goal was "voyeurism" and to create a scenario akin to a sexual "fantasy." A-165, 183-84. Ventura testified that escorts—including their spouses or girlfriends—occasionally joined her and Combs at sex clubs as part of this lifestyle. A-190-91. Jane similarly testified hotel nights were part of a role-playing fantasy. A-243-47.

Ventura and Jane both described freak-offs and hotel nights as highly staged performances. A freak-off, Ventura summarized, was a "very choreographed" show during which Combs was "direct[ing]" her and an escort "on what we were doing sexually." A-180, 157. She testified that "every freak-off was…directed by Sean. Like, he knew specifically where he wanted everyone to be, the lighting and such." A-169. Jane described hotel nights similarly: sexual performances during which Combs "g[a]ve you directions about what to do." A-278.

Ventura believed freak-offs caused Combs "personal shame," a weight she helped carry in the relationship. A-193-94. Jane said the same—the sexual

14

experiences were meaningful because they "brought [Combs] peace" and she was able to provide that peace for him. A-331-32. Indeed, she said she did not fully understand the relationship until she researched the terms "cuck" and "cuckolder," which helped describe "why [Combs] had derived so much pleasure from watching [his] woman be with other men." A-308-09.

Combs's girlfriends developed relationships with the male entertainers. Ventura testified, for example, that she and an escort "had our own friendship," who would say it was "[g]reat seeing you again sexy," and wished her a happy birthday. A-191, 339-40. Likewise, Jane testified she had a "friendship" with another entertainer, that he was "warm" to her, and that she "miss[ed]" him. A-336-37. Jane also organized a night merely because she "miss[ed]" that man. A-289-90. Jane also explained that the first time she met a different escort in person, he was "just really sweet" and they both had "little butterflies." A-262. That man later texted Jane he "would love to see [her]." A-276. Jane described another entertainer's behavior similarly, explaining he "was really nice," in a "nice mood," and "we took a liking to each other." A-271.

####        4.    *The Government's Mann Act Case Was Peripheral*

Most of the trial focused on the RICO and sex trafficking allegations. The two Mann Act counts were an afterthought. In fact, the government did not call a single escort who participated in a "freak-off" or "hotel night" involving interstate

15

travel. Rather, it called two different entertainers—Daniel Phillip and Sharay Hayes—who lived in New York and only met with Combs and Ventura there. Both denied the sex was coerced. A-149-153, 237-42. And both denied engaging in prostitution and testified they were paid solely to "create a sexy scene." A-151, 145-46, 238-39, 226-29.

Instead of calling entertainers who traveled, the government relied on summary charts containing financial and travel records to argue that entertainers were transported for sexual encounters and contemporaneously paid. In summation, the government told the jury "[j]ust look at the chart on [GX]1402," A-367, and "you should refer to" "one of the other summary exhibits, Government Exhibit 1406," A-368.

The government's Mann Act evidence was thus limited to summary exhibits linking travel, hotel, and financial records, and, in some instances, the testimony of Ventura and Jane or text messages indicating a hotel night occurred.

**C. The Jury Rejected The Government's Tale Of RICO Conspiracy And Threats, Fraud, Or Coercion**

The jury's verdict reveals what it found, and what it did not find.

*1. RICO*

In summation, the government told the jury Combs ran a "criminal enterprise with total control and with the loyal assistance of his inner circle, his chief of staff,…security team,…[and] foot soldiers, the personal assistants and

16

other employees." A-369. Although the jury found Combs committed prostitution offenses—which are RICO predicates—it found him not guilty. It thus rejected the government's argument that he conspired with another to commit those acts, as well as the government's broader allegation that he led a vast criminal enterprise.

### 2. Sex Trafficking

As to these counts, the government said: "The only question that matters here is whether there was one…freak-off where the defendant knew that force, fraud or coercion, or any combination thereof was used to get Cassie and Jane to a yes….that's all you need." A-377. The jury instructions defined the crime as using "force, threats of force, fraud, or coercion, or any combination of such means…to cause the alleged victim to engage in a commercial sex act." A-391. The court broadly instructed that coercion includes threats of "both physical and nonphysical types of harm," such as "psychological, financial, or reputational harm." A-393. The sex acts were undisputed, but the jury rejected any notion the sex was coerced or the product of threats or fraud.

In subsequent interviews, jurors confirmed they believed the evidence was consistent with the defense's arguments. For example, when Juror 6 was asked if he saw any "force, fraud, or coercion between Cassie and Sean," he described the relationship as "[t]wo people in love…overly in love. She wanted to be with him. He took her for granted." When asked if justice was served, he answered "100%.

17

We saw both sides of it and we came to our conclusions." And when asked similar questions, Juror 8 stated, "[y]ou can say he was a terrible person, but domestic violence wasn't one of the charges."[2]

### 3. Mann Act

As to the remaining two counts, the government emphasized: "I want to be clear,…these counts are totally separate from the sex trafficking counts. The law at issue here simply addresses transporting people…for the purposes of prostitution; *in other words, this charge does not require force, fraud or coercion.* So even if all the participants enthusiastically consented…it doesn't matter. It's still a crime." A-366 (emphasis added). The jury found Combs guilty solely of these two lesser counts.

In short, the jury rejected the bulk of the government's case.

## D. Sentencing

The district court apparently disagreed with the jury's verdict. It imposed a sentence of 50 months based on the very allegations of coercion and other acquitted conduct the jury had rejected. A-916.

That was a remarkably long sentence for a prostitution offense. It was quadruple the median (12 months) and triple the mean (14.9 months) sentence for

---

[2] 'A lot of bad things happened': the most shocking moments from the Diddy docuseries, *The Guardian* (Dec. 2, 2025), https://www.theguardian.com/music/2025/dec/02/sean-combs-the-reckoning-netflix-50-cent.

Mann Act defendants who, like Combs, had a base offense level of 14 and criminal history category of I. This includes even other defendants who received a "fraud or coercion" guidelines enhancement. A-829. It was the highest such sentence ever. Dkt.510, Ex.68. The sentence was also eight times higher than the mean sentence for the few other "Johns" (meaning consumers rather than pimps) prosecuted under the Mann Act in modern times (6.7 months). A-831.

The district court said the sentence was only "for the offenses of conviction" "not the 1591 sex trafficking…[or] RICO charge[s]," A-908, but its own words throughout the proceeding showed the opposite. The judge made numerous findings contradicting the verdict to justify the sentence's severity. In calculating the guidelines and weighing the 18 U.S.C. §3553(a) factors, the court relied heavily on evidence offered to prove sex trafficking and RICO conspiracy. Most notably, the court repeatedly said Combs "coerced" Ventura and Jane into sexual activity—even though the jury unanimously rejected that view when it found him not guilty of sex trafficking. A-789, 911, 914, 915, 922.

Combs had repeatedly argued the law prohibited the court from sentencing him based on conduct for which he had been acquitted. He argued that a 2024 guidelines amendment and constitutional principles precluded consideration of acquitted conduct for guidelines calculations or under §3553(a). Dkt.510 at 65-89; Dkt.525 at 6-18.

19

The district court rejected Combs's arguments and instead applied a "relevancy test" under which it could consider all conduct *in any way relevant to* the Mann Act counts for guidelines purposes. A-779. The trial court even questioned the entire notion of acquitted conduct, stating, "juries don't acquit defendants of conduct. They acquit them of charges." A-778-79. It essentially ruled that the 2024 amendment had no effect on sentencing practices.

The court then relied on a vast range of acquitted conduct to calculate the guidelines range. This included two enhancements that together added a whopping eight points to Combs's offense level: a 4-point enhancement for "fraud or coercion," §2G1.1(b)(1)(A) & (B)(i), predicated on the same evidence the jury rejected, and a 4-point enhancement for alleged "leadership" of criminal activity, §3B1.1(a), predicated on the same evidence of "leadership" of a criminal conspiracy to violate the Mann Act the jury rejected. A-788-92. The court also applied a five-point grouping enhancement because it deemed Ventura and Jane— and several male entertainers—"victims." A-787-88.

Together, these enhancements nearly doubled Combs's offense level (from 14 to 27), and multiplied the bottom of the range fivefold and quadrupled the top (from 15 to 21 months to 70 to 87 months). *See* USSG Ch. 5 Pt. A. Despite this dramatic impact on the guidelines range, the court insisted the acquitted conduct question was "narrow" and "inconsequential" because the amendment "solely

20

applies to the determination of the correct guidelines range." A-780, 787, 797.

The court believed it had a blank check to consider acquitted conduct in fashioning

the ultimate sentence, and thus said it "would impose the same sentence applying

the 3553(a) factors" even if it hadn't applied the enhancements. A-790-92. It

thought Second Circuit and Supreme Court precedent—including *United States v.*

*Watts*, 519 U.S. 148 (1997)—"made clear that acquitted conduct may be

considered" when balancing the 3553(a) factors. A-780. The court thus

announced it would "consider[] *all of the facts*"—including "facts" the jury found

not proven—when weighing the §3553(a) factors. A-780 (emphasis added).

For example, contradicting the jury's verdict, the court purported to find

"massive" evidence that Combs "abused," "subjugat[ed]," "degrad[ed],"

"exploit[ed]," and "devastat[ed]" Ventura and Jane, "especially when it came to

freak-offs and hotel nights." A-910-11, 913, 915-16, 921-22. The court said this

was "the reality of what happened," even though the twelve jurors unanimously

rejected this view after seeing all the evidence. A-911.

The court expressly rejected the jury's finding of "consensual experiences,"

A-910, and instead repeatedly insisted Combs had "coerced" Ventura and Jane into

participating in freak-offs and hotel nights. The court used the word "coercion"

five times, A-911, 912, 914, 915, 922—and invoked a smorgasbord of other

evidence the jury rejected when it found Combs was not guilty, such as "forced

21

sex," "violence," and "drugs," A-911, 915, 921.  For example, the court cited a June 2024 hotel night with Jane prosecutors had failed to convince the jury was a "clear-cut example[] of sex trafficking" and "coercion."  A-912; *see* A-349-50, 358-59 (government's closing).

Flatly ignoring the verdict, the court insisted it needed to impose a "serious sentence" reflecting the "aggravating factors that I have addressed," especially "the coercion."  A-914.  The court agreed Combs's case was "unique," A-916, but said he was "no John," A-911, even though the jury convicted him only of the interstate transportation of adults who willingly and enthusiastically got together to have sex, and Combs made no money from the conduct.  The court deemed Combs a pimp whose currency was "satisfying [his] sexual desires, instead of money"—finding "the coercion was the same, if not worse"—and justified a much more severe sentence than other mere customers (and pimps and sex traffickers) had received.  A-911.

After pronouncing the sentence and concluding the proceeding, the court provided some extraordinary "final words" aimed at the worldwide audience following the case, to share his moral judgments and disagreement with the jury's verdict.  A-920.  It applauded Ventura, Jane and the "other victims" who testified for "coming to the Court to tell the world what really happened," A-921, including with respect to the claims of coercion the jury rejected.  The court also thanked

22

Ventura, Jane and the other "victims" for their "courage," invoking Dr. Martin Luther King.  A-922.

## **SUMMARY OF ARGUMENT**

1.      Combs's sentence was illegal, and at a minimum, he should be resentenced.

> As Justice Sotomayor explained in *McClinton v. United States*:
>
> Juries are democratic institutions called upon to represent the community as a bulwark between the State and the accused, and their verdicts are the tools by which they do so….With an acquittal, the jury as representative of the community has been asked by the State to authorize punishment for an alleged crime and has refused to do so.[3]

143 S. Ct. 2400, 2401-02 (2023) (statement respecting denial of certiorari). Acquittals by jurors deserve "special weight," and must be treated "as inviolate, even if a judge" disagrees with the verdict.  *Id*. at 2402.  Jurists from across the ideological spectrum have voiced concerns that using acquitted conduct to enhance a sentence violates the Fifth and Sixth Amendments and the "perceived fairness of the criminal justice system."  *Id*. at 2401.  To address these concerns, the Sentencing Commission promulgated a guidelines amendment precluding such misuse of acquitted conduct.

---

[3] Unless otherwise noted, citations omit quotation marks, footnotes, emphasis, and alterations in the original source.

The district court refused to enforce the amendment and disregarded the constitutional and fairness principles that led to its promulgation. It imposed a draconian sentence based on acquitted conduct. The court's reasoning violated the law in multiple respects:

- The court misinterpreted the new amendment, finding it permits a judge to use any acquitted conduct remotely "relevant to" the offense of conviction to enhance a sentence. If accepted, this interpretation would nullify the amendment, which only authorizes courts to use acquitted conduct that also "establishes"—meaning proves an element of—the offense of conviction.

- Based on that legal error, the court proceeded to find "facts" contradicting the jury's verdict to justify a 4-level increase for fraud or coercion, a 4-point leadership enhancement, and a 5-point grouping enhancement for multiple "victims" who, per the verdict, were not injured by the Mann Act offenses.

- The Court erroneously concluded that it could also consider acquitted conduct and enhance Combs's sentence under 18 U.S.C. §3553(a) based on its own findings. This violated Combs's constitutional rights to have a jury determine any facts used to enhance his sentence beyond a reasonable doubt, and his double jeopardy rights.

2.  Combs is entitled to a judgment of acquittal, and his conviction should be reversed.

*First*, the term "prostitution" in the Mann Act must be narrowly construed to avoid due process, First Amendment, and federalism problems. The term is undefined in the statute and had an overbroad meaning at the time of enactment, which swept in merely immoral sexual conduct now protected by the Constitution. And its meaning has changed over time and varies depending upon local and state

laws. Properly construed, paying for a voyeuristic experience—which is what Combs was convicted of doing—is not engaging in "prostitution."

*Second*, freak-offs and hotel nights were highly choreographed sexual performances involving the use of costumes, role play, and staged lighting, which were filmed so Combs and his girlfriends could watch this amateur pornography later. Pornography production and viewing of this sort is protected by the First Amendment and thus cannot constitutionally be prosecuted.

## STANDARDS OF REVIEW

Interpretation and application of sentencing guidelines, *United States v. Olmeda*, 894 F.3d 89, 92 (2d Cir. 2018) (per curiam); *United States v. James*, 151 F.4th 28, 44 (2d Cir. 2025), and questions of evidentiary sufficiency, *United States v. Mackey*, 143 F.4th 129, 139 (2d Cir. 2025), are reviewed *de novo*. Claims of sentencing error are reviewed for abuse of discretion. *United States v. Singh*, 877 F.3d 107, 115 (2d Cir. 2017). An error of law is "by definition" an abuse of discretion. *Koon v. United States*, 518 U.S. 81, 100 (1996).

## ARGUMENT

I. **THE DISTRICT COURT ERRONEOUSLY RELIED ON ACQUITTED CONDUCT AND MISAPPLIED THE GUIDELINES**

25

A. **The District Court Misinterpreted And Misapplied The New Guideline**

In 2024, the Sentencing Commission adopted a new guideline prohibiting the use of acquitted conduct. The district court largely ignored it. The court questioned the entire premise of "acquitted conduct," in clear defiance of the guideline's plain text as well as the constitutional and fairness concerns that led to its enactment. The district court refused to enforce the jury's verdict.

1. *"Acquitted Conduct" May No Longer Be Considered For Sentencing Guidelines Purposes*

By its terms, the new guideline applies to any "conduct for which the defendant was criminally charged and acquitted in federal court." USSG §1B1.3(c). The commentary emphasizes that "*conduct* [that] underlies…an acquitted charge" cannot be considered for guidelines purposes and directs courts to exclude it from "relevant conduct." *Id.* App. Note 10 (emphasis added). Thus, courts are no longer permitted to consider acquitted conduct—i.e., the conduct underlying an acquitted charge—for guidelines purposes.

Acquitted conduct is not a novel concept. Indeed, courts often analyze the record to determine what issues the jury must have decided in a defendant's favor, such as when conducting collateral estoppel analysis under the Double Jeopardy Clause, as discussed below (at Point I.B.2). Courts applying the acquitted conduct amendment similarly analyze the record to identify specific conduct of which the

26

defendant was acquitted. *See, e.g.*, *United States v. Bongiovanni*, 2025 WL 2886336, at \*1 n.2, \*6 n.4, \*11, \*12 n.7 (W.D.N.Y. Oct. 10, 2025); *United States v. Och*, 2025 WL 1836632, at \*2-4 (D. Mass. July 3, 2025).

Here, the jury definitively resolved several critical issues in Combs's favor through its mixed verdict. As discussed above, force or coercion were required to prove the sex trafficking counts but not the Mann Act charges. *Compare* A-391-96 *with* A-396-99. By acquitting Combs of sex trafficking while convicting him under the Mann Act, the jury necessarily concluded that Ventura and Jane were not coerced. Its conclusion was based on extensive evidence—contemporary text messages, videos, other documents, and the women's own testimony—showing both women participated in the sex voluntarily and because they loved Combs.

Likewise, by acquitting Combs of RICO conspiracy, the jury necessarily found that no one conspired with Combs to violate the Mann Act, since the two Mann Act offenses would have formed the requisite RICO "pattern" had the government proved a conspiracy. *See* A-386-87.

In short, the jury acquitted Combs of coercion and conspiracy.

## 2. *The Amendment's Narrow Exception Doesn't Apply*

The district court nonetheless enhanced his sentence based on its own findings of coercion and conspiracy. The court relied on a narrow exception to the new guideline, which permits courts to consider acquitted conduct if it

"establishes, in whole or in part, the instant offense of conviction." USSG §1B1.3(c). To avoid swallowing the rule, this exception must be given a narrow scope. It was intended to cover situations where a jury renders inconsistent verdicts or reaches different verdicts on counts that have some overlapping but some unique elements (such as conspiracy versus substantive counts). The Commission's discussions about the scope of any exception focused on these precise scenarios—where there may be evidence proving multiple counts, but for unknown or illogical reasons the jury acquits on some counts and convicts on others.[4]

That is not what happened here. The jury's verdict was neither illogical nor inconsistent. But the court applied the exception anyway and used it to dramatically increase Combs's offense level, because it interpreted the exception as merely "a relevancy test." A-779. That is the wrong test for multiple reasons.

*First*, it is inconsistent with the guideline's text. The Commission used "establishes," not "relevant." And the plain meaning of "establishes" refers to conduct that proves the elements of the "offense of conviction."

---

[4] *See, e.g.*, Public Hearing on Proposed Amendments (Mar. 6, 2024) at 26-27 (split verdict on two firearm possession charges arising from same conduct); 92-93 (split verdict on different murder charges arising from same murder); 127-29 (conviction on conspiracy to distribute drugs charge, acquittal on related distribution charge), https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20240306-07/transcript_20240306.pdf.

28

"Establish" means to prove or demonstrate. *See, e.g.*, Black's Law Dictionary (12th ed. 2024) ("To prove; to convince someone of," e.g., "the House managers tried to establish the president's guilt"); Webster's New World College Dictionary 497 (5th ed. 2020) ("to prove; demonstrate," e.g., "to establish one's cause at law"). Courts routinely define "establish" in terms of proving a crime and its elements. *See, e.g.*, *United States v. Omotayo*, 132 F.4th 181, 200 (2d Cir. 2025) (government "needed to prove three elements…to establish aggravated identity theft").

The plain meaning of "establish" also comports with how the term is used elsewhere in the guidelines. For example, the fraud guideline says if "the conduct set forth in the count of conviction establishes an offense specifically covered by another guideline," that other guideline should be applied. §2B1.1(c)(3). This provision only applies where "the *elements of another offense* are established by" the convicted conduct. *United States v. Genao*, 343 F.3d 578, 584 (2d Cir. 2003) (emphasis added). Similarly, when applying a provision relating to whether a stipulation in a plea agreement "specifically *establishes* a more serious offense than the offense of conviction," §1B1.2(a) (emphasis added), "specifically establish" means proving the offense's elements, *see Braxton v. United States*, 500 U.S. 344, 349-51, 351* (1991). There is no reason to give "establishes" different meanings in §1B1.3(c) and elsewhere in the guidelines.

29

*Second*, the district court's "relevancy test" is so broad it would nullify the acquitted conduct guideline itself. If bare relevance was the test, the new amendment would be meaningless, since all conduct relevant to the offense of conviction was supposed to be considered under the former "relevant conduct" provision. *See* §1B1.3. If that were still the case, there would be no point to the acquitted conduct amendment at all.

That has to be wrong. The Sentencing Commission wouldn't have drafted an exception that swallows the rule. The term "relevant" has an expansive meaning: having "any tendency" to make a fact of consequence "more or less probable than it would be without the evidence." Fed. R. Evid. 401(a). This "very broad" definition, *United States v. Certified Env't Servs., Inc.*, 753 F.3d 72, 90 (2d Cir. 2014), is "not confined to that which directly establishes an element of the crime" and includes evidence that merely "adds context and dimension to the government's proof of the charges," *United States v. Gonzalez*, 110 F.3d 936, 941 (2d Cir. 1997).

*Third*, the amendment's history demonstrates that the Commission explicitly rejected the test adopted by the district court. When the Commission sought public comment for the amendment, the government proposed an exception for any

30

conduct that "relates…to the instant offense of conviction."[5]  The Commission

refused to adopt this proposal and chose instead to limit the carveout from

"acquitted conduct" to conduct that "establishes" a convicted count.  USSG

§1B1.3(c).  In doing so, the Commission rejected a relevance test—and did so for

the obvious reason that such a test would render the amendment meaningless.

 *Fourth,* the Sentencing Commission adopted the amendment in response to

decades of criticism by multiple jurists who opined that enhancing sentences based

on acquitted conduct raises fundamental fairness and constitutional concerns.[6]

---

[5] 2023-2024 Amendment Cycle: Proposed Amendments/Public Comment 52 (Feb. 22, 2024), ussc.gov/sites/default/files/pdf/amendment-process/public-comment/202402/88FR89142_public-comment.pdf.

[6] *See, e.g., McClinton*, 143 S. Ct. at 2400-03 (statement of Sotomayor, J., respecting denial of certiorari) (statement of Kavanaugh, J., respecting denial of certiorari, joined by Gorsuch, J. and Barrett, J.); *Jones v. United States*, 574 U.S. 948, 948 (2014) (Scalia, J., dissenting from denial of certiorari, joined by Thomas, J., and Ginsburg, J.); *United States v. Watts*, 519 U.S. 148, 163-64, 169-70 (1997) (Stevens, J., dissenting) (Kennedy, J., dissenting); *Townsend v. Burke*, 334 U.S. 736, 740-41 (1948) (Jackson, J.); *United States v. Tapia*, 2023 WL 2942922, at *2 n.2 (2d Cir. Apr. 14, 2023); *United States v. Mendoza*, 2022 WL 894700, at *2 (2d Cir. Mar. 28, 2022); *United States v. Martinez*, 769 F. App'x 12, 17 (2d Cir. 2019) (Pooler, J., concurring); *United States v. Brown*, 892 F.3d 385, 408-09, 415 (D.C. Cir. 2018) (Millett, J., concurring) (Kavanaugh, J., dissenting in part); *United States v. Lasley*, 832 F.3d 910, 920-23 (8th Cir. 2016) (Bright, J., dissenting); *United States v. Bell*, 808 F.3d 926, 927-32 (D.C. Cir. 2015) (Kavanaugh, J., concurring in denial of rehearing en banc) (Millett, J., concurring in denial of rehearing en banc); *United States v. Sabillon-Umana*, 772 F.3d 1328, 1331 (10th Cir. 2014) (Gorsuch, J.); *United States v. White*, 551 F.3d 381, 391-97 (6th Cir. 2008) (Merritt, J., dissenting); *United States v. Settles*, 530 F.3d 920, 924 (D.C. Cir. 2008) (Kavanaugh, J.); *United States v. Canania*, 532 F.3d 764, 776-78 (8th Cir. 2008) (Bright, J., concurring); *United States v. Mercado*, 474 F.3d 654, 658–65 (9th Cir. 2007) (Fletcher, J., dissenting); *United States v. Faust*, 456 F.3d 1342,

The Supreme Court was poised to consider these questions two years ago in *McClinton v. United States*. *See* Petition for Writ of Certiorari, 21-1557 (June 10, 2022). Multiple justices were troubled by permitting courts to increase a person's sentence based on a judge's finding that a defendant committed a crime that the jury found unproven. They denied the cert petition only because the Sentencing Commission was planning to address the issue. *See* 143 S. Ct. at 2403 (Sotomayor, J., statement respecting denial of certiorari) (Court "may need to take up the constitutional issues presented" if Commission doesn't act); *accord id.* (statement of Kavanaugh, J., joined by Gorsuch, J., and Barrett, J.).

The Commission responded to the constitutional and fairness issues the four Justices identified by adopting the amendment to exclude acquitted conduct. In its Reason for Amendment, the Commission explained, "[t]he use of acquitted conduct to increase a defendant's sentence has been a persistent concern for many within the criminal justice system and the subject of robust debate over the past several years." USSG App. C amend. 826. With this amendment, the Commission sought to address various years of concerns about "the perceived fairness of the

---

1349-53 (11th Cir. 2006) (Barkett, J., specially concurring); *United States v. Baylor*, 97 F.3d 542, 549-53 (D.C. Cir. 1996) (Wald, J., concurring specially); *United States v. Frias*, 39 F.3d 391, 393-94 (2d Cir. 1994) (Oakes, J., concurring); *United States v. Concepcion*, 983 F.2d 369, 393-96 (2d Cir. 1992) (Newman, J., concurring) (Newman, J., dissenting from denial of rehearing en banc); *see also* Brief of 17 Former Federal Judges as Amici Curiae in Support of Petitioner, McClinton v. United States (21-1557).

criminal justice system," "undermin[ing] the historical role of the jury," "respect for the law," and "diminish[ing] the public's perception that justice is being done." *Id.* (quoting *McClinton*). Above all, the amendment was "about tone and attitude and signaling what our criminal justice system holds dear." Public Hearing on Proposed Amendments (Mar. 6, 2024) at 105 (Commissioner John Gleeson).

The district court's interpretation of the amendment would run roughshod over these constitutional and fairness issues by permitting courts to consider all conduct in any way *relevant to* the convicted count—thereby completely eviscerating the amendment.

        3.     *The Evidence The District Court Used To Enhance The Sentence Was Not Relevant Conduct Anyway*

Even if bare relevance were the proper test—which it isn't—much of the evidence on which the district judge relied should have been excluded. For example, one of the most inflammatory pieces of evidence at trial was the Intercontinental Video, which showed an incident of domestic abuse at a Los Angeles hotel. That evidence was admitted to try to prove force and coercion. But that video—like much of the government's other evidence—was not relevant to prove that Combs arranged for people to travel for a hotel night in another state. In fact, no one even traveled interstate to get to the Los Angeles hotel where the incident occurred.

33

In other words, if Combs had been charged solely with the two Mann Act counts, the bulk of the government's evidence from this trial would have been irrelevant and inadmissible. Yet the district court—determined to punish Combs for the acquitted counts—considered all that evidence anyway. It did not even follow its own proposed test.

## B. The District Court Impermissibly Relied On Acquitted Conduct To Analyze The 3553(a) Factors

The district court's heavy reliance on acquitted conduct in fashioning the sentence under §3553(a) violated the Due Process Clause, the Double Jeopardy Clause, the Sixth Amendment jury trial right, and was fundamentally unfair and unjust. As the Sentencing Commission recognized when it amended the guidelines, such use of acquitted conduct fails to "promote respect for the law." 18 U.S.C. §3553(a)(2)(A). Amendment 826 (Reason for Amendment).

### 1. Sixth Amendment And Due Process Violations

a. The court's reliance on purported evidence of "coercion" and other acquitted conduct made a mockery of the verdict and rendered the jury a mere "procedural formality," *Blakely v. Washington*, 542 U.S. 296, 305-06 (2004), rather than the "fundamental reservation of power in our constitutional structure" the Framers intended, *McClinton*, 143 S. Ct. at 2402 (Sotomayor, J.).

The district court tried to address these Sixth Amendment concerns by invoking *United States v. Watts*'s statement that "a jury's verdict of acquittal does

34

not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." 519 U.S. 148, 157 (1997) (per curiam). But *Watts* merely purports to *permit*, not *require*, the use of acquitted conduct at sentencing. What is more, this Circuit previously directed courts to "consider the jury's acquittal when assessing the weight and quality of the evidence presented by the prosecution and determining a reasonable sentence." *United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005) (Sotomayor, J.). Here, the judge violated this command, ignored the verdict, and adopted the exact coercion theory the jury had rejected, despite purporting to rely on *Vaughn*. A-780.[7]

Regardless, *Watts* concerned only double jeopardy—not the jury trial right. *See United States v. Booker*, 543 U.S. 220, 240, 240 n.4 (2005). And it pre-dates not only the amendment but also *Apprendi* and its progeny. Indeed, when the Commission issued the 2024 amendment, it struck citations to *Watts* and the idea that courts can consider acquitted conduct. This makes clear courts can no longer merely rely on *Watts* to support this practice. Amendment 826; §6A1.3 Commentary.

---

[7] That reliance was particularly misplaced because of Justice Sotomayor's subsequent opinion in *McClinton*, which the district court ignored.

b.      The district court punished Combs for conduct not authorized by the jury's verdict, violating *Apprendi* and its progeny.  These decisions hold that "[w]hen a judge inflicts punishment that the jury's verdict alone does not allow," he "exceeds his proper authority."  *E.g.*, *Blakely*, 542 U.S. at 303-04.  The jury's verdict clearly did not allow the court to dramatically increase Combs's sentence based on alleged evidence of coercion and other acquitted conduct.

*Apprendi* also emphasizes the need for most facts to be found by a jury beyond a reasonable doubt—a burden the government failed to meet at trial on the RICO conspiracy and sex trafficking counts.  At sentencing, however, the court found that the same allegations the jury rejected were proven by a preponderance.

In doing so, the court ignored that an acquittal is not just a finding that the charges were not proven beyond a reasonable doubt.  It is an "affirmative indication of innocence," *Thompson*, 596 U.S. at 45, and an "official statement in a court of law that a criminal defendant is not guilty," *Acquittal*, Black's Law Dictionary (12th ed. 2024).  "So far as the criminal justice is concerned," an acquittal means "the defendant has been set free or judicially discharged from an accusation; released from a charge or suspicion of guilt," because "the jury has formally and finally determined that the defendant will not be held criminally culpable for the conduct at issue."  *McClinton*, 143 S. Ct. at 2402 (Sotomayor, J.).

36

Now that Combs has been acquitted of the RICO conspiracy and sex trafficking counts, there is nothing else he can do to clear his name. To treat the jury's acquittals as anything less than a finding of innocence would directly undermine the presumption of innocence.

As the Commission recognized when it amended the guidelines, acquittals must be "accorded special weight, distinguishing them from conduct that was never charged and passed upon by a jury, and viewed as inviolate," and "afford[ed] absolute finality." Amendment 826; *see Burks v. United States*, 437 U.S. 1, 16 (1978). As Chairman Reeves put it: "Not guilty means not guilty."[8] That is true even if, as the district court made clear here, it was "convinced that the jury was mistaken." *McClinton*, 143 S. Ct. at 2402 (Sotomayor, J).

### 2. Double Jeopardy Violations

The use of acquitted conduct to enhance Combs's sentence raises serious double jeopardy concerns.

By the time of sentencing, the jury had already "necessarily decided" whether coercion was used and whether a racketeering conspiracy existed in Combs's favor. *Yeager v. United States*, 557 U.S. 110, 119-20 (2009). Accordingly, "[s]traightforward" application, *Ashe v. Swenson*, 397 U.S. 436, 445 (1970), of Double Jeopardy collateral estoppel principles reaffirmed by this Court

---

[8] https://www.ussc.gov/about/news/press-releases/april-17-2024.

just weeks after Combs's sentencing, *see United States v. Cole*, 158 F.4th 113, 117, 123-24 (2d Cir. 2025), prohibited the district court from making contrary findings at the subsequent sentencing proceeding.

But the district court ignored what the jury actually found. Instead, it acted as a thirteenth juror and adopted the government's "implausible" and "unrealistic" view of the record to enhance the sentence not only under the guidelines, but under §3553(a). *See Cole*, 158 F.4th at 124-25, 131. The Commission was concerned about courts acting in precisely this way—i.e., "supplant[ing] what the jury has found, and reject[ing] all that" and "becom[ing] a super jury."[9]

*Watts* is not to the contrary. As the Supreme Court later emphasized, *Watts* "presented a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause." *Booker*, 543 U.S. at 240 n.4. It is thus of limited precedential value as to using acquitted conduct at sentencing for other purposes— such as the 3553(a) factors. More importantly, *Watts*'s rationale that "sentencing enhancements do not punish a defendant for crimes of which he was not convicted, but rather increase his sentence because of the manner in which he committed the crime of conviction," 519 U.S. at 154, doesn't apply here. The district court's

---

[9] Public Hearing on Proposed Amendments (Feb. 24, 2023) at 99-101 (Commission Chair and Judge Reeves), https://www.ussc.gov/sites/default/files/pdf/amendment-process/public-hearings-and-meetings/20230223-24/0224_Transcript.pdf.

repeated claims about "fraud" or "coercion" or "leadership" of criminal activity, A-788-92, 911, 914, 915, 922, are unrelated to the "manner" in which the jury found Combs violated the Mann Act—i.e., by arranging interstate flights to places where adults voluntarily gathered to have sex.

> 3. *The District Court's Heavy Reliance On Acquitted Conduct Was Unfair And Unjust*

*First*, if Combs's sentence is affirmed, defendants who are innocent of serious charges will be deterred from going to trial when they are also charged with lesser charges that are harder to defend. What was the point of exercising his right to a jury trial if Combs could be acquitted of the most serious charges but end up with a severe and disparate sentence on lesser charges because a judge disagreed with the acquittals? Going forward, "[e]ven defendants [like Combs] with strong cases may understandably choose not to exercise their right to a jury trial." *McClinton*, 143 S. Ct. at 2402 (Sotomayor, J.).

*Second*, how does the court's heavy reliance on acquitted conduct respect the jurors' public service and place in the criminal justice system? The jurors were "the sole and exclusive judges of the facts." A-378-79. They carried out this role by listening attentively to seven weeks of testimony and argument, deliberating for more than two days, and reaching a verdict. But the jury's acquittals on the RICO conspiracy and sex trafficking charges were not respected. Instead, Combs was sentenced "in essence as if he had been convicted" of those charges, *Brown*, 892

39

F.3d at 415 (Kavanaugh, J., dissenting in part), "based on facts the judge [found] without the aid of a jury," *Sabillon-Umana*, 772 F.3d at 1331 (Gorsuch, J.).

*Third*, what kind of signal does the court's sentence send to the public about due process and the rule of law? Our criminal justice system depends on "the respect and confidence of the community in applications of the criminal law." *In re Winship*, 397 U.S. 358, 364 (1970). "People respect the law more when it is visibly fair…." Stephanos Bibas, *Transparency and Participation in Criminal Procedure*, 81 N.Y.U. L. Rev. 911, 949-51 (2006). The court's heavy reliance on acquitted conduct here undermines these aims. It was "fundamentally unfair" and "[un]just." *Martinez*, 769 F. App'x at 17 (Pooler, J., concurring); *Concepcion*, 983 F.2d at 396 (Newman, J., dissenting from denial of rehearing en banc). The "woman on the street would be quite taken aback" by it. *McClinton*, 143 S. Ct. at 2403 (Sotomayor, J. ). Indeed, "most folks in the public have a real recoil at the idea that…notwithstanding [an] acquittal, the court can nevertheless turn around and use that information and those facts to ultimately increase the defendant's sentence." Public Hearing on Proposed Amendments (Feb. 24, 2023) at 92 (Commissioner and Judge Claria Horn Boom).

Commentators have noted the unfairness of the sentence in this case. "Flawed as [Combs] may be, he shouldn't spend a day in prison for conduct that a

40

jury found wasn't a crime." *Prison Time for Something Diddy Didn't Do*, Wall St. Journal (Oct. 9, 2025).

The Guidelines were amended for a reason: The use of acquitted conduct is widely considered unfair, by everyone from Supreme Court justices to laypersons on the street. It is particularly troubling that the district court ignored the amendment in this case, which is one of the highest-profile criminal prosecutions in U.S. history.

### C. The District Court Violated The Acquitted Conduct Guideline By Applying The Fraud/Coercion Enhancement

The district court imposed a 4-point enhancement, finding "the offense involved fraud or coercion." USSG §2G1.1(b)(1)(A) & (B)(i). That finding directly contradicted the jury's verdict. It was based entirely on acquitted conduct.

The district court mentioned two particular instances of purported "coercion": Combs's "threats to release videos of freak-offs" with Ventura on a flight back to New York from the 2012 Cannes Film Festival, and "threats concerning Jane's home in connection with" the October 2023 "sobriety party." A-789. The court said these episodes were both "squarely permissible to consider even if counted as acquitted conduct." A-789.[10]

---

[10] The district court relied heavily on the PSR's many references to acquitted conduct after overruling Combs's objections to those parts of the PSR. A-787; Dkt.508 (PSR) at 60-61.

That is wrong. The evidence of coercion, including the two instances mentioned by the district judge, was admitted to establish the sex trafficking counts, not the Mann Act counts. As noted above, the sex trafficking counts required proof of coercion. A-391. And the government presented this evidence to prove that element, the only disputed element at trial.

The government told the jury: "The sex trafficking charges in this case are based on…the illegal actions that made [Ventura] and Jane believe that they had no choice but to do the freak-offs and the hotel nights even when they didn't want to." A-346-47; *see also* A-347-48. The government highlighted the *exact same two instances* of alleged coercion as proof of sex trafficking, arguing they were "clear-cut" instances of coercion. *See* A-349, 352-54, 361-64. By contrast, the government emphasized that the Mann Act counts were "totally separate," did not require proof of coercion—and the government never once suggested that the two incidents were somehow relevant to the Mann Act counts. A-366.

The jury heard the government's allegations of coercion—and it rejected them. There is no other explanation for its decision to acquit on sex trafficking but convict on prostitution.[11] Indeed, the district court recognized as much, because it said it could rely on the Cannes and sobriety party evidence, along with other

---

[11] The jury also acquitted Combs of two RICO predicates that similarly required evidence of fraud or coercion: inducement/enticement to engage in prostitution (18 U.S.C. §2422(a)) and forced labor (18 U.S.C. §1589). A-78.

42

supposed evidence of fraud or coercion, even if Combs was acquitted of such conduct, based on its erroneous overbroad interpretation of §1B1.3(c)'s exception. A-789-90.  Because this evidence did not "establish" any element of either Mann Act count, §1B1.3(c) foreclosed imposition of the enhancement.

**D.      The District Court Violated The Acquitted Conduct Guideline By Applying The Leadership Enhancement**

The district court also imposed a 4-point enhancement after finding Combs was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."  USSG §3B1.1(a).  The court found that Combs was "plainly the organizer" of freak-offs and hotel nights, because his staff were "acting for his benefit and [at] his direction."  A-791.

But the jury rejected this theory when it acquitted Combs of RICO conspiracy.

The government had alleged that Combs oversaw a criminal enterprise comprising him and an "inner circle" of assistants and advisers.  The RICO conspiracy's means and methods purportedly including transporting Ventura, Jane, and male entertainers "across state lines and internationally" for freak-offs and "[o]ther commercial sex acts."  A-73-74.  At trial, the government called numerous witnesses to try to prove the existence of this alleged racketeering enterprise and conspiracy, and told the jury Combs was the "leader" of, "at the top of," and the

43

"head of" it.  A-342-43, 374.  The government also claimed Combs's employees were co-conspirators because they helped arrange the hotel nights.  A-344, 375-76.

But the jury rejected these allegations and acquitted Combs of RICO conspiracy.  Had the jury believed Combs was the leader or organizer of a group of individuals that together violated the Mann Act—or even that he conspired with a single other person to commit such violations—it would have convicted him, because any two racketeering acts sufficed to establish the requisite pattern.  A-387.  Any two incidents constituting a Mann Act violation would have sufficed had the jury found other co-conspirators were involved.

The jury must not have found any such co-conspirators.  The only logical conclusion from its acquittal is that the jury found the Mann Act was violated, but by Combs alone and without the assistance of any subordinates—and that it therefore rejected the premise that Combs was an "organizer or leader of [the] criminal activity."  §3B1.1(a).  There was thus no basis for the district court to make the "specific factual findings" necessary to support the leadership enhancement consistent with the jury's verdict.  *James*, 151 F.4th at 44-45.

The court acknowledged that "some of" the evidence it found of Combs's purported leadership/organization of the alleged conspiracy to violate the Mann Act might overlap with Count One and thus conflict with the acquittal.  But the court nonetheless relied on its flawed relevance test and concluded this evidence

44

"establishes" the Mann Act counts—in particular, "[Combs's] intent, the transport of escorts, Jane and Ventura, for sex, and proof that the acts were in fact acts of prostitution." A-791.

Although some evidence the government used to try to prove the RICO conspiracy count might provide tangential background for the Mann Act charges, *see Gonzalez*, 110 F.3d at 941, it does not prove the elements of those charges. For example, whether Combs had the requisite scienter turns solely on whether, at the time of the interstate travel, *Combs*—not any of his assistants—intended Ventura, Jane, or the male entertainers to engage in prostitution. *See United States v. Broxmeyer*, 616 F.3d 120, 129-30 (2d Cir. 2010). So however involved Combs's employees may have been in, for example, setting up and cleaning hotel rooms, or delivering cash to pay entertainers, that evidence—like the other evidence the court relied on—did not establish Combs's intent.

Combs cannot be punished for being the leader of a conspiracy the jury found did not exist.

### E.    The District Court Misapplied The Grouping Enhancement

The district court imposed a 5-point grouping enhancement because it found that Ventura, Jane, and eight entertainers who traveled interstate, were "victims" within the meaning of Application Note 1 to USSG §2G1.1: "a person transported, persuaded, induced, enticed, or coerced to engage in, or travel for the purpose of

engaging in, a commercial sex act or prohibited sexual conduct, whether or not the person consented to the commercial sex act or prohibited sexual conduct." A-787-88.

But the application note does not apply in this case, especially since the jury found that Ventura and Jane were not defrauded, threatened or coerced. Neither Ventura, Jane, nor any of the men were "victims" under the plain meaning of that term, so any reading of §2G1.1 Application Note 1 that extends to these individuals is "inconsistent with, or a plainly erroneous reading of" the guideline itself and not entitled to deference. *Stinson v. United States*, 508 U.S. 36, 38 (1993).[12]

The plain meaning of "victim" is one harmed or injured by a particular action. *E.g.*, Black's Law Dictionary (7th ed. 1999) ("A person harmed by a crime, tort, or other wrong."); The Oxford English Reference Dictionary 1609 (2d. ed. 1996) ("[A] person injured or killed as a result of an event or circumstance."). Courts have understood "victim" the same way. *E.g.*, *United States v. Aloba*, 2025

---

[12] Although *Stinson* remains controlling in this Circuit, Combs preserves the argument that the commentary is no longer controlling in light of *Kisor v. Wilkie*, 588 U.S. 558 (2019), as several other circuits have held, *see, e.g.*, *United States v. Nasir*, 17 F.4th 459 (3d Cir. 2021) (en banc); *United States v. Riccardi*, 989 F.3d 476 (6th Cir. 2021); *United States v. Castillo*, 69 F.4th 648 (9th Cir. 2023); *United States v. Dupree*, 57 F.4th 1269 (11th Cir. 2023) (en banc).

WL 1248827, at *2 (9th Cir. Apr. 30, 2025) (one "harmed by a defendant's crimes").

This understanding of "victim" is reflected in the criminal code, and even a provision relating to federal sex crimes including the Mann Act itself. 18 U.S.C. §3771(e)(2)(A) (Crime Victims' Rights Act defines "crime victim" as "a person directly and proximately harmed as a result of the commission of" an offense); §2429(d) (Mann Act's restitution provision defines "victim" as an "individual harmed as a result of a crime under this chapter"). The guidelines themselves also generally equate "victimization" with some kind of harm or injury. *See, e.g.*, §2B1.1 App. Note 1 (fraud guideline defines victim as "any person who sustained any part of the actual loss" or "any individual who sustained bodily injury as a result of the offense"); §2A2.2(b)(3) (increase offense level when "victim" suffers various types of "injuries"); §2H4.1(b)(1) (same).

By its verdict, the jury rejected the notion that Ventura or Jane were harmed or injured by the Mann Act violations. It found Ventura and Jane participated in freak-offs and hotel nights willingly when it acquitted Combs of sex-trafficking. And the government never suggested the male escorts were harmed or injured. Nor did the government contest that they voluntarily and often enthusiastically travelled across state lines to have consensual sex with Combs's girlfriends. The

47

district court nevertheless imposed the grouping enhancement based on an untenable reading of §2G1.1(d)(1).

Because the alleged Mann Act offenses were victimless, the court should have instead applied Application Note 2 to §3D1.2. It provides that counts involving victimless offenses are grouped together so long as whatever "societal interests" are implicated are "closely related." That is the case here, where the two Mann Act counts involved identical alleged misconduct.

## II.   COMBS IS ENTITLED TO ACQUITTAL BECAUSE THE MANN ACT MUST BE LIMITED TO A NARROW CLASS OF CONDUCT

The Mann Act—originally known as the "White Slave Traffic Act"—is the most notorious statute in the history of the federal criminal code. It has spawned reams of criticism for its racist origins and history of selective enforcement. It was enacted in the wake of an early twentieth century "hysteria that 'white slavers' were preying upon young women—coercing them into prostitution through threats, intimidation, and force." *United States v. Flucas*, 22 F.4th 1149, 1166 (9th Cir. 2022) (Bybee, J., dissenting). The scope of the Act, however, has never been clear. It forbids transporting women across state lines to engage in "prostitution," but does not define prostitution. When it was enacted a century ago, prostitution had a different meaning, and the meaning has changed throughout its history and varies depending on location.

Many courts in the modern era have recognized that, in part to avoid constitutional problems, prostitution statutes cannot be construed to cover mere voyeurism. In other words, a person who merely watches others have sex does not engage in prostitution, even if some money is exchanged. The Mann Act should be so construed, and under that properly narrowed interpretation, Combs is entitled to acquittal.

## A. The Act Must Be Limited To Avoid Constitutional Problems

Criminal statutes must be construed to avoid constitutional difficulties. If a statute's text is amenable to "two plausible statutory constructions," and one of the two "would raise a multitude of constitutional problems," then "the other should prevail." *Clark v. Martinez*, 543 U.S. 371, 380-81 (2005). The constitutional avoidance canon thus counsels in favor of narrow interpretations that avoid vagueness, First Amendment, federalism, and other constitutional concerns. *See, e.g., McDonnell v. United States*, 579 U.S. 550, 574-77 (2016).

In *Skilling*, for example, the Supreme Court held that the "honest services" statute was impermissibly vague on its face—but rather than striking the statute down entirely, it pared the statute down to its "solid core." *Skilling v. United States*, 561 U.S. 358, 407 (2010); *see also id.* at 408 (holding statute "can and should be salvaged by confining its scope to the core."); *Snyder v. United States*,

49

603 U.S. 1, 14-16 (2024) (construing criminal statute narrowly to avoid vagueness and federalism problems).

The same is true here.  The Mann Act should be pared to its core, which does not include mere voyeurism.

### 1.  *Vagueness*

a.  The Due Process Clause requires that criminal statutes define prohibited conduct with "sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983); *accord Skilling*, 561 U.S. at 402-03.  The Mann Act fails this test.  Throughout its history, its scope has been murky, and it has regularly been applied in an arbitrary manner.

The Act forbids transporting a person across state lines "with intent that such individual engage in prostitution."  18 U.S.C. §2421(a).  The statute has never defined "prostitution," and that word's meaning has never been fixed.  The problem is particularly acute because statutory terms must be interpreted according to their ordinary meaning at the time of enactment.  *Wisconsin Central Ltd. v. United States*, 585 U.S. 274, 277 (2018).  The meaning of prostitution has never been plain, at the time of enactment or since.

50

The statute's drafters were focused on combatting the "horrors" of "white-slave traffic." 45 Cong. Rec. 1040 (1910) (statement of Rep. Mann). They said it was not supposed to regulate "voluntary prostitution," H.R. Rep. No. 47, 61st Cong., 2d Sess. 9-10 (1909), but whatever limitations were intended were not clearly expressed in the statutory text.

That lack of textual clarity has led to a century of disputes and confusion. In the statute's early years, the Supreme Court gave the statute an extraordinarily broad reach. It held that "prostitute" in the White Slave Traffic Act referred "to women who, for hire or without hire, offer their bodies to indiscriminate intercourse with men." *Caminetti v. United States*, 242 U.S. 470, 486 (1917). It held, in other words, that any woman who had sex outside marriage was a "prostitute."[13]

This expansive reading sparked sharp dissents and was criticized by commentators. *See*, *e.g.*, *id*. at 497 (McKenna, J., dissenting); *see United States v. Holte*, 236 U.S. 140, 146 (1915) (Lamar, J., dissenting) (arguing, based on Congress's stated intent, that statute should be limited to "slaver[s]"). Several decades later, the Court reaffirmed *Caminetti*, holding that the Mann Act could be

---

[13] Many state courts construed prostitution similarly at the time. *E.g.*, *State v. Thuna*, 109 P. 331, 331 (Wash. 1910) (woman who engages in fornication, even "without hire," is "certainly as much a common prostitute as one who does so solely for hire"); *Carpenter v. People*, 8 Barb. 603, 610 (N.Y. 1850) (same); *People v. Cummons*, 23 N.W. 215, 215 (Mich. 1885) (same).

51

used to combat the "barbarism" of Morman polygamy. *Cleveland v. United States*, 329 U.S. 14, 19 (1946). Dissenters again lamented the statute's breadth: "Today another unfortunate chapter is added to the troubled history of the White Slave Traffic Act." *Id.* at 24 (Murphy, J., dissenting).

A statute prohibiting "indiscriminate sex" plainly violates the Due Process Clause. It lacks clarity, and it is inevitably a tool for arbitrary and selective enforcement. Indeed, the Mann Act's history proves the point—through much of it, the statute has been used to punish disfavored minorities, especially black men. *See*, *e.g.*, David J. Langum, *Crossing Over the Line: Legislating Morality and the Mann Act* (2006) (examining Act's history and deployment in high-profile cases); Jessica R. Pliley, *Policing Sexuality: The Mann Act and the Making of the FBI* (2014) (demonstrating how, over last century, prosecutors have primarily used Act to prosecute sexual practices previously perceived as immoral, including interracial relationships).

Some lower courts simply defied the Supreme Court's rulings, and even the Department of Justice eventually recognized that the statute must be limited to comport with constitutional norms. Beginning in 1953, the U.S. Attorneys' Manual stated that prosecutions under the White Slave Traffic Act "should not be

instituted in the so-called 'non-commercial' cases."[14]  The 1961 version stated:

"prosecution of persons who are not engaged in commercial prostitution

enterprises as panderers, operators of houses of prostitution or call girl

operations…should not be instituted without prior approval of the Criminal

Division."[15]  Similar limitations have been contained in successive versions of the

Manual, up to the present day.  *See generally* Dkt.486 at 10-12.

      b.     In modern times, prostitution is often understood as "sex for money."

But even that concept is unclear and overbroad, because it covers conduct not

deemed "prostitution" under various state and local laws—including paying to see

*other* people have sex.  For example, in *Wooten v. Superior Court*, the issue was

"whether a customer's observation of sexual conduct between two dancers, in

exchange for consideration, constitutes a lewd act for purposes of prostitution."

113 Cal. Rptr. 2d 195, 200 (Cal. Ct. App. 2001).  The court held it was not,

because prostitution "requires touching between the prostitute and the customer,

even if the customer is simply an observer of sexual acts."  *Id*. at 199.  It relied in

part on the California Supreme Court's First Amendment decision in *Freeman*,

---

[14] 1953 U.S. Attorneys' Manual at 111,
https://www.justice.gov/archive/usao/usam/1953/title2criminaldivision.pdf.
[15] 1961 U.S. Attorneys' Manual at 109,
https://www.justice.gov/archive/usao/usam/1961/title2criminaldivision.pdf.

discussed below. *Wooten*'s holding has been incorporated into the California model jury instructions. CALCRIM (Cal. Model Jury Instructions) No. 1154.

Similarly, New York courts have endorsed the "common-sense notion that prostitution is the trading of sexual conduct with another person for a fee where the sexual conduct is performed on the person who pays the fee." *People v. Paulino*, 2005 N.Y. Misc. LEXIS 3430, at *9 (N.Y. Sup. Ct. Aug. 4, 2005). Where a "non-participating, third party" merely pays a person to perform sexual acts, there is no prostitution. *Id*. As discussed below, this is consistent with New York courts' recognition that overbroad definitions of prostitution would impinge on First Amendment rights. Thus, "agreements by which only the accused 'prostitute' was to engage in sexual conduct" while "the beneficiary was to act only as voyeur" are not covered by the state's prostitution statute. *People v. Greene*, 110 Misc. 2d 40, 41 (N.Y. Crim. Ct. 1981); *see Metwally v. City of New York*, 215 A.D.3d 820, 823-24 (2d Dep't 2023).

In *Commonwealth v. Bleigh*, a Pennsylvania court likewise held that paying someone else to watch them engage in sex acts is not prostitution. 586 A.2d 450, 453 (Pa. Sup. Ct. 1991). In that case, the state had charged performers with prostitution, but the court reversed the conviction because "there was no physical interaction between the dancers and the patrons," so the conduct was "more akin to commercial voyeurism." *Id*. A Georgia appellate court has likewise held that

54

situations of "commercial voyeurism" must be distinguished from prostitution. *State v. Smoot*, 729 S.E.2d 416, 425-26 (Ga. Ct. App. 2012). Several other state courts have ruled similarly—paying others to watch sex, without participating, is not prostitution. *See State v. Burgess*, 669 S.W.2d 637, 639-40 (Mo. Ct. App. 1984); *State v. Turnpaugh*, 741 N.W.2d 488, 490-91 (Wisc. Ct. App. 2007); *State v. Mayfield*, 900 P.2d 358, 361-62 (N.M. Ct. App. 1995); *see also State v. Taylor*, 808 P.2d 314, 318 (Ariz. Ct. App. 1990).

Because the Mann Act does not define "prostitution," the term's changing meaning over time and depending on location creates vagueness problems.

### 2. *Substantive Due Process*

Broad readings of the statute would also violate modern substantive due process doctrine. As noted above, the Supreme Court held a century ago that the Mann Act prohibits as "prostitution" any kind of adultery or fornication— essentially all extramarital sex. But the Supreme Court subsequently recognized that due process forbids certain kinds of invasive government regulation of private sexual lives. Recognizing the right of consenting adults to choose sexual partners, for example, the Supreme Court struck down Texas's sodomy law. *Lawrence v. Texas*, 539 U.S. 558 (2003). As a general matter, the government may not target the sex lives of "consenting adults acting in private." *Id*. at 569; *see also Obergefell v. Hodges*, 576 U.S. 644 (2015) (right to same-sex marriage).

Prohibiting "indiscriminate intercourse" would not comport with modern substantive due process doctrine. In other words, if the statute were interpreted in accordance with its original plain meaning, it would be flatly unconstitutional. Due process concerns require a limiting construction.

### 3. First Amendment

Part of the rationale underpinning some of the 21st century decisions holding that "commercial voyeurism" is not "prostitution," whether stated or unstated, is a concern about avoiding serious First Amendment problems. As explained below in Point III, applying the Mann Act to Combs's conduct would violate the First Amendment. At a minimum, a narrower construction is required to avoid those problems.

### 4. Federalism

The Supreme Court has repeatedly invoked federalism concerns to narrow the scope of federal criminal statutes to avoid "'plac[ing] under federal superintendence a vast array of conduct traditionally policed by the States.'" *Ciminelli v. United States*, 598 U.S. 306, 316 (2023) (quoting *Cleveland v. United States*, 531 U.S. 12, 27 (2000)); *see also*, *e.g.*, *Snyder*, 603 U.S. at 14-15. Those concerns are particularly salient here, because "prostitution" is a classic area traditionally policed by state and local authorities, which have taken varying approaches to whether to regulate, and what conduct to regulate. And, as

56

discussed, in New York and California, where most of the "freak-offs" or "hotel nights" took place, paying for voyeurism (which is what the jury found Combs did) is not "prostitution." It is one thing for the federal government to criminalize serious crimes like sex trafficking when state lines are crossed or interstate commerce is implicated. But federal policing of "prostitution" by a defendant with no commercial interest in the activity, just because someone traveled interstate for consensual sex, "federalizes traditionally state matters," a result that must be avoided through a narrower construction. *Ciminelli*, 598 U.S. at 316.

## B. The Act Should Be Construed To Exclude Voyeurs, Requiring Acquittal

To avoid these constitutional problems, the Mann Act should be construed so it does not cover those who engage in voyeurism or merely film others having sex. In other words, the term "prostitution" in the Act should be limited to those situations where a paying customer engages in sex with the person being paid. Under this interpretation, the conduct proven at trial does not violate §2421(a). What it showed was that Combs arranged for adult males to have sex with his girlfriends—while he watched and filmed. He did not have sexual contact with any of the men.

The government presented no evidence that Combs himself ever had sex with any escort or entertainer. The videos showed the other men having sex with Combs's girlfriends. *See, e.g.*, GXBX-205; GXBX-206; GXBX-207; GXAX-101-

B; GXAX-102-D; GXAX-105-C.  The only male participants called as witnesses testified that they knew Combs would only watch.  Daniel Phillip explained that when he was first hired to participate in a freak-off, Ventura told him that Combs "wasn't going to try to touch [him] or anything."  A-138.  The "purpose" of the engagement was "[t]o have sex with Cassie," and Combs would only watch.  A-141.  Sharay Hayes testified he was only involved in sexual "encounters with Ventura in front of Combs."  A-230.

Ventura herself testified that early in their relationship, Combs told her he was into "voyeurism."  A-166.  He didn't want to have sex with other men, but rather "to watch me with another man."  A-183, 156-57.  Jane testified similarly.  A-258, 308.  The government's own witnesses repeatedly testified that Combs arranged the freak-offs because he enjoyed watching his girlfriends have sex with other men.  A-139-40, 149, 248, 256-60, 297-98.

In this regard, there is no real dispute about the facts.  The dispute is about the scope of the statute.  If the Mann Act is limited—as it should be—to situations where a paying customer engages in sex, then Combs is entitled to acquittal as a matter of law.  His convictions on both Mann Act counts should be reversed.

Indeed, if the convictions are upheld, that means other similar, common voyeuristic activity—such as watching adult sexual performances on OnlyFans—is

also "prostitution" and thus a federal crime if anyone involved travels interstate. The Court should not adopt such an overbroad interpretation of the statute.

### C.     The District Court's Reasoning Fails

The district court attempted to distinguish the state voyeurism cases on various grounds, SPA-6-8, but this misses the point. Combs's argument is not that any particular state court decision should define "prostitution" in the federal statute, but that these state decisions demonstrate that many definitions of prostitution don't cover paying for a voyeuristic experience. This shows the term doesn't have a fixed meaning and that the definition covering all sex for hire is unconstitutionally vague.

The district court also bizarrely reasoned that *Cleveland* sub silentio overruled *Caminetti*. SPA-4-5. But the Supreme Court and this Court have cited *Caminetti* dozens of times since *Cleveland*—neither Court has ever suggested that *Caminetti* has been overruled.

Indeed, in *United States v. Bitty*, and then in *Caminetti*, the Supreme Court expressly held that "prostitution" "refers to women who, for hire or without hire, offer their bodies to indiscriminate intercourse with men." *Caminetti*, 242 U.S. at 486 (quoting *Bitty*, 208 U.S 393, 401 (1908)). The Court was explicit that it was interpreting the statutory term "prostitution," not "debauchery" or the immoral purposes clause that were removed from the statute in the 1986 amendment.

59

The district court held that *Cleveland* overruled that holding, because it said prostitution "normally suggests sexual relations for hire." 329 U.S. at 17. But the district court pulled that quote entirely out of context. The Court was explaining that, while that might be the normal usage, it was not the sole usage covered by the Act. And the Court went on to hold that it would "not stop to re-examine" the holding of *Caminetti*: "we adhere to its holding which has been in force for almost 30 years, that the Act, while primarily aimed at the use of interstate commerce for the purposes of commercialized sex, *is not restricted to that end*." *Id*. at 18 (emphasis added).

When Congress re-enacted the statute in 1986, it changed the immoral purposes clause but otherwise left the statutory term "prostitution" untouched. "[W]hen judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, the intent to incorporate its...judicial interpretations as well." *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006); *accord Brathwaite v. Garland*, 3 F.4th 542, 549-50 (2d Cir. 2021). In short, neither *Cleveland* nor the 1986 amendment "fixed" *Caminetti*'s interpretation—nor did they adopt any alternate definition.

60

## III. THE CONVICTIONS VIOLATE THE FIRST AMENDMENT

### A. Combs Was Engaged In Protected First Amendment Activity

The evidence at trial demonstrated that freak-offs and hotel nights involved live sexual performances that Combs directed and recorded for subsequent private viewing with his girlfriends. These creative and elaborate performances were, as Combs argued at trial, "homemade porn," A-371, that Combs experienced both as a filmmaker and as a consumer—when he was watching them live and with his girlfriends. Either way, Combs was engaged in protected First Amendment activity.

Ventura and Jane testified that these were highly staged performances. Ventura said freak-offs were "very choreographed" shows during which Combs would "direct" her and an escort on "where he wanted everyone to be" and "what we were doing sexually." A-157, 169, 180. Jane likewise described hotel nights as choreographed performances where Combs "g[a]ve you directions about what to do." A-278. And for Jane, hotel nights also involved dancing with the entertainers. A-256; *see also, e.g.*, A-264, 274-75.

Hayes and Phillip gave similar accounts. Hayes was hired to create sexy "scene[s]"—"movie[s]" in which "Combs was…the director," and "[Hayes] and Cassie were actors"—with Combs giving "directions" about "angles…positionings, and…the sexual activity." A-222, 226, 232, 235-36, 240.

61

Phillip similarly described how Combs "definitely did direct us," including "for what to do in terms of touching each other in sexual ways." A-154-55. These performances often involved role play—such as when Combs asked Phillip to wear a NYPD uniform, and other instances involving different "names and scenarios and characters." *See* A-147-48, 280-81; *see also* A-300.

Witnesses described how the performances were choreographed in other ways as well—how the rooms were set up (e.g., furniture, lighting), A-142, 157, 181-82, 227, 233, 247; how Ventura and Jane dressed (e.g., outfits, shoes, nails), A-163-64, 168, 176, 254-55, 282-83; and the supplies (e.g., baby oil), A-177-79.

Combs and his girlfriends also routinely filmed the performances—and this was an important part of the experience for them. Jane testified Combs would film her "[a]lmost every time," A-277, and Ventura said "freak-offs were video recorded," period, A-188. The performances were recorded so he and his girlfriends could watch them later on. *E.g.*, A-188-89, 285, 328. Ventura would routinely "watch [the videos] with Sean afterwards," A-188, and Jane even bought Combs a portable screen for their "movie nights," A-286, 311-12.

### B. Upholding The Convictions Would Violate The First Amendment

1. This case falls squarely into the line of decisions overturning convictions for prostitution offenses because the defendant was engaged in

protected First Amendment activity by directing and filming sexually explicit performances.

In *People v. Freeman*, for example, the California Supreme Court held that upholding a prostitution-based conviction for a "producer and director" of a sexually explicit film would have "rather obviously place[d] a substantial burden on the exercise of protected First Amendment rights," and that the legislature had not "intend[ed] the anti[prostitution] law to apply" when an individual pays an actor fees to perform in a sexually explicit video. 758 P.2d 1128, 1131-32 (Cal. 1988).[16] The New Hampshire Supreme Court reached a similar conclusion in *State v. Theriault*, where the defendant was prosecuted for asking a couple if he could pay them to make films of them having sex in hotel rooms. The court held that the state's prostitution law could not be applied "to the constitutionally protected activity of making a sexually explicit videotape"—even though the defendant was a mere amateur pornographer, unlike the "commercial" pornographer in *Freeman*. 960 A.2d 687, 688, 692 (N.H. 2008).

Other decisions similarly recognize the First Amendment issues raised by enforcing prostitution laws in like circumstances. *See, e.g.*, *Paulino*, 2005 N.Y. Misc. LEXIS 3430, at *12 (holding that state would "bear a…heav[y]"

---

[16] *Freeman* remarked in dicta that the Mann Act "has no direct impact upon" the First Amendment because it concerns interstate transport "for an immoral purpose," 758 P.2d at 1134—a phrase no longer in the statute.

63

constitutional burden and face "thorny First Amendment issues" in prosecuting adult film producers for prostitution); *Greene*, 110 Misc. 2d at 41-42 (construing New York prostitution law as "proscribing agreements calling for sexual conduct to be performed *for* another person, as well as with another person…would surely intrude upon areas of behavior traditionally protected by the First Amendment").

As in these cases, Combs was engaged in protected First Amendment activity when he filmed sexual performances during freak-offs and hotel nights as an amateur pornographer.  This conduct can be criminalized, therefore, only if doing so would, among other things, "further[] an important or substantial governmental interest."  *United States v. O'Brien*, 391 U.S. 367, 376-77 (1968).

But the government has no legitimate interest in this unprecedented Mann Act case:  It involves no minors, coercion, exploitation of vulnerable individuals, or pimps profiteering from sex work—but rather only adults engaging in fully consensual sexual conduct, and a defendant who didn't even have sex with the "prostitutes" (i.e., the male entertainers).

2.	The Mann Act convictions not only violate Combs's First Amendment rights as a producer of amateur pornography, but also as a consumer of such pornography.  The Supreme Court has repeatedly held—including in a decision issued just last term—that adults have a First Amendment right to view adult pornography that cannot be burdened unless, unlike here, there is a

64

sufficiently important government interest.  *See Free Speech Coal., Inc. v. Paxton*,

606 U.S. 461, 475-77 (2025); *Ashcroft v. ACLU*, 542 U.S. 656, 665-66 (2004);

*United States v. Playboy Ent. Grp.*, 529 U.S. 803, 811-12 (2000); *Reno v. ACLU*,

521 U.S. 844, 874-75 (1997); *Sable Commc'ns v. FCC*, 492 U.S. 115, 126 (1989);

*see also Stanley v. Georgia*, 394 U.S. 557, 564-65 (1969).  The sexual

performances at issue are materially indistinguishable from adult pornography—

which Combs viewed both live and on a screen with his girlfriends, similar to how

most porn is consumed today.

### C.    The District Court Misconstrued The Record And Misapplied The Law

The district court concluded the sexual performances at issue were not

protected by the First Amendment at all and that even if they were, criminalizing

this conduct is constitutionally permissible.  SPA-11-13.  The court's analysis

conflicts with controlling precedent on both points.

1.    Combs's amateur porn, like many other adult films, was creative,

intricate, and highly choreographed—and therefore had expressive content and was

protected by the First Amendment.

"[A] wide array of conduct…can qualify as expressive."  *Masterpiece

Cakeshop v. Colorado Civ. Rights Comm'n*, 584 U.S. 617, 657 & n.1 (2018)

(Thomas, J., concurring, joined by Gorsuch, J.) (collecting cases).  That includes

films and other performances, however "amateurish" or "crude."  *Schacht v.*

*United States*, 398 U.S. 58, 61-63 (1970); *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501-02 (1952).  It also includes sexually explicit conduct such as nude dancing—and this type of conduct need not have a "narrow, succinctly articulable message" to be expressive, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Boston*, 515 U.S. 557, 569 (1995), but rather only a general "erotic message," *Barnes v. Glen Theatre, Inc.*, 501 U.S. 560, 565-66, 570-71 (1991) (plurality opinion); *see also id.* at 581 (Souter, J., concurring in judgment).  Most adult pornography is also generally protected by the First Amendment.  *See, e.g.*, *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 240 (2002).

The trial evidence amply demonstrates that the sexual performances that occurred during freak-offs and hotel nights were expressive.  These performances conveyed a "particularized message" that was tailored specifically for and would "reasonably be understood…to be communicative" by "those who viewed it"— Combs and his girlfriends.  *Texas v. Johnson*, 491 U.S. 397, 404 (1989); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984).  Combs himself choreographed these performances for this purpose.  Yet the court disregarded this evidence, thereby "fail[ing] to take seriously [the Supreme Court's] enduring commitment to protecting the speech rights of all comers, no matter how controversial—or even repugnant—many may find the message at hand."  *303 Creative LLC v. Elenis*, 600 U.S. 570, 600-01 (2023).

This case is nothing like the two decisions the district court cited, where there was no expressive activity of any kind—let alone something resembling the undisputedly expressive and creative act of filming and choreographing a live performance for subsequent viewing. *See Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705 (1986) (adult bookstore happened to be premises for prostitution, which had "absolutely no element of protected expression"); *Rumsfeld v. FAIR*, 547 U.S. 47, 70 (2006) (law schools attempted to "stretch a number of First Amendment doctrines" to protect their non-expressive choice to restrict military recruiters' access to students).

In addition to relying on these cases, the district court concluded the First Amendment was not implicated because Combs sought "sexual gratification" during and even participated in freak-offs and hotel nights. The court said the filming was merely "incidental," and that Combs was attempting to "launder[]" illegal conduct into constitutionally protected conduct (whatever that means). SPA-11-12. This logic misunderstands both the evidence at trial and the law.

The record is clear that Combs didn't have sex with the entertainers but was instead an observer and producer. A-157, 165-66, 183, 278, 308. Moreover, directing and recording was a key motivation for Combs and his girlfriends, who routinely watched these videos after the fact. *See* A-188-89, 285-86, 311-12, 328. And the First Amendment protects such expressive activity even if the person who

67

films a sexual performance is aroused while doing it. The district court offered no rationale for why sexual arousal should strip an individual of their First Amendment rights—and there is none. Indeed, *Freeman* squarely rejected any such notion when it held that there would have been a First Amendment violation even assuming the defendant was aroused and thus had a mens rea sufficient "to come within the definition of" California's prostitution statute. 758 P.2d at 1331.

2.      The district court misapplied the *O'Brien* test when it concluded that governments *generally* have a "strong interest in controlling prostitution within [their] jurisdiction," and that there is a *general* federal interest in "halting the interstate sex trade." SPA-12-13. The relevant inquiry was whether the government has a substantial interest in enforcing the Mann Act *in these circumstances* rather than the abstract, *see, e.g.*, *Freeman*, 758 P.2d at 1132-33; *Johnson*, 491 U.S. at 407-10—and there is no serious argument that it does.

The court suggested the government may have had this kind of case-specific interest because Combs "enabled commercial prostitution, distributed illegal drugs, and was physically violent." SPA-13. But Combs wasn't convicted of any of this alleged conduct. It is undisputed that he received no "commercial" profit from any prostitution, and the alleged violence and drug use was part of the sex trafficking and RICO conspiracy counts of which Combs was acquitted.

68

3. The district court ignored Combs's argument that his First Amendment rights were violated as a *consumer* of the sexual performances that took place during freak-offs and hotel nights. This is a separate and independent basis for overturning Combs's convictions.

## **CONCLUSION**

For the foregoing reasons, this Court should order Combs's immediate release and either grant a judgment of acquittal or vacate and remand for resentencing.

Dated: December 23, 2025
New York, New York

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Theodore Sampsell-Jones
Jason Anthony Driscoll
Christopher D. Johnson
SHAPIRO ARATO BACH LLP
1140 Ave. of the Americas, 17th Fl.
New York, New York 10036
(212) 257-4880
ashapiro@shapiroarato.com
tsampselljones@shapiroarato.com
jdriscoll@shapiroarato.com
cjohnson@shapiroarato.com

*Attorneys for Defendant-Appellant
Sean Combs*

69

## CERTIFICATE OF COMPLIANCE

1.      The undersigned counsel of record for Defendant-Appellant Sean Combs certifies pursuant to Federal Rule of Appellate Procedure 32(g) and Local Rule 32.1 that the foregoing brief contains 15,661 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), according to the Word Count feature of Microsoft Word, and is therefore in compliance with this Court's Order dated December 22, 2025, permitting Combs to file a principal brief of up to 16,000 words.

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font of Times New Roman.

Dated:  December 23, 2025

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro

70