# 25-2623

*To Be Argued By:*
CHRISTY SLAVIK

## United States Court of Appeals

### FOR THE SECOND CIRCUIT

### DOCKET NO. 25-2623

UNITED STATES OF AMERICA,

*Appellee,*

*v.*

SEAN COMBS, also known as Puff Daddy, also known
as P. Diddy, also known as Diddy, also known as PD,
also known as Love,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE
## UNITED STATES OF AMERICA

JAY CLAYTON,
*United States Attorney*
26 Federal Plaza, 37th Floor
New York, New York 10278

MEREDITH C. FOSTER,
EMILY A. JOHNSON,
CHRISTY SLAVIK,
MADISON REDDICK SMYSER,
MITZI STEINER,
OLGA I. ZVEROVICH,
*Assistant United States Attorneys,*
  *Of Counsel.*

# TABLE OF CONTENTS

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .  1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . .  2

    A.  The Government's Case . . . . . . . . . . . . . . . .  2

        1.  Freak Offs with Ventura . . . . . . . . . . .  3

        2.  Hotel Nights with Jane . . . . . . . . . . . .  6

        3.  Combs's Use of Others to Facilitate
            Freak Offs and Hotel Nights . . . . . . . . .  9

    B.  The Defense Case . . . . . . . . . . . . . . . . . . . .  10

    C.  The Verdict . . . . . . . . . . . . . . . . . . . . . . . . .  10

    D.  The Motion for Acquittal . . . . . . . . . . . . . .  11

    E.  The Sentencing Proceedings . . . . . . . . . . .  12

        1.  The Presentence Report and
            Sentencing Submissions . . . . . . . . . . .  12

        2.  The Sentencing . . . . . . . . . . . . . . . . . .  14

ARGUMENT:

POINT I—The District Court Did Not Err at
    Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

    A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . .  18

        1.  Standard of Review . . . . . . . . . . . . . . .  18

        2.  The Acquitted Conduct Guideline . . .  19

ii

PAGE

3.  Consideration of Acquitted Conduct in Determining the Appropriate Sentence . . . . . . . . . . . . . . . . . . . . . . . . 20

B.  Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 22

   1.  The District Court Properly Applied the Acquitted Conduct Guideline . . . . . . . 22

   2.  The District Court Correctly Calculated the Applicable Guidelines Range . . . . 28

      a.  The District Court Properly Applied the Fraud/Coercion Enhancement . . . . . . . . . . . . . . . . 29

      b.  The District Court Properly Applied the Leadership Enhancement . . . 32

      c.  The District Court Properly Applied the Grouping Enhancement . . . . . 35

      d.  Any Guidelines Error Was Harmless . . . . . . . . . . . . . . . . . . . . 36

   3.  The District Court Properly Considered Combs's Conduct in Determining the Appropriate Sentence Under Section 3553(a) . . . . . . . . . . . . . . . . . . . . . . . 38

POINT II—Combs Is Not Entitled to Acquittal Based on His Arguments that the Mann Act Should Be Construed to Exclude His Conduct . . . . . . . . . 44

A.  Applicable Law . . . . . . . . . . . . . . . . . . . . . . . 45

iii

PAGE

1. The Mann Act. . . . . . . . . . . . . . . . . . . . 45

2. Standard of Review . . . . . . . . . . . . . . . 45

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . 46

1. The District Court Correctly Construed
the Term "Prostitution" in the Mann
Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

2. The Canon of Constitutional Avoidance Is
Inapplicable . . . . . . . . . . . . . . . . . . . . . 49

a. There Are No Vagueness
Concerns . . . . . . . . . . . . . . . . . . . 50

b. There Are No Substantive Due
Process Concerns. . . . . . . . . . . . . 57

c. There Are No First Amendment
Concerns . . . . . . . . . . . . . . . . . . . 58

d. There Are No Federalism
Concerns . . . . . . . . . . . . . . . . . . . 58

3. Combs Is Not Entitled to Acquittal Even
Under His Own Definition . . . . . . . . 59

POINT III—Combs's Convictions Do Not Violate the
First Amendment . . . . . . . . . . . . . . . . . . . . . . . 60

A. Applicable Law . . . . . . . . . . . . . . . . . . . . 60

1. First Amendment. . . . . . . . . . . . . . . . 60

iv

PAGE

2. Standard of Review . . . . . . . . . . . . . . .  61

B. Discussion . . . . . . . . . . . . . . . . . . . . . . . . .  61

1. Combs's Conduct Does Not Implicate the
First Amendment. . . . . . . . . . . . . . . .  61

2. Even If Combs's Conduct Implicated the
First Amendment, His Convictions Do
Not Violate It . . . . . . . . . . . . . . . . . . .  66

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  69

## TABLE OF AUTHORITIES

*Cases*:

*Aetna Life Ins. Co. v. Big Y Foods, Inc.*,
52 F.4th 66 (2d Cir. 2022) . . . . . . . . . . . . . . . . .  47

*Alleyne v. United States*,
570 U.S. 99 (2013). . . . . . . . . . . . . . . . . . . . . . . .  40

*Arcara v. Cloud Books, Inc.*,
478 U.S. 697 (1986). . . . . . . . . . . . . . . . . . .  65, 66

*Bano v. Union Carbide Corp.*,
273 F.3d 120 (2d Cir. 2001) . . . . . . . . . . . . . . . .  42

*California v. Freeman*,
488 U.S. 1311 (1989). . . . . . . . . . . . . . . . . . .  62, 67

*Carpenter v. United States*,
585 U.S. 296 (2018). . . . . . . . . . . . . . . . . . . . . . .  39

v

PAGE

*Ciminelli v. United States*,
598 U.S. 306 (2000). . . . . . . . . . . . . . . . . . . . . . . . 58

*City of Erie v. Pap's A.M.*,
529 U.S. 277 (2000). . . . . . . . . . . . . . . . . . . . . . . . 61

*Cleveland v. United States*,
329 U.S. 14 (1946). . . . . . . . . . . . . . . . . . . . . . 47, 48

*Cleveland v. United States*,
531 U.S. 12 (2000). . . . . . . . . . . . . . . . . . . . . . . . 59

*Commonwealth v. Bleigh*,
586 A.2d 450 (Pa. Sup. Ct. 1991). . . . . . . . . . . . 54

*Coregis Ins. Co. v. Am. Health Found., Inc.*,
241 F.3d 123 (2d Cir. 2001) . . . . . . . . . . . . . . . . 27

*Erotic Serv. Provider Legal Educ. & Rsch. Project v.
Gascon*,
880 F.3d 450 (9th Cir. 2018) . . . . . . . . . . . . . . . . 67

*Jennings v. Rodriguez*,
583 U.S. 281 (2018). . . . . . . . . . . . . . . . . . . . . . . . 50

*Killgore v. City of S. El Monte*,
3 F.4th 1186 (9th Cir. 2021). . . . . . . . . . . . . . . . . 67

*Lawrence v. Texas*,
539 U.S. 558 (2003). . . . . . . . . . . . . . . . . . . . 57, 58

*Molina-Martinez v. United States*,
578 U.S. 189 (2016). . . . . . . . . . . . . . . . . . . . . . . . 37

*Obergefell v. Hodges*,
576 U.S. 644 (2015). . . . . . . . . . . . . . . . . . . . . . . . 57

vi

PAGE

*People v. Freeman*,
758 P.2d 1128 (Cal. 1988). . . . . . . . . . . . . . . . 63, 64

*People v. Greene*,
441 N.Y.S.2d 636 (N.Y. Crim. Ct. 1981) . . . . 55, 63

*People v. Paulino*,
2005 N.Y. Misc. LEXIS 3430
(N.Y. Sup. Ct. Aug. 4, 2005) . . . . . . . . . . . . . . . 56

*Pierre v. Holder*,
738 F.3d 39 (2d Cir. 2013) . . . . . . . . . . . . . . . . 50

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*,
547 U.S. 47 (2006). . . . . . . . . . . . . . . . . . 60, 62, 66

*Smoot v. State*,
729 S.E.2d 416 (Ga. Ct. App. 2012) . . . . . . . . . . 55

*State v. Burgess*,
669 S.W.2d 637 (Mo. Ct. App. 1984) . . . . . . . 54, 56

*State v. Mayfield*,
900 P.2d 358 (N.M. Ct. App. 1995) . . . . . . . . . . . 54

*State v. Taylor*,
808 P.2d 314 (Ariz. Ct. App. 1990) . . . . . . . . . . . 55

*State v. Theriault*,
960 A.2d 687 (N.H. 2008) . . . . . . . . . . . . . . . 63, 64

*State v. Turnpaugh*,
741 N.W.2d 488 (Wisc. Ct. App. 2007) . . . . . . . . 54

*Taniguchi v. Kan Pac. Saipan, Ltd.*,
566 U.S. 560 (2012). . . . . . . . . . . . . . . . . . . . . . . . 46

vii

PAGE

*Texas v. Johnson,*
　491 U.S. 397 (1989). . . . . . . . . . . . . . . . . 60, 61, 66

*United States v. Alvarez,*
　601 F. App'x 16 (2d Cir. 2015) . . . . . . . . . . . . . . 31

*United States v. Anderson,*
　139 F.3d 291 (1st Cir. 1998). . . . . . . . . . . . . . . . 32

*United States v. Barker,*
　723 F.3d 315 (2d Cir. 2013) . . . . . . . . . . . . . 19, 55

*United States v. Bell,*
　808 F.3d 926 (D.C. Cir. 2015). . . . . . . . . . . . . . 44

*United States v. Booker,*
　543 U.S. 220 (2005). . . . . . . . . . . . . . . . . . . 40, 43

*United States v. Caltabiano,*
　871 F.3d 210 (2d Cir. 2017) . . . . . . . . . . . . . . . 24

*United States v. Caminetti,*
　242 U.S. 470 (1917). . . . . . . . . . . . . . . . . . 47, 58

*United States v. Ciavarella,*
　716 F.3d 705 (3d Cir. 2013) . . . . . . . . . . . . . . . 21

*United States v. Concepcion,*
　139 F.4th 242 (2d Cir. 2025) . . . . . . . . . . . . 50, 52

*United States v. Cramer,*
　777 F.3d 597 (2d Cir. 2015) . . . . . . . . . . . . . 18, 29

*United States v. Darrah,*
　132 F.4th 643 (2d Cir. 2025) . . . . . . . . . . . . 18, 37

*United States v. Farhane,*
　634 F.3d 127 (2d Cir. 2011) . . . . . . . . . . . . . . . 51

viii

PAGE

*United States v. Farias*,
   469 F.3d 393 (5th Cir. 2006) . . . . . . . . . . . . . . . 21

*United States v. Faust*,
   456 F.3d 1342 (11th Cir. 2006) . . . . . . . . . . . . . 22

*United States v. Frampton*,
   382 F.3d 213 (2d Cir. 2004) . . . . . . . . . . . . . . . 46

*United States v. Grubbs*,
   585 F.3d 793 (4th Cir. 2009) . . . . . . . . . . . . . . 21

*United States v. Heras*,
   609 F.3d 101 (2d Cir. 2010) . . . . . . . . . . . . . . . 31

*United States v. Herrera*,
   584 F.2d 1137 (2d Cir. 1978) . . . . . . . . . . . . 51, 52

*United States v. High Elk*,
   442 F.3d 622 (8th Cir. 2006) . . . . . . . . . . . . . . 22

*United States v. Houtar*,
   980 F.3d 268 (2d Cir. 2020) . . . . . . . . . . . . . . . 45

*United States v. Irizarry-Sisco*,
   87 F.4th 38 (1st Cir. 2023) . . . . . . . . . . . . . . . . 21

*United States v. Jass*,
   569 F.3d 47 (2d Cir. 2009) . . . . . . . . . . . . . . . . 37

*United States v. Johnson*,
   507 F.3d 793 (2d Cir. 2007) . . . . . . . . . . . . . 21, 41

*United States v. Magallanez*,
   408 F.3d 672 (10th Cir. 2005) . . . . . . . . . . . . . . 22

*United States v. Martinez*,
   110 F.4th 160 (2d Cir. 2024) . . . . . . . . . . . . 31, 32

ix

PAGE

*United States v. Martinez,*
   525 F.3d 211 (2d Cir. 2008) . . . . . . . . . . . . . . . . 21

*United States v. Mercado,*
   474 F.3d 654 (9th Cir. 2007) . . . . . . . . . . . . . . . 22

*United States v. Mi Sun Cho,*
   713 F.3d 716 (2d Cir. 2013) . . . . . . . . . . . . . . . . 49

*United States v. Monsalve,*
   342 F. App'x 451 (11th Cir. 2009) . . . . . . . . . . . 32

*United States v. Muir,*
   710 F. App'x 510 (2d Cir. 2018) . . . . . . . . . . . . . 38

*United States v. Nadi,*
   996 F.2d 548 (2d Cir. 1993) . . . . . . . . . . . . . . . . 51

*United States v. Nadirashvili,*
   655 F.3d 114 (2d Cir. 2011) . . . . . . . . . . . . . . . . 51

*United States v. O'Brien,*
   391 U.S. 367 (1968) . . . . . . . . . . . . . . . . . . . . . 61, 62

*United States v. Paccione,*
   202 F.3d 622 (2d Cir. 2000) . . . . . . . . . . . . . . . . 34

*United States v. Palomar-Santiago,*
   593 U.S. 321 (2021) . . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Quinones,*
   511 F.3d 289 (2d Cir. 2007) . . . . . . . . . . . . . . 24, 27

*United States v. Rainford,*
   110 F.4th 455 (2d Cir. 2024) . . . . . . . . . . . . . . . . 36

*United States v. Requena,*
   980 F.3d 30 (2d Cir. 2020) . . . . . . . . . . . . . . . . . 46

x

PAGE

*United States v. Roeder*,
    526 F.2d 736 (10th Cir. 1975) . . . . . . . . . . . . . . . 62

*United States v. Santiago*,
    739 F. App'x 693 (2d Cir. 2018) . . . . . . . . . . . . . 37

*United States v. Settles*,
    530 F.3d 920 (D.C. Cir. 2008). . . . . . . . . . . . . . . 22

*United States v. Shahid*,
    486 F. App'x 915 (2d Cir. 2012) . . . . . . . . . . . . . 39

*United States v. Soler*,
    759 F.3d 226 (2d Cir. 2014) . . . . . . . . . . . . . . . . 45

*United States v. Stinson*,
    508 U.S. 36 (1993). . . . . . . . . . . . . . . . . . . . . . . . 36

*United States v. Sweargin*,
    935 F.3d 1116 (10th Cir. 2019) . . . . . . . . . . . . . 32

*United States v. Texidor*,
    164 F.4th 248 (3d Cir. 2026) . . . . . . . . . . . . . . . 42

*United States v. Ulbricht*,
    858 F.3d 71 (2d Cir. 2017) . . . . . . . . . . . . . . . . . 39

*United States v. Valle*,
    807 F.3d 508 (2d Cir. 2015) . . . . . . . . . . . . . . . . 46

*United States v. Vaughn*,
    430 F.3d 518 (2d Cir. 2005) . . . . . . . .   21, 38, 40, 41

*United States v. Venturella*,
    391 F.3d 120 (2d Cir. 2004) . . . . . . . . . . . . . . . . 49

*United States v. Waltower*,
    643 F.3d 572 (7th Cir. 2011) . . . . . . . . . . . . . . . 22

xi

PAGE

*United States v. Ware,*
141 F.4th 970 (8th Cir. 2025) . . . . . . . . . . . . . . . 42

*United States v. Watkins,*
667 F.3d 254 (2d Cir. 2012) . . . . . . . . . . . . . . . . 18

*United States v. Watts,*
519 U.S. 148 (1997) . . . . . . . . . . . . . . . . . . . *passim*

*United States v. Wells,*
519 U.S. 482 (1997) . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. White,*
551 F.3d 381 (6th Cir. 2008) . . . . . . . . . . . . . . . 22

*United States v. Wrightwood Dairy Co.,*
315 U.S. 110 (1942) . . . . . . . . . . . . . . . . . . . . . . 58

*Washington v. Glucksberg,*
521 U.S. 702 (1997) . . . . . . . . . . . . . . . . . . . . . . 57

*Western Union Telegraph Co. v. Call Pub. Co.,*
181 U.S. 92 (1901) . . . . . . . . . . . . . . . . . . . . . . . 58

*Wooten v. Superior Court,*
93 Cal. App. 4th 422 (Cal. Ct. App. 2001) . . . 55, 56

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 1591(a)(1) . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1591(b)(1) . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1594(a) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1962(d) . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

xii

PAGE

18 U.S.C. § 2421(a) . . . . . . . . . . . . . . . . . . 2, 45, 48, 52

18 U.S.C. § 3553(b)(1) . . . . . . . . . . . . . . . . . . . . . . . 35

18 U.S.C. § 3661 . . . . . . . . . . . . . . . . . . . . . . . . 20, 42

Fed. R. Crim. P. 29 . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S.S.G. § 1B1.3 . . . . . . . . . . . . . . . . . . . . 19, 29, 42

U.S.S.G. § 1B1.3(a) . . . . . . . . . . . . . . . . . . . . . . . . 19

U.S.S.G. § 1B1.3(c) . . . . . . . . . . . . . . . . . . . . . *passim*

U.S.S.G. § 2G1.1 . . . . . . . . . . . . . . . . . . . . . . . 35, 36

U.S.S.G. § 2G1.1(a)(1) . . . . . . . . . . . . . . . . . . . . . . 32

U.S.S.G. § 2G1.1(a)(2) . . . . . . . . . . . . . . . . . . . . . . 12

U.S.S.G. § 2G1.1(b)(1) . . . . . . . . . . . . . . . . . . . 12, 29

U.S.S.G. § 2G1.1(c)(1) . . . . . . . . . . . . . . . . . . . . . . 13

U.S.S.G. § 2G1.1(d)(1) . . . . . . . . . . . . . . . . . . . 12, 35

U.S.S.G. § 3B1.1(a) . . . . . . . . . . . . . . . . . . . . . 12, 33

U.S.S.G. § 3D1.4 . . . . . . . . . . . . . . . . . . . . . . . . . 12

U.S.S.G. § 6A1.3 . . . . . . . . . . . . . . . . . . . . . . . 20, 42

U.S.S.G. App. C Supp., Amend. 826 . . . . . . 19, 26, 42

Leonard B. Sand et al., 3 Modern Federal Jury
    Instructions: Criminal . . . . . . . . . . . . . . . . . 45, 47

2B Fed. Jury Prac. & Instr. (6th ed.) . . . . . . . . . . . 46

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 25-2623

———————————

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

SEAN COMBS, also known as Puff Daddy, also known
as P. Diddy, also known as Diddy, also known as PD,
also known as Love,

*Defendant-Appellant.*

———————————

## BRIEF FOR THE UNITED STATES OF AMERICA

———————————

### Preliminary Statement

Sean Combs appeals from a judgment of conviction
entered on October 16, 2025, in the United States Dis-
trict Court for the Southern District of New York, fol-
lowing an eight-week jury trial before the Honorable
Arun Subramanian, United States District Judge.

Superseding Indictment S3 24 Cr. 542 (AS) (the
"Indictment") was filed on April 3, 2025, in five counts.
Count One charged Combs with racketeering conspir-
acy, in violation of 18 U.S.C. § 1962(d). Count Two
charged Combs with sex trafficking by force, fraud, or

2

coercion of Casandra Ventura, in violation of 18 U.S.C.
§§ 1591(a)(1), (b)(1), 1594(a), and 2. Count Three
charged Combs with transportation of Ventura and
commercial sex workers to engage in prostitution, in
violation of the Mann Act, 18 U.S.C. §§ 2421(a) and 2.
Count Four charged Combs with sex trafficking by
force, fraud, or coercion of "Jane," in violation of 18
U.S.C. §§ 1591(a)(1), (b)(1), 1594(a), and 2. Count Five
charged Combs with transportation of Jane and com-
mercial sex workers to engage in prostitution, in viola-
tion of the Mann Act, 18 U.S.C. §§ 2421(a) and 2.

Trial commenced on May 12, 2025, and ended on
July 2, 2025, when Combs was convicted of Counts
Three and Five and acquitted of Counts One, Two, and
Four.

On October 3, 2025, Judge Subramanian sentenced
Combs principally to 50 months' imprisonment, to be
followed by five years' supervised release.

Combs is serving his sentence.

## Statement of Facts

### A. The Government's Case

The Government's proof at trial established that for
more than a decade and on hundreds of occasions,
Combs paid dozens of male commercial sex workers, or
escorts, to have sex with two of Combs's girlfriends,
Ventura and Jane.[1] These sex sessions—"Freak Offs"

---

[1] "Jane" was a pseudonym used at trial to protect
the victim's privacy.

3

or "Hotel Nights"—went on for hours or days as Combs directed the encounters, masturbated, and often filmed. Combs plied Ventura and Jane with drugs and was at times physically violent—hitting, kicking, and punching them—before, during, or after Freak Offs and Hotel Nights. Combs relied on his staff to book travel (including interstate and international trips), set up and clean hotel rooms, and deliver drugs, cash, and other supplies in connection with Freak Offs and Hotel Nights.

The Government's evidence at trial included the testimony of 34 witnesses, including Ventura and Jane, two escorts, and several of Combs's former employees. The Government also introduced hundreds of exhibits, including text messages among Combs and his victims; video recordings of Freak Offs and Hotel Nights; and financial records showing payments to escorts.

### 1. Freak Offs with Ventura

Combs was in a relationship with Ventura between approximately 2008 and 2018. (SA-77, 92).[2] After

---

[2] "Br." refers to Combs's brief on appeal; "A-" and "SPA-" refer to the appendix and special appendix, respectively, filed with Combs's brief; "SA-" refers to the supplemental appendix filed with this brief; "Law Professors Br." refers to the brief submitted by law professors as *amici curiae*; "NACDL Br." refers to the brief submitted by the National Association of Criminal Defense Lawyers as *amicus curiae*; "PSR" refers to the Presentence Report prepared by the Probation Office

4

meeting Ventura, Combs, the head of Bad Boy Records at the time, signed Ventura to a record contract and began pursuing her romantically when she was 21 years old and he was 38 years old. (SA-13-23). Soon, as Ventura's boyfriend and boss, Combs began controlling many areas of Ventura's life, including her career, appearance, day-to-day activities, and social interactions. (SA-24-25, 100, 114-16).

Shortly after their romantic relationship started, Combs became severely abusive to Ventura, smashing her in the head, knocking her over, dragging her, kicking her, and stomping on her head. (SA-7). This abuse regularly left Ventura with "knots in [her] forehead, busted lips, swollen lips, black eyes . . . [and] bruises all over [her] body." (SA-7). More than a dozen witnesses testified at trial about Combs's brutal abuse of Ventura. (*See, e.g.*, SA-78-90, 94-99, 102-13, 117-34).

After Combs began to physically abuse Ventura, he introduced her to Freak Offs, during which Combs directed and often videorecorded Ventura having sex with male escorts. (SA-8-12; A-188-89). Freak Offs often lasted for two or three days and followed a similar pattern, which Combs dictated: continuous application of baby oil, mutual touching and masturbation, oral sex, and penetrative sex. (SA-27, 48-53; A-178-79).

———————

in connection with Combs's sentencing; and "Dkt." refers to an entry on the District Court's docket for this case. Unless otherwise noted, case and record text quotations omit internal quotation marks, citations, and previous alterations.

5

Combs then had sex with Ventura, often with the escort's semen still on Ventura's body. (SA-51-52; A-187).

Freak Offs were fueled by copious amounts of drugs that Combs provided Ventura, including ecstasy, MDMA, ketamine, and GHB. (SA-27, 46-47). The drugs were "dissociative and numbing," allowing Ventura to get through Freak Offs—emotionless "sex with a stranger that [she] didn't want to be having sex with." (SA-46-47). At Combs's suggestion, Ventura often took opiates after Freak Offs to come down from the other drugs. (SA-62-63). Ventura eventually developed an opioid addiction, for which she later sought treatment. (SA-63, 91).

Over time, Freak Offs became frequent occurrences, taking place as often as weekly. (SA-26-27). Combs often arranged for escorts to travel interstate or internationally to participate in Freak Offs and provided cash to pay escorts for sex. (SA-39, 42-47, 263-85).

Combs was often physically violent toward Ventura before, during, and after Freak Offs. (*See, e.g.*, SA-2-6, 64-73, 466). One beating took place at the Intercontinental Hotel in Los Angeles, when Combs punched Ventura in the face during a Freak Off and then hit, kicked, and attempted to drag Ventura back to the hotel room after she attempted to leave. (SA-56-57, 262). Another beating took place in New York, when Combs assaulted Ventura between Freak Off "sessions," throwing a glass liquor bottle at her head, grabbing her by her hair, dragging her into the bedroom, and slapping her as he told her: "bitch, when I tell you to come here, you come now, not later." (SA-4). Faced

6

with this violence, Ventura continued participating in
Freak Offs in part because she "didn't really know
what no would be or what no could turn into" with
Combs. (A-158).

Combs also used videos of Freak Offs as "blackmail
material." (SA-11-12, 59-61, 75-76; *see also* SA-467,
511-14). One blackmail incident took place after
Combs assaulted Ventura during the 2012 Cannes
Film Festival in France. (SA-74-76, 133-34). On the
flight back from France to New York, Combs played
Freak Off videos, which Ventura thought she had de-
leted, and threatened Ventura that he would release
them. (SA-74-75). Ventura was "scared" and "felt
trapped." (SA-75). When they landed in New York,
Combs demanded a Freak Off. (SA-75). Ventura
agreed, afraid that Combs "could put these videos out
and ruin everything for me, embarrass me." (SA-75).

### 2. Hotel Nights with Jane

Combs's relationship with Jane began in early 2021
and continued until 2024. (SA-135-38). Soon after they
started dating, Combs introduced elements of "Hotel
Nights" into their sex life, including plying Jane with
drugs before and during sex. (SA-139-41). Jane even-
tually agreed to try a Hotel Night, during which
Combs gave her ecstasy and instructed her and the es-
cort to touch each other, rub oil on each other, and
have oral sex and then intercourse with each other.
(SA-142-53). Combs watched and masturbated. (A-
248).

Although Jane wanted to have sex with "[j]ust"
Combs, her relationship with Combs became mostly

7

about Hotel Nights with escorts. (SA-154-56). Combs provided Jane with ecstasy, cocaine, and molly, which she felt she needed to get through the Hotel Nights. (SA-171-77, 181; A-278-80). Like Freak Offs, Hotel Nights took place across the country and abroad, with Combs often arranging for Jane and escorts to travel interstate and internationally. (SA-161-62, 185-86, 195-96, 286-302).

As time went on, Jane began telling Combs that she wanted to stop doing Hotel Nights. (SA-157-59; *see, e.g.*, SA-403-05). But after Combs began paying Jane's monthly rent in April 2023, Combs repeatedly threatened to withhold her rent when she protested against Hotel Nights. (SA-159-60, 214-15, 444-65, 519-21).

In September 2023, Jane told Combs that she did not want to fly from Los Angeles to see him in New York because she did not want "to be used and locked in a room to perform and fulfill your fantasies." (SA-197-98, 406-14). Jane also told Combs that she did not "want to feel obligated to perform these nights w you in fear of losing the roof over my head." (SA-169-70, 406-14). In response, Combs promised Jane that it would "just be us" having a "romantic one-on-one time together." (SA-197-98). But after Jane boarded her flight to New York, Combs contacted an escort service to arrange a Hotel Night. (SA-197-99, 312-15). After Jane landed, Combs gave her ecstasy, and they had a Hotel Night with an escort who had traveled from Atlanta to New York. (SA-199-206, 303-29).

About a month later, on October 16, 2023, Jane repeatedly texted Combs that she did not want to participate in Hotel Nights anymore. (*See, e.g.*, SA-415-24 ("I

8

don't want to be fucked and mistreated. I don't feel like performing love less cold sex" / "I'm not a porn star I'm not an animal" / "It's been 3 years of me having to fuck strangers" / "I need a break. I can't be in another hotel room doing drugs and performing exhausted for days")). When Jane continued to refuse, Combs reminded her that he paid her rent and asked her eight times: "Are you going to let me in our house???" (SA-425-33; *see also* SA-210-11). That day, Combs arranged for an escort to travel from Las Vegas to Los Angeles for a Hotel Night with Jane. (SA-395-402). Jane tried to do that Hotel Night, with three escorts, without drugs. (SA-212-13). Between the second and third escort, Jane threw up, but Combs told her to continue. (SA-213). A few days later, Jane texted Combs: "I already did not wanna do anything and I did" / "U have me feeling a little crazy and feeling used. Like I got tricked into a party" (*i.e.*, a Hotel Night). (SA-434-35). And a few days later, Jane told Combs that she felt threatened: "Threatenin me over the roof over my head ever since I fuckin got Here" / "U got me sick and now u threaten the house for the millionth time." (SA-436-43).

In June 2024—just a month after Combs publicly apologized when the video of his assault of Ventura at the Intercontinental Hotel was publicly released (SA-216, 261)—Combs viciously assaulted Jane after she provoked him. Combs kicked down multiple doors in Jane's home, knocked her down, and then lifted her off the floor by her neck in a chokehold. (SA-217-21). Jane managed to escape, but Combs waited for her and continued the assault after she returned, kicking down a bedroom door, punching Jane in the head, punching

9

and kicking her while she was curled up on the ground, dragging her by the hair, and slapping her in the face so hard that she fell down in the shower. (SA-221-38).

After Combs finished beating Jane, he directed her to ice her face and put on lingerie and high heels, while Combs texted an escort for a Hotel Night. (SA-238-40). When the escort arrived, Combs brought Jane into the bathroom, gave her a pill, and told her: "Take this fucking pill. You're not going to ruin my fucking night. You better go out there. You're not going to ruin my fucking night. Get out there. Suck his dick. Fuck him. I don't care, just you're not going to ruin my fucking night." (SA-241). When Jane protested, Combs said, an inch away from Jane's face: "is this coercion?" (SA-242). Jane then took the ecstasy pill and, at Combs's direction, performed oral sex on the escort until he ejaculated. (SA-242-43). As a result of Combs's attack that day, Jane had a bruised eye and bruising and welts on her head. (SA-244-48).

### 3. Combs's Use of Others to Facilitate Freak Offs and Hotel Nights

Combs used the services of his staff, as well as outsiders, to facilitate Freak Offs and Hotel Nights. Kristina Khorram, Combs's chief of staff, helped coordinate travel and hotel rooms for Freak Offs and Hotel Nights; ensured that Combs had cash to pay escorts; and connected Combs to a drug supplier to ensure that Combs had drugs on hand for Freak Offs and Hotel Nights. (*See, e.g.*, SA-28-30, 161, 178-82, 249-50, 330-62, 515-18; A-178). Bridget Kreshover and Garren James, who owned an escort service

10

(Cowboys4Angels), knowingly provided Combs with escorts for sex and arranged for escorts' travel on occasions. (SA-33-36, 44, 58, 314-25, 363-402, 468-510). Combs also directed Ventura and Jane to facilitate their own Freak Offs and Hotel Nights, including by finding escorts, arranging escorts' travel, and paying escorts (with Combs reimbursing them). (SA-31-41, 44-46, 183-84, 186-194, 207-08, 320-25, 328-29; A-262, 268, 276).

## B.  The Defense Case

Combs advanced the defense case by introducing exhibits and through his cross-examinations of government witnesses and jury addresses. Throughout trial, Combs conceded his physical violence (which had been captured on videos and photographs admitted at trial), acknowledging that he engaged in abuse that was "horrible," "dehumanizing," and "indefensible." (A-119; *see also* SA-252-56, 259; A-111). Combs argued, however, that "domestic violence is not sex trafficking" or any other charged crime, and there was no evidence that Ventura (or anyone else) "engaged in any sexual activity because of violence or the threat of violence." (SA-251; *see also* SA-260; A-111, 370).

## C.  The Verdict

On July 2, 2025, the jury convicted Combs on Counts Three and Five (the Mann Act counts) and acquitted him on Counts One, Two, and Four (the racketeering conspiracy and sex trafficking counts).

11

### D. The Motion for Acquittal

In his post-trial motion for a judgment of acquittal under Federal Rule of Criminal Procedure 29, Combs argued that to avoid constitutional problems, the Mann Act should be "narrowly construed to apply only to defendants who have a commercial motive or—at the very least—to johns who pay a prostitute to have sex with the john." (Dkt. 486 at 25).[3] Combs further argued that acquittal was warranted because his conduct, which included filming the Freak Offs, was protected by the First Amendment. (*Id.* at 43-53). The Government opposed the motion. (Dkt. 493).

After oral argument (Dkt. 547), Judge Subramanian denied Combs's motion in a detailed written decision (SPA-1-16). Judge Subramanian rejected Combs's proposed construction and held that the correct definition of "prostitution" in the Mann Act is "sex in exchange for money or its equivalent"—as the jury had been instructed at Combs's own request. (SPA-3-8). Judge Subramanian carefully considered each of Combs's constitutional arguments and found them to be without merit. (SPA-8-13). Judge Subramanian also rejected Combs's "standalone challenge to his conviction under the First Amendment." (SPA-8).

---

[3]  All page numbers in citations to filings below refer to the CM/ECF-generated page numbers at the top of the page.

12

### E.   The Sentencing Proceedings

#### 1.   The Presentence Report and Sentencing Submissions

In advance of sentencing, the Probation Office calculated Combs's advisory sentencing range under the U.S. Sentencing Guidelines to be 70 to 87 months' imprisonment, based on an offense level of 27 and a Criminal History Category of I. (PSR ¶ 227). The Probation Office applied the November 2024 Guidelines Manual and calculated the offense level as follows:

- The offenses in Counts Three and Five had ten victims (Ventura, Jane, and eight escorts), each of which was treated as a separate Group pursuant to U.S.S.G. § 2G1.1(d)(1);

- With respect to each of the Groups, the base offense level was 14 pursuant to U.S.S.G. § 2G1.1(a)(2);

- With respect to the two Groups pertaining to Ventura and Jane, a four-level increase applied pursuant to U.S.S.G. § 2G1.1(b)(1) because the offense involved fraud or coercion (the "Fraud/Coercion Enhancement");

- With respect to each of the Groups, a four-level leadership increase applied pursuant to U.S.S.G. § 3B1.1(a) (the "Leadership Enhancement"); and

- Pursuant to U.S.S.G. § 3D1.4, the combined offense level for the ten Groups was

13

> 27, based on the highest offense level applicable to any of the Groups (22) and a five-level increase based on more than five total Units (the "Grouping Enhancement").

(PSR ¶¶ 83-153). The Probation Office recommended a sentence of 60 months' imprisonment. (PSR at 69).

Combs objected to the application of the Fraud/Coercion Enhancement, the Leadership Enhancement, and the Grouping Enhancement, principally invoking the new acquitted conduct guideline, U.S.S.G. § 1B1.3(c), which provides that "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, in whole or in part, the instant offense of conviction" (the "Acquitted Conduct Guideline"). (*See* Dkt. 510 at 86-92, 111-44). Combs further argued the District Court could not consider acquitted conduct under Section 3553(a) without raising "serious" constitutional and fairness concerns. (*See id.* at 92-111). Combs calculated his Guidelines range to be 6 to 12 months' imprisonment and sought a sentence of at most 14 months' imprisonment. (*Id.* at 85-86, 173).

The Government opposed Combs's objections and raised its own Guidelines objections, arguing, among other things, that the District Court should apply the threats-or-fear cross-reference in U.S.S.G. § 2G1.1(c)(1) and other enhancements, which would increase Combs's Guidelines sentence to 240 months' imprisonment, the statutory maximum term. (Dkt.

14

516 at 42-44). The Government sought a sentence of at least 135 months' imprisonment. (*Id.* at 4).

### 2. The Sentencing

On October 3, 2025, Combs appeared before Judge Subramanian for sentencing. (A-769-924). At the outset, Judge Subramanian addressed Combs's "foundational objection" regarding "the extent to which the Court may consider so-called acquitted conduct in determining the correct range under the sentencing guidelines." (A-778). Judge Subramanian noted the lack of case law interpreting the new guideline, which was "ambiguous, given that, in most cases, including this one, juries don't acquit defendants of conduct. They acquit them of charges." (A-778-79). However, the accompanying application note, referring to "overlapping conduct," suggested that "the real test is simple, to determine whether conduct that underlies an acquitted charge also establishes, in whole or in part, the instant offense of conviction." (A-779). Regarding what "establishes in whole or in part means, it's best understood as a relevancy test. Evidence is not relevant if it does not tend to prove or disprove an element of the offense." (A-779).

Judge Subramanian acknowledged that applying the guideline will necessarily "lead to some line drawing questions," which the U.S. Sentencing Commission "recognized, stating that the Court will be in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and, therefore, qualifies as relevant conduct." (A-779). The District Court had "done its best

15

to do that" in this case. (A-779). Judge Subramanian underscored that, ultimately, the extent to which acquitted conduct may be considered in calculating the advisory Guidelines range was a "narrow and, in this case, inconsequential" issue, because the District Court "considers all of the facts applying a preponderance of the evidence standard to impose a sentence sufficient but not greater than necessary to comply with the purposes set out in 18 U.S.C. [§] 3553(a)." (A-780; *see also* A-800).

Turning to the Guidelines calculation itself, Judge Subramanian overruled both parties' objections. (A-781-800). In particular, Judge Subramanian declined the Government's request to apply the threats-or-fear cross-reference in Section 2G1.1(c)(1). (A-781-84). "Ventura and Jane testified credibly that there was psychological, emotional, and physical violence in connection with the freak-offs and hotel nights." (A-784). However, the "technical question" before the District Court was "the intersection between the acquitted conduct provision and the [ ] cross-reference." (A-784). Applying the Acquitted Conduct Guideline, Judge Subramanian found that the conduct on which the Government relied to support the cross-reference was "acquitted conduct," because it underlay "the acquitted sex trafficking charge[s]," and that the Government had not demonstrated that there was "evidence that would establish, in whole or in part, the prostitution charges that also proves by a preponderance of the evidence that the defendant caused Ventura and Jane to engage in sex acts by threatening or placing them in immediate fear," as required under the cross-reference. (A-783-84).

16

Judge Subramanian also overruled Combs's objections to the three enhancements at issue in this appeal. With respect to the Grouping Enhancement, Judge Subramanian found that Ventura, Jane, and at least seven escorts were victims of the Mann Act offenses under the clear definition in the guideline. (A-787-88). With respect to the Fraud/Coercion Enhancement, Judge Subramanian found that "[t]he two instances cited by the government concerning Combs'[s] threats to release videos of freak-offs to Ventura and threats concerning Jane's home in connection with the hotel nights alone prove by a preponderance of the evidence that coercion was used under the definition provided in the guidelines." (A-789). With respect to the Leadership Enhancement, Judge Subramanian found that Combs was the organizer or leader of a criminal activity that involved at least five other criminally responsible participants and was otherwise extensive. (A-790-91).

In applying the Fraud/Coercion and Leadership Enhancements, Judge Subramanian considered the Acquitted Conduct Guideline and found that the evidence on which he relied was properly considered because it established in part the Mann Act offenses. (A-789, 791). Judge Subramanian also expressly noted that he "would impose the same sentence" under Section 3553(a) even if the Fraud/Coercion and Leadership Enhancements did not apply. (A-790, 792).

After calculating Combs's advisory Guidelines range to be 70 to 87 months' imprisonment and hearing from the parties, Combs, Combs's children, and others on behalf of the defense (A-800-908), Judge

17

Subramanian addressed the Section 3553(a) factors and explained the reasons for Combs's sentence (A-908-16). At the outset, Judge Subramanian made clear that Combs was "being sentenced for the offenses of conviction, the Mann Act charges here and not the 1591 sex trafficking charge and not the RICO charge that [he was] acquitted of." (A-908). Judge Subramanian considered Combs's mitigating factors, including his iconic "work history, impact on the black community, and entrepreneurship," his efforts to help his fellow inmates, his devotion to his family, and his previous drug addiction. (A-909-10; *see also* A-915). On the other side of the ledger, however, was "[t]he severity of the conduct at issue, the violence, the drugs, the coercion, and the devastation that it caused to Mr. Combs's victims." (A-915-16). For more than a decade, Combs, from a position of "power and control," abused his victims "physically, emotionally, and psychologically" and "used that abuse to get [his] way, especially when it came to freak-offs and hotel nights." (A-910).

After carefully considering all the Section 3553(a) factors—including the need to avoid unwarranted sentencing disparities—Judge Subramanian sentenced Combs principally to a below-Guidelines sentence of 50 months' imprisonment, to be followed by five years' supervised release. (A-911-17).

18

# **A R G U M E N T**

## **POINT I**

### **The District Court Did Not Err at Sentencing**

Combs argues that the District Court "flouted" the Acquitted Conduct Guideline in calculating the Guidelines range and violated the Constitution by considering acquitted conduct in determining the appropriate sentence. (Br. 2, 25-48; *see also* Law Professors Br. 9-17; NACDL Br. 4-14). These arguments are meritless. The District Court properly applied the Acquitted Conduct Guideline, correctly calculated the Guidelines range, and properly considered the aggravated manner in which Combs carried out his Mann Act offenses and harmed his victims in fashioning the appropriate sentence under Section 3553(a).

## **A. Applicable Law**

### **1. Standard of Review**

This Court reviews the reasonableness of a district court's sentence "under a deferential abuse-of-discretion standard." *United States v. Watkins*, 667 F.3d 254, 260 (2d Cir. 2012). This Court reviews the "district court's application of the Guidelines *de novo*, while factual determinations underlying a district court's Guidelines calculation are reviewed for clear error." *United States v. Cramer*, 777 F.3d 597, 601 (2d Cir. 2015). Guidelines errors, like other procedural errors, are subject to harmless-error review. *See, e.g.*, *United States v. Darrah*, 132 F.4th 643, 651 (2d Cir. 2025). This Court is "free to affirm an appealed decision on

19

any ground which finds support in the record, regardless of the ground upon which the trial court relied." *United States v. Barker*, 723 F.3d 315, 319 (2d Cir. 2013).

### 2. The Acquitted Conduct Guideline

The Guidelines range "shall be determined" by considering all "relevant conduct," broadly defined in Section 1B1.3(a). In the 2024 Guidelines Manual, the Sentencing Commission added the Acquitted Conduct Guideline as an exception to the definition of "relevant conduct." U.S.S.G. § 1B1.3(c). Under that guideline, "[r]elevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct also establishes, *in whole or in part*, the instant offense of conviction." *Id.* (emphasis added). In the commentary, the Commission explained that, in "cases in which certain conduct underlies both an acquitted charge and the instant offense of conviction," the district court "is in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct." U.S.S.G. § 1B1.3, comment. (n.10).

In adopting the new guideline, the Commission expressly recognized that its application may require a fact-intensive inquiry in some cases, including those involving "linked or related charges" or "overlapping conduct." U.S.S.G. App. C Supp., Amend. 826, at 264 (Reason for Amendment) (Nov. 1, 2024). The Commission underscored that it deliberately declined to set any bright-line rules, explaining that district courts

20

are in the best position to make the determinations based on the individual facts of each case:

> To ensure that courts may continue to appropriately sentence defendants for conduct that establishes counts of conviction, rather than define the specific boundaries of 'acquitted conduct' and 'convicted conduct' in such cases, the Commission determined that the court that presided over the proceeding will be best positioned to determine which conduct can properly be considered as part of relevant conduct based on the individual facts in those cases.

*Id.*

### 3. Consideration of Acquitted Conduct in Determining the Appropriate Sentence

The Acquitted Conduct Guideline only addresses the consideration of acquitted conduct with respect to the Guidelines calculation; it does not affect the district court's ability to otherwise consider acquitted conduct in determining the appropriate sentence. In adopting the guideline, the Commission expressly clarified that even acquitted conduct that is not relevant conduct for purposes of determining the Guidelines range may still be considered in determining the appropriate sentence. *See* U.S.S.G. § 6A1.3, p.s., comment. (explaining that, notwithstanding the Acquitted Conduct Guideline, "nothing in the Guidelines Manual abrogates a court's authority under 18 U.S.C. § 3661").

21

Under Section 3661, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." District courts thus enjoy "broad discretion to consider various kinds of information" in sentencing. *United States v. Watts*, 519 U.S. 148, 151 (1997) (per curiam). In particular, "a jury's verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge, so long as that conduct has been proved by a preponderance of the evidence." *Id.* at 157. That is because "acquittal on criminal charges does not prove that the defendant is innocent; it merely proves the existence of a reasonable doubt as to his guilt." *Id.* at 155. Following *Watts*, this Court has repeatedly reaffirmed that "district courts may find facts relevant to sentencing—as opposed to elements of the offense—by a preponderance of the evidence and in so doing may take into account acquitted conduct when sentencing defendants." *United States v. Johnson*, 507 F.3d 793, 797 (2d Cir. 2007); *see also United States v. Martinez*, 525 F.3d 211, 214-15 (2d Cir. 2008); *United States v. Vaughn*, 430 F.3d 518, 527 (2d Cir. 2005).[4]

---

[4] Every other Circuit with criminal jurisdiction has reached the same conclusion. *See, e.g.*, *United States v. Irizarry-Sisco*, 87 F.4th 38, 50-51 (1st Cir. 2023); *United States v. Ciavarella*, 716 F.3d 705, 735-736 (3d Cir. 2013); *United States v. Grubbs*, 585 F.3d 793, 798-799 (4th Cir. 2009); *United States v. Farias*,

22

## B. Discussion

### 1. The District Court Properly Applied the Acquitted Conduct Guideline

The record flatly belies Combs's contention that the District Court "flouted" and "defied" the Acquitted Conduct Guideline (Br. 2-3). The record shows that, before relying on any potential acquitted conduct in calculating any aspect of Combs's Guidelines range, the District Court conscientiously conducted the fact-intensive inquiry required by the Acquitted Conduct Guideline to assess whether the conduct "establishe[d], in whole or in part, the instant offense[s] of conviction." U.S.S.G. § 1B1.3(c). After conducting that inquiry, the District Court declined to apply the threats-or-fear cross-reference—which would have led to a "dramatic" increase in the Guidelines range—finding that the Government failed to demonstrate that conduct that "would establish, in whole or in part, the prostitution charges" also "prove[d] by a preponderance of the evidence that the requirements of the cross-

---

469 F.3d 393, 399-400 & n.17 (5th Cir. 2006); *United States v. White*, 551 F.3d 381, 386 (6th Cir. 2008) (en banc); *United States v. Waltower*, 643 F.3d 572, 575-578 (7th Cir. 2011); *United States v. High Elk*, 442 F.3d 622, 626 (8th Cir. 2006); *United States v. Mercado*, 474 F.3d 654, 656-658 (9th Cir. 2007); *United States v. Magallanez*, 408 F.3d 672, 683-685 (10th Cir. 2005); *United States v. Faust*, 456 F.3d 1342, 1347-48 (11th Cir. 2006); *United States v. Settles*, 530 F.3d 920, 923-924 (D.C. Cir. 2008).

23

reference were satisfied." (A-784). By contrast, the District Court applied the Fraud/Coercion Enhancement, finding that two specific instances of conduct both helped establish the Mann Act offenses and satisfied the requirements of the enhancement. (A-788-90). The District Court's careful application of the Acquitted Conduct Guideline flatly refutes Combs's baseless claims that the District Court "largely ignored" the guideline (Br. 26) or "ruled that [it] had no effect on sentencing practices" (Br. 20).

Combs and *amici* argue that the District Court erred in adopting "merely a relevancy test" to determine whether conduct "establishes in whole or in part, the instant offense of conviction." (Br. 28; *see also* NACDL Br. 4-7; Law Professors Br. 9-17). But the District Court's relevancy test—which asks whether acquitted conduct "tend[s] to prove . . . an element of the offense" (A-779)—is simply a restatement of the guideline's plain text: If conduct "tend[s] to prove" an element of the offense of conviction, then it necessarily "establishes" that element "in part," and vice versa. As the District Court correctly observed, "[n]othing in the guidelines suggests that the commission intended for courts to ignore conduct relevant to establishing the offense in question, so a more restrictive reading of this language is untenable." (A-779).

Moreover, as the District Court correctly noted, the relevancy test is "pretty much exactly the approach" that Combs himself had proposed below. (A-779-80). In his reply sentencing submission, Combs expressly conceded that "where conduct establishes *or helps to establish* one or more elements of the convicted count—

24

*even if it is not by itself sufficient to establish any single element or all the elements*—it can be considered relevant conduct even if it also established or help[ed] establish elements of a count of which the defendant was acquitted." (Dkt. 525 at 19 (emphases added)). There is no daylight between the District Court's test ("tend[s] to prove . . . an element of the offense" (A-779)) and Combs's own test ("helps to establish" an element of the offense (Dkt. 525 at 19))—both mean the same thing and merely restate the language of the guideline. In any event, regardless of what label the District Court used for the test, the District Court properly applied the guideline, because, as discussed below, the conduct on which the District Court relied in imposing the challenged enhancements established in part Combs's Mann Act offenses.

To the extent Combs now purports to walk away from his own test below and suggest that acquitted conduct is not relevant conduct unless it "proves the elements of the offense of conviction" (Br. 28), any such argument is waived. *See United States v. Wells*, 519 U.S. 482, 488 (1997) ("[A] party may not complain on appeal of errors that he himself invited or provoked the district court to commit."); *United States v. Calta-biano*, 871 F.3d 210, 219 (2d Cir. 2017) (invited error doctrine precludes defendant from challenging on appeal jury instructions he requested the district court deliver); *United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007) (under the invited error doctrine, "when defendants obtain precisely what they affirmatively sought, it ill behooves them now to complain of error"). In any event, any such argument is meritless because the Acquitted Conduct Guideline—by its use of the

25

phrase "establishes, in whole or *in part*" (which Combs and *amici* quote and then ignore in their briefs)— plainly does not limit consideration of acquitted conduct to conduct that *on its own* is sufficient to prove an element of the offense.[5]

Combs and *amici* argue that "the district court's 'relevancy test' is so broad that it would nullify the acquitted conduct guideline itself," because "all conduct relevant to the offense of conviction was supposed to be considered under the former 'relevant conduct' provision." (Br. 30; *see also* NACDL Br. 6-7; Law Professors Br. 13). This argument is meritless. Indeed, the District Court's application of its relevancy test *in this*

———————

[5] The legislative history of the Acquitted Conduct Guideline confirms that the Commission knew how to limit conduct only to that constituting elements of crimes, but did not do so here. In the Commission's proposed amendment to Section 1B1.3(c), a proposed definition of "acquitted conduct" was conduct "*constituting an element of* . . . a charge of which the defendant has been acquitted." United States Sentencing Commission, Federal Register Notice of Proposed 2023-2024 Amendments 51, https://www.ussc.gov/sites/default/files/pdf/amendment-process/federal-register-notices/20231222_fr-proposed-amdts.pdf (last accessed Feb. 19, 2026) (emphasis added). The Commission did not use comparable language in adopting its final amendment to Section 1B1.3(c), either in the definition of acquitted conduct or in its explanation of what acquitted conduct can be considered relevant conduct.

26

*case* refutes any notion that it interpreted the exception to the guideline to "swallow[ ] the rule." (Br. 30). The District Court did not, as Combs suggests (*see* Br. 33-34), indiscriminately consider all the trial evidence in calculating the Guidelines range. Rather, the District Court surgically focused only on the narrow swath of conduct that established the Mann Act offenses and considered whether any of *that* conduct satisfied the requirements of the Guidelines enhancements at issue, concluding in the case of the threats-or-fear cross-reference that it did not. (A-784, 789-90).[6]

To the extent Combs is inviting this Court to engage in the speculative exercise of applying the Acquitted Conduct Guideline to hypothetical fact patterns not presented in this case, this Court should reject that invitation. The Commission itself expressly recognized that the guideline may require courts "to parse out acquitted conduct in a variety of specific scenarios, including those involving 'linked or related charges' or 'overlapping conduct.'" U.S.S.G. App. C Supp., Amend. 826, at 264 (Reason for Amendment) (Nov. 1, 2024). In light of the fact-intensive nature of that inquiry, the Commission declined to set any bright-line rules to "define the specific boundaries of 'acquitted conduct' and 'convicted conduct,'" explaining that "the court

---

[6] Notably, with respect to the Fraud/Coercion Enhancement, the District Court expressly noted that, had it been allowed to consider more conduct under the Acquitted Conduct Guideline, additional conduct would "unquestionably support application of this enhancement." (A-790).

27

that presided over the proceeding will be best positioned to determine which conduct can properly be considered as part of relevant conduct based on the individual facts in those cases." *Id.* The District Court did precisely that here. Just like this Court would not engage in the exercise of determining what evidence may or may not be admissible at trial in hypothetical cases —a similar discretionary decision that a district court makes based on the particular facts of each case—it should not engage in any similar exercise here.

Combs also argues that the Acquitted Conduct Guideline's "amendment's history demonstrates that the Commission explicitly rejected the test adopted by the district court." (Br. 30; *see also* NACDL Br. 6). But that is not true. The "rejected" test would have excluded from the definition of "acquitted conduct" any conduct that "was determined by the court to have been established at trial beyond a reasonable doubt and "relates, in whole or in part, to the instant offense of conviction."[7] But "relates to"—akin to "associated with," *Coregis Ins. Co. v. Am. Health Found., Inc.*, 241 F.3d 123, 129 (2d Cir. 2001)—is a far broader concept than the District Court's test, requiring that conduct "tend[ ] to prove . . . an element of the offense" (A-779).

---

[7] *See* United States Sentencing Commission, 2023-2024 Amendment Cycle: Proposed Amendments/ Public Comment, https://www.ussc.gov/sites/default/ files/pdf/amendment-process/public-comment/202402/ 88FR89142_public-comment.pdf (last accessed Feb. 19, 2026).

28

Combs's remaining arguments are meritless. The District Court's analysis did not "run roughshod" over the concerns by jurists with use of acquitted conduct at sentencing. (Br. 33). The Acquitted Conduct Guideline was adopted in response to those concerns, and the District Court diligently applied that guideline based on the trial record in this case, just as the Commission directed. Nor, as discussed, is there any merit to Combs's contention that the District Court "did not even follow its own . . . test" because it considered "all" trial evidence in calculating the Guidelines range. (Br. 34). The record is clear that in determining whether to apply any Guidelines enhancement, the District Court—far from considering "all" trial evidence—properly considered only the narrow conduct that established the offenses of conviction. (*See* A-784, 788-90).

### 2. The District Court Correctly Calculated the Applicable Guidelines Range

In challenging the Fraud/Coercion and Leadership Enhancements, Combs does not contest the District Court's findings that the trial evidence established, by a preponderance of the evidence, the enhancements' requirements. Rather, Combs argues that the District Court committed reversible error by considering conduct in violation of the Acquitted Conduct Guideline. (*See* Br. 25-34, 41-45). Combs also argues that the District Court erred in applying the Grouping Enhancement because the Mann Act offenses are "victimless." (Br. 45-48). These arguments fail. Having presided over the eight-week trial, Judge Subramanian was "in the best position to determine whether . . . overlapping

29

conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct." U.S.S.G. § 1B1.3, comment. (n.10). The District Court's careful and reasoned determinations were well within its discretion. It properly applied all the challenged enhancements, and any error was harmless in any event.

### a. The District Court Properly Applied the Fraud/Coercion Enhancement

The Fraud/Coercion Enhancement applies whenever a Mann Act offense "involved fraud or coercion." U.S.S.G. § 2G1.1(b)(1). The District Court applied the enhancement based on two specific instances of coercion: "Combs'[s] threats to release videos of freak-offs to Ventura and threats concerning Jane's home in connection with the hotel nights." (A-789). Combs does not dispute that both instances independently satisfy the enhancement's requirements. Rather, Combs argues that the District Court should have ignored them based on the Acquitted Conduct Guideline. (Br. 41-43). Combs is wrong.[8]

Even assuming, as the District Court did (A-789), that both instances of coercion are acquitted conduct,

––––––––––

[8]  Because under the grouping analysis, Combs's Guidelines range would be unaffected if the enhancement applied to either of the two groups relating to Ventura or Jane alone, this Court should affirm if it concludes that the enhancement was properly applied as to either Group. *See Cramer*, 777 F.3d at 603.

30

each "establishe[d] . . . in part," U.S.S.G. § 1B1.3(c), the intent element of the Mann Act offenses—that is, that Combs intended that the individuals whom he transported in interstate or foreign commerce "would engage in an act of prostitution." (A-397). With respect to Ventura, Combs threatened Ventura, on a transatlantic flight from France to New York, that he would release Freak Off sex videos and then promptly demanded, upon landing, that Ventura engage in a Freak Off, which she did, fearing Combs's threats. (SA-74-76, 133-34). Similarly, with respect to Jane, after Jane repeatedly told Combs that she did not want to continue to participate in Hotel Nights, Combs threatened her with losing her home (for which he was paying rent), and then promptly arranged for an escort to travel from Las Vegas to Los Angeles for a Hotel Night, which Jane agreed to do, fearing Combs's threats. (SA-210-11, 363-402, 415-35, 303-29). In both cases, Combs's threats—which occurred during or immediately preceding the act of transportation—helped establish Combs's intent that the victim would engage in an act of prostitution (Freak Off or Hotel Night) on the heels of Combs's threats.

Combs argues that the Mann Act offenses did not "require proof of coercion." (Br. 42). In effect, Combs appears to suggest that where there is factual overlap between acquitted and convicted counts, a sentencing judge, in calculating the Guidelines range, must consider only the minimum necessary conduct to achieve the counts of conviction, regardless of the actual evidence introduced at trial. This suggestion finds no support in the Guidelines, the application note, the Commission's published rationale, or any other authority.

31

Moreover, such an approach would be unworkable and unrealistic, as it would require sentencing courts to parse each piece of evidence to determine a hypothetical alternative minimum quantum of evidence that could have carried the Government's burden on the counts of conviction. Such an exercise would be particularly intractable for a *mens rea* element such as intent, which "may be proved by circumstantial evidence alone." *United States v. Heras*, 609 F.3d 101, 106 (2d Cir. 2010).

Finally, while the District Court did not reach this issue, this Court can also affirm on the alternative ground that the specific instances of conduct on which the District Court relied were not acquitted conduct—that is, conduct for which Combs "was criminally charged and acquitted in federal court." U.S.S.G. § 1B1.3(c). Combs argues that by acquitting him of sex trafficking, the "jury necessarily concluded that Ventura and Jane were not coerced." (Br. 27). But that argument runs headlong into the well-established principle that "[i]t is inappropriate for a sentencing court to speculatively conclude that the jury found or rejected a certain fact based on its verdict of acquittal." *United States v. Martinez*, 110 F.4th 160, 175 (2d Cir. 2024). The sex trafficking statute is complex and has requirements absent from the Fraud/Coercion Enhancement. (*See* Dkt. 516 at 83-85). Of particular relevance here, "[t]he sex trafficking statute criminalizes certain means when they are used to cause [a commercial sex] act." *United States v. Alvarez*, 601 F. App'x 16, 18 (2d Cir. 2015); (*see* A-393-94). Coercive threats must also "be sufficient in kind or degree to overcome the will of an ordinary person." (A-392-94). By contrast,

32

the enhancement broadly applies whenever there is "prostitution plus coercion," even if the coercive conduct did not cause a person to engage in a specific sex act. *United States v. Monsalve*, 342 F. App'x 451, 454 n.7 (11th Cir. 2009) (per curiam); *see, e.g.*, *United States v. Sweargin*, 935 F.3d 1116, 1122-23 (10th Cir. 2019) (upholding enhancement where victim stated that she was not coerced to travel for prostitution on a particular occasion); *United States v. Anderson*, 139 F.3d 291, 298 (1st Cir. 1998).[9] A reasonable jury thus could have concluded, for example, that Combs's coercive acts did not "cause" the commercial sex acts, or that they were insufficient to overcome the will of an ordinary person, without needing to decide whether Combs's offense "involved fraud or coercion" within the broader meaning of the Fraud/Coercion Enhancement. *See Martinez*, 110 F.4th at 175 ("With the return of a general verdict, it is impossible to know anything more than the jury's bottom-line decision to acquit.").

### b.    The District Court Properly Applied the Leadership Enhancement

The Leadership Enhancement applies "[i]f the defendant was an organizer or leader of a criminal

───────────

[9]    The Guidelines themselves impose far more severe consequences for sex trafficking than for prostitution that involves fraud or coercion. Had Combs been convicted of sex trafficking, his Chapter Two offense level would have been at least 34, not 18, as it is for a Mann Act violation plus coercion. *See* U.S.S.G. § 2G1.1(a)(1).

33

activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). The District Court found that Combs was "plainly the organizer of the freak-offs and hotel nights," and that Combs's staff "were acting for his benefit and [at] his direction" in helping to arrange them. (A-791). The District Court found that Combs's offense involved at least five other criminally responsible participants (Ventura, Jane, Khorram, James, and Kreshover) and was otherwise extensive. (A-790-91). Combs does not challenge any of these findings except insofar as he argues that they were improperly based on acquitted conduct underling the racketeering conspiracy count. (Br. 43-45). Combs is, once again, wrong.

Even assuming, as the District Court did, that any of the conduct on which the District Court relied was acquitted conduct, the District Court acted well within its discretion in finding that this conduct also "plainly establishe[d], in whole or in part, the offenses of conviction," because it helped establish Combs's "intent, the transport of escorts, Jane and Ventura[] for sex, and proof that the acts were in fact acts of prostitution." (A-791). While Combs disagrees with the District Court's determination as to intent, he raises no specific challenge to the District Court's independently sufficient determinations that the conduct also helped establish the other requirements of his Mann Act offenses. (*See* Br. 45). Nor could he. For example, Khorram's facilitation, at Combs's request, of interstate travel for Jane and escorts for Hotel Nights (*see, e.g.*, SA-304, 309) plainly helped establish the Mann Act's transportation element.

34

Finally, this Court should affirm on the alternative ground that the conduct on which the District Court relied in applying the Leadership Enhancement was not conduct for which Combs "was criminally charged and acquitted in federal court." U.S.S.G. § 1B1.3(c). *First*, the RICO statute has numerous complex requirements that are absent from the Leadership Enhancement (*see* Dkt. 516 at 94), and Combs's dubious contention—that "[t]he only logical conclusion" from his acquittal is that the jury found that he violated the Mann Act "alone" (Br. 44)—again runs headlong into the Supreme Court's directive that "[a]n acquittal is not a finding of any fact." *Watts*, 519 U.S. at 155. And *second*, acquitted conduct conceivably could be implicated only in findings regarding whether Combs's *employees* were knowing participants. But the District Court also found that four non-employees (Ventura, Jane, James, and Kreshover) were knowing participants (in addition to Combs),[10] and, moreover, that Combs's criminal activity "was otherwise extensive," because it used "the services of numerous outsiders that were peculiar and necessary to the offense." (A-790-91). These findings plainly do not implicate any acquitted conduct and independently support the application of the Leadership Enhancement.

---

[10] Combs counts as one of the five participants. *See United States v. Paccione*, 202 F.3d 622, 624-25 (2d Cir. 2000) (per curiam).

35

### c. The District Court Properly Applied the Grouping Enhancement

The guideline applicable to Combs's Mann Act offenses provides that "[i]f the offense involved more than one victim," the grouping rules "shall be applied as if the [offense] in respect to each victim had been contained in a separate count of conviction." U.S.S.G. § 2G1.1(d)(1). The commentary defines "victim" as "a person transported, persuaded, induced, enticed, or coerced to engage in, or travel for the purpose of engaging in, a commercial sex act or prohibited sexual conduct, *whether or not the person consented to the commercial sex act or prohibited sexual conduct*." U.S.S.G. § 2G1.1, comment. (n.1) (emphasis added). Based on this definition, the District Court found that Ventura, Jane, and at least seven escorts were victims for purposes of Section 2G1.1 and, as a result, applied the Grouping Enhancement. (A-787-88, 801).

Combs does not, and cannot, dispute that Ventura, Jane, and the escorts were victims under the clear definition in the commentary. Instead, Combs argues that the District Court erred by not ignoring that clear definition. (Br. 45-48). But this argument is foreclosed by binding authority. Congress has directed courts to consider "the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission" in imposing a sentence. 18 U.S.C. § 3553(b)(1). And the Supreme Court has directed that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent

36

with, or a plainly erroneous reading of, that guideline." *United States v. Stinson*, 508 U.S. 36, 38 (1993).

Combs is left to argue that the definition of "victim" in the commentary is "inconsistent with, or a plainly erroneous reading of the guideline itself." (Br. 46). According to Combs, "[t]he plain meaning of 'victim' is one harmed or injured by a particular action," and persons who participate in an act of prostitution "willingly" and "voluntarily"—as Combs claims Ventura, Jane, and the escorts did—cannot be "harmed or injured." (Br. 46-47). But even accepting Combs's dubious factual premise that Ventura, Jane, and the escorts participated in Freak Offs and Hotel Nights willingly and voluntarily, this Court has held that a person may be "harmed by a crime"—and thus be a "victim"—even if he "engaged in the scheme voluntarily" and willfully. *United States v. Rainford*, 110 F.4th 455, 483-84 (2d Cir. 2024). In *Rainford* itself, this Court held that recruits in a slip-and-fall scheme were victims notwithstanding that they were also co-conspirators, because "the organizers of the conspiracy took advantage of their economic vulnerability to lead them to undertake serious physical and legal risks." *Id.* at 484. So, too here, the Commission properly determined—consistent with the plain meaning of "victim"—that persons transported by others to engage in prostitution are victims even if they "consented to the commercial sex act." U.S.S.G. § 2G1.1, comment. (n.1).

### d.   Any Guidelines Error Was Harmless

Even if the District Court erred in applying any of the challenged enhancements, "the record indicates

37

clearly that the district court would have imposed the same sentence in any event." *United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009). *First*, the District Court underscored that the application of the Acquitted Conduct Guideline in this case was a "narrow" and "inconsequential" issue, because it would "consider[ ] *all* of the facts applying a preponderance of the evidence standard to impose a sentence sufficient but not greater than necessary to comply with the purposes set out in 18 U.S.C. [§] 3553(a)." (A-780 (emphasis added)). *Second*, the District Court expressly stated that it "would impose the same sentence" under Section 3553(a) regardless of whether the Fraud/Coercion and Leadership Enhancements applied. (A-790, 792). *Third*, the District Court's detailed explanation of the reasons for Combs's sentence (A-908-16) made "clear that the judge based the sentence he . . . selected on factors independent of the Guidelines." *Molina-Martinez v. United States*, 578 U.S. 189, 200 (2016). On this record, any error in applying the challenged enhancements was clearly harmless. *See, e.g.*, *Darrah*, 132 F.4th at 651; *Jass*, 569 F.3d at 68 (any Guidelines error was harmless where "the district court unequivocally stated that it would impose the same . . . sentence on [defendant] however the issue of [the challenged enhancement] ultimately works out on appeal"); *United States v. Santiago*, 739 F. App'x 693, 695 (2d Cir. 2018) (any Guidelines error was harmless where district court "made abundantly clear that it thought the sentence it chose was appropriate irrespective of the Guidelines range").

38

### 3. The District Court Properly Considered Combs's Conduct in Determining the Appropriate Sentence Under Section 3553(a)

Combs argues that the District Court violated the Constitution—specifically, the Double Jeopardy and Due Process Clauses of the Fifth Amendment and the Sixth Amendment right to a jury trial—in considering his "coercion and other acquitted conduct" in fashioning the appropriate sentence under Section 3553(a). (Br. 34-41; *see also* NACDL Br. 7-14). According to Combs, the District Court should have closed its eyes to how he carried out his Mann Act offenses and abused his victims—violently beating them, threatening them, lying to them, and plying them with drugs. To do otherwise, Combs says, violated the Constitution and was "unfair and unjust." (Br. 34). Combs is wrong.

Combs's constitutional arguments are foreclosed by binding precedent. *See, e.g.*, *Watts*, 519 U.S. at 154-56 (consideration of acquitted conduct at sentencing comports with the Double Jeopardy Clause and "application of the preponderance standard at sentencing generally satisfies due process"); *Vaughn*, 430 F.3d at 525-27 (reaffirming *Watts* after *Apprendi* and *Booker* and holding that district courts may, consistent with the Fifth and Sixth Amendments, "find facts relevant to sentencing by a preponderance of the evidence, even where the jury acquitted the defendant of that conduct"). This Court has thus summarily rejected constitutional challenges identical to Combs's. *See United States v. Muir*, 710 F. App'x 510, 510-11 (2d Cir. 2018) (defendant's arguments that consideration of

acquitted conduct at sentencing "violated the Due Process and Double Jeopardy Clauses of the Fifth Amendment, and the Sixth Amendment's guarantee of trial by jury . . . are foreclosed by circuit precedent"); *United States v. Shahid*, 486 F. App'x 915, 916 (2d Cir. 2012) ("[W]e have previously considered and rejected arguments that the Fifth Amendment's Due Process Clause and the Sixth Amendment right to a jury trial prohibit consideration of acquitted conduct in deciding on a sentence within the minimum and maximum statutory range for the crime of conviction.").[11]

Against this wall of authority, Combs claims that *Watts* addressed the use of acquitted conduct in calculating the Guidelines range and "is thus of limited precedential value as to using acquitted conduct at sentencing for other purposes—such as the 3553(a) factors." (Br. 38). But *Watts* itself, not to mention its progeny, reaffirmed the broader principle that courts may consider acquitted conduct in determining the

---

[11] One set of *amici* argues that the District Court lacked *statutory* authority to consider acquitted conduct at sentencing. (Law Professors Br. 17-24). This Court is "not required to address arguments raised only by an *amicus*." *United States v. Ulbricht*, 858 F.3d 71, 128 (2d Cir. 2017), *overruled on other grounds by Carpenter v. United States*, 585 U.S. 296 (2018). In any event, this argument is also foreclosed by precedent. *See Watts*, 519 U.S. at 152 (recognizing that "the broad language of § 3661" provides no basis for "courts to invent a blanket prohibition against considering" acquitted conduct "at sentencing").

appropriate sentence. *See* 519 U.S. at 152 (noting that the well-established principle that acquitted conduct can be considered at sentencing predated the Guidelines). Nor does the footnote in *Booker* that *Watts* "presented a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause" (Br. 38 (quoting *United States v. Booker*, 543 U.S. 220, 240 n.4 (2005))) help Combs. The Supreme Court was merely underscoring that *Watts* did not address the Sixth Amendment issue presented in *Booker* itself. *See Booker*, 543 U.S. at 240. This Court has expressly reaffirmed *Watts*'s core holding post-*Booker*. *See Vaughn*, 430 F.3d at 527.

Combs also invokes the *Apprendi* doctrine to argue that consideration of acquitted conduct usurps the jury's role. (Br. 36). But in the *Apprendi* line of cases, the Supreme Court has repeatedly reaffirmed the principle underlying *Watts*—that, within the statutory range of sentences authorized by a jury's verdict, a sentencing judge may make factual findings to aid its determination of the appropriate sentence, unconstrained by the jury's verdict. In *Alleyne v. United States*, 570 U.S. 99 (2013), for example, the Supreme Court expressly recognized the "important[]" distinction between, on the one hand, "facts that increase either the statutory maximum or minimum" and, on the other, facts "used to guide judicial discretion in selecting a punishment within limits fixed by law." *Id.* at 113 n.2. Whereas the former must be found by a jury, "the Sixth Amendment does not govern" the latter, which may be found by a sentencing judge even if they lead to a "more severe" sentence. *Id.*; *see also id.* at 116 ("We have long recognized that broad sentencing

41

discretion, informed by judicial factfinding, does not violate the Sixth Amendment").

Combs also argues that the District Court failed to "consider the jury's acquittal when assessing the weight and quality of the evidence presented by the prosecution and determining a reasonable sentence." (Br. 35 (quoting *Vaughn*, 430 F.3d at 527)). But the District Court acknowledged Combs's acquittals and made clear that Combs was "sentenced for the offenses of conviction, the Mann Act charges here and not the 1591 sex trafficking charge and not the RICO charge that [he was] acquitted of." (A-908); *see Johnson*, 507 F.3d at 797 (district court adequately considered the jury's acquittal as required by *Vaughn* where it "specifically acknowledged the acquittals in issuing its sentence").[12] Nor did the District Court commit any "perversion of justice" by "act[ing] as a thirteenth juror" and sentencing Combs "as if the jury had found him guilty of sex trafficking and RICO." (Br. 3; *see also* NACDL Br. 10). The record is pellucid that Combs was sentenced only for his Mann Act offenses of conviction (A-908) and not for any acquitted charges—which would have resulted in a sentence many years, if not decades, longer than Combs's 50-month sentence.[13]

––––––––––

[12]  Indeed, Combs does not contest that all the facts on which the District Court relied at sentencing were supported by a preponderance of the evidence.

[13]  One set of *amici* argues that this Court should find Combs's sentence to be "unreasonable" in light of the District Court's reliance on acquitted conduct.

42

Combs's suggestion that the Acquitted Conduct Guideline undercuts "*Watts* and the idea that courts can consider acquitted conduct" under Section 3553(a) (Br. 35) also fails. Section 1B1.3, by its plain text, only limits what is considered relevant conduct in calculating the Guidelines range. Moreover, in adding the Acquitted Conduct Guideline to the Guidelines, the Commission made clear that "nothing in the Guidelines Manual abrogates a court's authority under 18 U.S.C. § 3661." U.S.S.G. App. C Supp., Amend. 826, at 264 (Reason for Amendment) (Nov. 1, 2024); *see also* U.S.S.G. § 6A1.3, p.s., comment. Thus, as two Circuits have already held, "§ 1B1.3(c) does not preclude courts from considering acquitted conduct when analyzing the factors under 18 U.S.C. § 3553(a) and determining whether and where to impose a sentence within or outside of the Guidelines range." *United States v. Texidor*, 164 F.4th 248, 254 (3d Cir. 2026); *see also United States v. Ware*, 141 F.4th 970, 974 n.2 (8th Cir. 2025).

Ultimately, the reason that no federal court has accepted the arguments Combs presses is that they are inconsistent with the very premise of the modern sentencing regime. The system of judicial fact-finding and

––––––––––

(Law Professors Br. 24-29). This Court need not consider this argument, as Combs has not raised it. *See, e.g.*, *Bano v. Union Carbide Corp.*, 273 F.3d 120, 127 n.5 (2d Cir. 2001). In any event, nothing about Combs's 50-month sentence for transporting others for prostitution over the course of more than a decade—during which time Combs admittedly abused his victims and provided them with drugs—is unreasonable.

43

advisory guidelines is calculated to preserve both the sentencing judge's "broad discretion in imposing a sentence within a statutory range," *Booker*, 543 U.S. at 233, and the "basic aim of ensuring similar sentences for those who have committed similar crimes in similar ways," *id.* at 252. By contrast, Combs seeks an unprecedented rule against consideration of any conduct that could have also supported a conviction on an acquitted count. That rule would eliminate sentencing judges' long-recognized discretion to engage in fact-finding to aid their sentencing decisions, forcing them to blind their eyes to the actual conduct of each defendant before them. Such a sentencing regime would undermine Congress's "basic statutory goal" of "diminish[ing] sentencing disparity," which "depends for its success upon judicial efforts to determine, and to base punishment upon, the *real conduct* that underlies the crime of conviction." *Id.* at 250 (emphasis in original); *see also id.* at 252 (emphasizing the need to consider all conduct relevant to sentencing to achieve "the sentencing statute's basic aim of ensuring similar sentences for those who have committed similar crimes in similar ways"). Combs's proposed regime would also be inconsistent with Section 3553(a), which requires sentencing judges to consider, among other factors, "the history and characteristics of the defendant" and "the need for the sentence imposed . . . to afford adequate deterrence to criminal conduct" and "to protect the public from further crimes of the defendant." Contrary to Combs's repeated accusations that the District Court acted unfairly, it is Combs's proposed practice

44

that would generate unfair and unjust sentencing results.[14]

## POINT II

### Combs Is Not Entitled to Acquittal Based on His Arguments that the Mann Act Should Be Construed to Exclude His Conduct

After proposing at trial to define "prostitution" in the Mann Act as "engaging in sexual activity for money or its equivalent" (Dkt. 273 at 56), Combs now argues that "prostitution" must be narrowly construed, under the canon of constitutional avoidance, to

--------

[14] To be sure, as Combs and *amici* note, some federal jurists have expressed concern about the practice of considering acquitted conduct at sentencing. But the animating concern of those jurists is with "allowing judges to materially increase the length of imprisonment based on facts that were *submitted directly to and rejected by* the jury." *United States v. Bell*, 808 F.3d 926, 930 (D.C. Cir. 2015) (Millett, J., concurring) (emphasis in original). That concern is simply not present in this case. None of the facts on which the District Court relied in sentencing Combs (some of which Combs himself admitted at trial) was directly submitted and rejected by the jury. In a case like this—where a defendant was acquitted via general verdict of offenses with an array of complex requirements—the Supreme Court's admonition that "[a]n acquittal is not a finding of any fact," *Watts*, 519 U.S. at 155, carries special force.

45

apply only to "situations where a paying customer engages in sex with the person being paid." (Br. 57; *see* Br. 48-57). Under this narrow construction, Combs argues that acquittal is required because he "did not have sexual contact with any of the [escorts].". (Br. 57; *see* Br. 57-60). The District Court correctly rejected this meritless argument. (SPA-4-13).

## A. Applicable Law

### 1. The Mann Act

The Mann Act criminalizes "knowingly transport[ing] any individual in interstate or foreign commerce . . . with intent that such individual engage [1] in prostitution, or [2] in any sexual activity for which any person can be charged with a criminal offense." 18 U.S.C. § 2421(a). The statute does not define "prostitution." The phrase "any sexual activity for which any person can be charged with a criminal offense," which is not at issue in this case, is a catch-all provision incorporating "state sexual abuse offenses." Leonard B. Sand et al., 3 Modern Federal Jury Instructions: Criminal, ¶ 64.04, Instr. 64-18 cmt.

### 2. Standard of Review

This Court reviews a district court's denial of a motion for a judgment of acquittal under Rule 29, including issues of statutory interpretation and constitutional challenges, *de novo*. *See United States v. Houtar*, 980 F.3d 268, 273 (2d Cir. 2020); *United States v. Soler*, 759 F.3d 226, 229 (2d Cir. 2014). In assessing a sufficiency of the evidence challenge, this Court "view[s] the evidence in the light most favorable to the

46

Government with all reasonable inferences resolved in the Government's favor." *United States v. Requena*, 980 F.3d 30, 43 (2d Cir. 2020). The "verdict must be upheld if any rational trier of fact could have found the essential elements of the crime had been proved beyond a reasonable doubt." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015). This Court is free to affirm on any ground that finds support in the record, regardless of the ground upon which the district court relied. *See, e.g.*, *United States v. Frampton*, 382 F.3d 213, 223 (2d Cir. 2004).

## B.  Discussion

### 1.  The District Court Correctly Construed the Term "Prostitution" in the Mann Act

In denying Combs's Rule 29 motion, the District Court determined that the plain meaning of "prostitution" in the Mann Act is "sex in exchange for money or its equivalent" (SPA-4)—the same definition that had been provided to the jury at Combs's request (A-399; Dkt. 273 at 56).

This definition is plainly correct. Because the Mann Act does not define "prostitution," this Court must first look to the term's ordinary meaning. *See, e.g.*, *Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012). "Every modern dictionary" that the District Court consulted defined "prostitution" as sex for sale. (SPA-4 (citing dictionaries)); *see also* 2B Fed. Jury Prac. & Instr. § 60:05 (6th ed.) (defining "prostitution" as "offering money in return for any sexual act"). Indeed, this ordinary definition is so well understood that Sand provides that "it should not be necessary to provide

47

any" definition of "prostitution" to the jury in a Mann Act prosecution. Sand, 3 Modern Federal Jury Instructions: Criminal, ¶ 64.01, Instr. 64-4 cmt.

The ordinary definition is further supported by the Mann Act's history. (SPA-4-6). In 1917, the Supreme Court broadly defined "prostitution" as sex *for hire or without hire.*" *United States v. Caminetti*, 242 U.S. 470, 486 (1917) (emphasis added). But three decades later, in 1946, the Supreme Court embraced a narrower definition, recognizing that "[p]rostitution, to be sure, normally suggests sexual relations *for hire.*" *Cleveland v. United States*, 329 U.S. 14, 17 (1946) (emphasis added). Against this backdrop, in 1986, Congress amended the Mann Act, reenacting the prostitution clause but eliminating the statute's "anachronistic features" like the broad "debauchery" and "immoral purpose" provisions. (SPA-5). As the District Court reasoned—and Combs acknowledges (Br. 60)—"Congress is presumed to have been aware of the *Cleveland* Court's interpretation of prostitution and to have adopted it when re-enacting the statute." (SPA-5 (citing *Aetna Life Ins. Co. v. Big Y Foods, Inc.*, 52 F.4th 66, 75 (2d Cir. 2022)). The narrower definition was "also what prostitution unambiguously meant at the time of amendment." (SPA-5 (citing dictionaries)). Finally, only the narrower definition is consistent with Congress's purpose in amending the Mann Act: "It would make little sense for Congress to get rid of" the "debauchery" and "immoral purpose" provisions—criticized for their "alarming scope"—"but, at the same time, preserve a sweeping definition of prostitution with the same effect." (SPA-5).

48

Combs concedes that "[i]n modern times, prostitution is often understood as 'sex for money.'" (Br. 53).[15] Combs's only response on this point is that the District Court "bizarrely reasoned that *Cleveland* sub silentio overruled *Caminetti*." (Br. 59). But the District Court expressly acknowledged that "*Cleveland* didn't explicitly overturn *Caminetti*." (SPA-5). Rather, *Cleveland* offered a narrower definition of "prostitution," "recognizing that prostitution 'normally suggests sexual relations for hire.'" (SPA-5 (quoting *Cleveland*, 329 U.S. at 17)). Combs cites *Cleveland*'s subsequent statement that "we adhere to [*Caminetti*'s] holding . . . that the Act, while primarily aimed at the use of interstate commerce for the purposes of commercialized sex, *is not restricted to that end.*" (Br. 60 (emphasis in original) (quoting *Cleveland*, 329 U.S. at 18)). But *Cleveland* made *that* statement in addressing the broader "debauchery" provision then in the Mann Act, which the Supreme Court contrasted with the narrower definition of "prostitution." *See* 329 U.S. at 17

———————

[15] Combs suggests that, under this definition, liability under the Mann Act would extend to "common voyeuristic activity—such as watching adult sexual performances on Only Fans . . . if anyone involved travels interstate." (Br. 58-59). This suggestion is entirely off base. To incur liability, a defendant must "*knowingly transport[ ]* any individual in interstate or foreign commerce . . . with *intent* that such individual engage in prostitution." 18 U.S.C. § 2421(a) (emphases added).

49

("Prostitution, to be sure, normally suggests sexual relations for hire. But debauchery has no such implied limitation.").

## 2. The Canon of Constitutional Avoidance Is Inapplicable

Invoking the canon of constitutional avoidance, Combs argues that "the Mann Act should be construed so it does not cover those who engage in voyeurism or merely film others having sex." (Br. 57). To achieve this end, Combs says, the definition of "prostitution" must be limited to "those situations where a paying customer engages in sex with the person being paid." (Br. 57). This argument is meritless.

As an initial matter, Combs's proposed definition has no support in any authority and would lead to absurd results. *See United States v. Venturella*, 391 F.3d 120, 126 (2d Cir. 2004) ("A statute should be interpreted in a way that avoids absurd results."). Indeed, Combs's proposed "definition would narrow prostitution almost out of existence," as "[i]t would exclude any situation in which a person pays a third party (like a brothel) to have sex with an employee." (SPA-6); *see United States v. Mi Sun Cho*, 713 F.3d 716, 719 (2d Cir. 2013) (per curiam) (affirming Mann Act conviction of a defendant who transported a woman interstate to join a brothel).

In any event, the canon of constitutional avoidance has no application here. Under that canon, when "a serious doubt is raised about the constitutionality of an Act of Congress," courts "will first ascertain whether a construction of the statute is fairly possible by which

50

the question may be avoided." *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018). But "[t]he canon of constitutional avoidance comes into play only when, after the application of ordinary textual analysis, the statute is found to be susceptible of more than one construction." *Id.* The "canon has no application in the absence of statutory ambiguity." *United States v. Palomar-Santiago*, 593 U.S. 321, 329 (2021).

Here, as discussed, "prostitution" plainly means "sex in exchange for money or its equivalent." (SPA-4). Because the statute "is not ambiguous," the "constitutional avoidance canon does not apply." *Pierre v. Holder*, 738 F.3d 39, 48 (2d Cir. 2013). Moreover, there are also no "serious constitutional problems" to avoid. *Id.* Combs argues that the ordinary definition of "prostitution" would raise vagueness, substantive due process, First Amendment, and federalism concerns in his case. (Br. 50-57; *see also* Dkt. 547 at 13 (confirming below that these constitutional arguments are made only on an as-applied basis)). The District Court correctly rejected these arguments. (SPA-9-13).

### a. There Are No Vagueness Concerns

"A criminal statute is void for vagueness if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Concepcion*, 139 F.4th 242, 248 (2d Cir. 2025). "In an ordinary as-applied claim, the challenger asserts that a law cannot constitutionally be applied to his individual circumstances." *Id.* When, as here, the "statute is judged on an as

51

applied basis, one whose conduct is clearly proscribed by the statute cannot successfully challenge it for vagueness." *United States v. Nadi*, 996 F.2d 548, 550 (2d Cir. 1993).

Here, as the District Court correctly explained, Combs's conduct "sits at the heartland of the Act's legitimate proscriptions." (SPA-13). For more than a decade, Combs transported escorts, including across state lines, intending for the escorts to have sex with Ventura or Jane in exchange for money, which they did. (*See* SPA-14-15 (summarizing evidence of Combs's intent)). Because Combs's own conduct is "clearly proscribed" by the Mann Act, *United States v. Nadirashvili*, 655 F.3d 114, 122 (2d Cir. 2011), and indeed "falls within the core of the statute's prohibition," *United States v. Farhane*, 634 F.3d 127, 139 (2d Cir. 2011), Combs cannot bring a successful as-applied vagueness challenge.

Combs raises several arguments for why the Mann Act may be unconstitutionally vague unless his narrower definition is adopted. All are meritless. *See generally United States v. Herrera*, 584 F.2d 1137, 1149 (2d Cir. 1978) (holding, in rejecting a vagueness challenge to a New York prostitution statute, that "[t]he definition of prostitution as being a person who engages or agrees or offers to engage in sexual conduct with another person in return for a fee is not so vague as to make persons of common intelligence guess at its meaning").

*First*, Combs notes that "[t]he statute has never defined 'prostitution.' " (Br. 50). But as this Court has repeatedly reaffirmed, "a statutory term is not

52

impermissibly vague simply because it lacks a statutory definition." *Concepcion*, 139 F.4th at 250 (citing cases). While "the absence of a statutory definition can be a relevant consideration," other factors, such as "the plain meaning of the statute's wording, the use of familiar legal concepts, and . . . a scienter requirement [can] defeat a vagueness challenge." *Id.* Here, as discussed, the plain meaning of the term "prostitution" is clear, and "[p]aying an escort to have sex with somebody is exactly the kind of activity that 'a person of ordinary intelligence' would have 'fair notice' is meant by prostitution." (SPA-9 (citing *Concepcion*, 139 F.4th at 251)).[16] Moreover, the Mann Act's scienter requirement—that the defendant "knowingly" transport an individual "with intent" that the individual engage in prostitution, 18 U.S.C. § 2421(a)—further defeats any vagueness challenge. *See Concepcion*, 139 F.4th at 250.

*Second*, Combs argues that the meaning of "prostitution" has never been fixed—from the broad definition in *Caminetti* to the "modern" understanding of the term as "sex for money." (Br. 50-55). But as the District Court explained, "the word's changing nature has little to do with Combs's challenge," because none of the "changes has moved [Combs's] activities in or out of statute's ambit." (SPA-9); *see Herrera*, 584 F.2d at 1149 ("[E]ven if the outermost boundaries of the statute may be imprecise, any such uncertainty has little

---

[16] Indeed, Combs himself well understood that he was paying for illegal activities, as he inquired whether escorts were undercover police. (*See* SPA-14).

53

relevance here where the defendants' conduct falls squarely within the 'hard core' of the statute's proscriptions.").

*Third*, Combs contends that even the "modern" understanding of "prostitution" as "sex for money" is "unclear and overbroad, because it covers conduct not deemed 'prostitution' under various state and local laws—including paying to see *other* people have sex." (Br. 53 (emphasis in original)). But Combs's reliance on state law is misplaced. As an initial matter, there is no basis to look to state law definitions of "prostitution," because, as the District Court observed, "[t]hough the Mann Act has a provision that integrates state law, that isn't the one that Combs was convicted under." (SPA-9). Nor do the state cases raise any vagueness concern with the federal term. (SPA-9). As the District Court explained, the state cases "don't conflict with the definition the Court used, and even if they did, they interpreted statutes with different language." (SPA-9). Moreover, "even if there were a conflict," Combs has not explained how "a federal statute could be de-fanged by state laws that occupy a similar field; the principles of preemption and intergovernmental immunity run in the other direction." (SPA-9-10).[17]

———————

[17] Contrary to Combs's suggestion (Br. 59), the District Court specifically addressed, and rejected, Combs's argument that "a constellation of conflicting state laws renders the federal term vague." (SPA-9).

54

Fundamentally, the purported uncertainty that Combs raises based on state cases—whether paying to see other people have sex is "prostitution" (Br. 53)—is irrelevant to any as-applied vagueness challenge in this case. Combs was not convicted of prostitution; he was convicted of *transporting* others to engage in prostitution. And it is beyond dispute that the individuals Combs transported engaged in actual sex and did not merely watch others have sex. Moreover, Combs participated in some of the sex acts himself, including by having oral sex with Ventura while an escort was penetrating her. (SA-51-52, 54-55). Combs thus cannot manufacture a vagueness concern in the Mann Act by citing irrelevant state cases[18] holding that there is no

_____

[18] *See State v. Turnpaugh*, 741 N.W.2d 488, 490-91 (Wisc. Ct. App. 2007) (interpreting the phrase "non-marital sexual intercourse for anything of value" in a Wisconsin prostitution statute to exclude paying to watch another "masturbate," because "sexual intercourse" statutorily requires "vulvar penetration"); *State v. Mayfield*, 900 P.2d 358, 360-62 (N.M. Ct. App. 1995) (interpreting "sexual act" in a New Mexico prostitution statute to exclude masturbation of another by "erotic stimulation by sexual fantasies"); *Commonwealth v. Bleigh*, 586 A.2d 450, 453 (Pa. Sup. Ct. 1991) (interpreting "sexual activity" in a Pennsylvania prostitution statute to exclude "self-masturbation for the sexual gratification of . . . customers"); *State v. Burgess*, 669 S.W.2d 637, 639-40 (Mo. Ct. App. 1984) (interpreting "sexual contact" in a Missouri prostitution statute to exclude touching "clothing covering

"prostitution"—as defined in certain state statutes—
"when there's no sexual contact at all between the par-
ticipants." (SPA-7).

The remaining cases that Combs cites are likewise
inapposite and do not raise any concern that the Mann
Act is unconstitutionally vague as applied to Combs.
Two cases addressed the scenario of a club where cus-
tomers could pay to watch employees perform sex acts
on each other. (Br. 53, 55; *see* SPA-7-8). In *State v. Tay-
lor*, 808 P.2d 314 (Ariz. Ct. App. 1990), the Arizona
court held that the charged employee—who engaged in
sex acts with another dancer for a paying customer—
was "legitimately prosecuted under Arizona's prostitu-
tion statutes," *id.* at 319, because the statutes were
"written sufficiently broadly to encompass a sexual
transaction for a customer who engages only as vo-
yeur," *id.* at 316.[19] By contrast, in *Wooten v. Superior*

---

defendant's genitals, not the genitals themselves");
*People v. Greene*, 441 N.Y.S.2d 636, 637-38 (N.Y. Crim.
Ct. 1981) (interpreting the phrase "sexual conduct
with another person" in a New York prostitution stat-
ute to exclude "an auto-erotic exhibition performance
. . . *for another*" (emphasis in original)); *see also Smoot
v. State*, 729 S.E.2d 416, 426 (Ga. Ct. App. 2012) (gen-
erally noting that some forms of "adult nude entertain-
ment" are distinct from "prostitution").

[19] Notably, the relevant Arizona statute defined
"prostitution" as—contrary to Combs's proposed defi-
nition—"engaging in or agreeing or offering to engage
in sexual conduct with another person under a fee ar-
rangement *with that person or any other person*." *Id.*

56

*Court*, 93 Cal. App. 4th 422 (Cal. Ct. App. 2001), the California court concluded that managers of a similar club were not involved in pimping or pandering, because "California's statute was not written sufficiently broadly to encompass a sexual transaction for a customer who engages only as voyeur." *Id.* at 435; *see also id.* at 433-34 (distinguishing other states' statutes). *Wooten*'s application of a state-specific statute, based on state precedent, to a particular fact pattern not present here raises no vagueness concern in this case: Nothing about *Wooten*'s conclusion that a California prostitution statute did not reach strip club sex performances suggests that the Mann Act is unconstitutionally vague as applied to Combs, who transported escorts interstate and paid them to have sex with Combs's girlfriends, as Combs masturbated and sometimes sexually participated.

Finally, Combs cites *People v. Paulino*, 2005 N.Y. Misc. LEXIS 3430 (N.Y. Sup. Ct. Aug. 4, 2005), in which a New York trial court addressed whether targeting escort services but not adult film distributors for prosecution violated the Equal Protection Clause of the Fourteenth Amendment. *Id.* at *7. The court held that it did not, explaining that because the definition of "prostitution" was generally confined to a bilateral exchange involving two parties, escorts and film distributors were not similarly situated. *Id.* at *8-10. *Paulino* has no bearing on this case. Combs is entirely differently situated from adult film distributors: He

—————

(emphasis in original); *see also, e.g.*, *Burgess*, 669 S.W.2d at 639 (similar definition under Missouri law).

57

hired and transported commercial sex workers to have sex with his girlfriends for his own sexual gratification, sometimes directly participating in the sex acts. *See* Points II.B.3, III.B.1, *infra*. Moreover, contrary to Combs's proposed rule that "a paying customer" must "engage[ ] in sex with the person being paid" (Br. 57), *Paulino* itself involved an escort service in which customer payments for prostitution services were deposited into the defendant-operator's account, notwithstanding that the defendant did not engage in any sex himself, *see* 2005 N.Y. Misc. LEXIS 3430, at *2.

### b. There Are No Substantive Due Process Concerns

Combs's conclusory invocation of the substantive due process doctrine (Br. 55-56) is also meritless. (*See* SPA-10). Notably, Combs argues only that "if the statute were interpreted in accordance with its original plain meaning"—*i.e.*, the broad *Caminetti* definition— then "it would be flatly unconstitutional." (Br. 56). Combs does not specifically argue that the ordinary definition of prostitution—"sex in exchange for money or its equivalent" (SPA-4)—creates any substantive due process concerns. (*See* Br. 55-56). Indeed, "Combs fails to show that his conviction implicates any right or liberty interest protected by the Fifth Amendment" or recognize, let alone apply, the test governing substantive due process claims. (SPA-10 (citing *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997)). Combs's passing citations to the Supreme Court's decisions in *Lawrence v. Texas*, 539 U.S. 558 (2003), and *Obergefell v. Hodges*, 576 U.S. 644 (2015) (Br. 55), are inapposite, as neither decision addressed prostitution. *See*

58

*Lawrence*, 539 U.S. at 578 ("This present case does not involve . . . prostitution.")

### c. There Are No First Amendment Concerns

Combs's argument that "a narrower construction is required" to avoid First Amendment problems (Br. 56) fails for the reasons discussed in Point III, *infra*.

### d. There Are No Federalism Concerns

Finally, Combs's argument that the Mann Act should be construed more narrowly to avoid federalism concerns (Br. 56-57) is likewise meritless. (*See* SPA-10-11). Combs relies on *Ciminelli v. United States*, 598 U.S. 306 (2000) for the proposition that the scope of a federal statute should be narrowed when it governs "a vast array of conduct traditionally policed by the States." *Id.* at 316. But the Mann Act criminalizes not prostitution but the *interstate transportation* of people for prostitution—a concern that could hardly be "traditionally policed by the States." *Id.*; *see United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119 (1942) ("The power of Congress over interstate commerce is plenary and complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than are prescribed in the Constitution. It follows that no form of state activity can constitutionally thwart the regulatory power granted by the commerce clause to Congress."); *Caminetti*, 242 U.S. at 491; *Western Union Telegraph Co. v. Call Pub. Co.*, 181 U.S. 92, 100 (1901). Moreover, "even if prostitution *were* traditionally regulated by states, Congress's intention to criminalize activity related to prostitution is crystal clear

59

from its use of the word 'prostitution' in the [Mann Act]." (SPA-11 (emphasis in original)); *see Cleveland v. United States*, 531 U.S. 12, 25 (2000) (Congress must "convey[ ] its purpose clearly" before it is "deemed to have significantly changed the federal-state balance in the prosecution of crimes").

### 3. Combs Is Not Entitled to Acquittal Even Under His Own Definition

Even accepting *arguendo* Combs's proposed restriction of "prostitution" to "those situations where a paying customer engages in sex with the person being paid" (Br. 57), the evidence was sufficient for a rational jury to convict Combs on the Mann Act counts. Combs argues that, under his proposed definition, acquittal is required because "[h]e did not have sexual contact with any of the [escorts]," whom he transported interstate and paid to have sex with Ventura and Jane. (Br. 57). But contrary to Combs's suggestion that he merely "watched and filmed" (Br. 57), Combs in fact sometimes directly participated in the sex acts. At times, Combs "and the escort would both . . . have intercourse" with Ventura at the same time. (SA-51; *see also* SA-55). At other times, Ventura, at Combs's direction, would "put [an escort's] semen on [Combs], "usually on his chest, on his nipples." (SA-52). Combs also had sex with his girlfriends, often with the escort's semen still on or near them, in between the rounds of sex with the escorts. (SA-1, 51-52, 163-68). In addition, Ventura and Jane often paid the escorts for Combs, and Combs reimbursed them. (SA-39-40, 187-88, 193, 207-08). Taken in the light most favorable to the Government, this evidence is sufficient for a rational jury

60

to convict Combs even on his own restricted definition of "prostitution."

## POINT III

### Combs's Convictions Do Not Violate the First Amendment

Combs argues that his Mann Act convictions run afoul of the First Amendment because he was a consumer and producer of amateur pornography who watched and often filmed Freak Offs and Hotel Nights for later viewing. (Br. 61-69). The District Court correctly rejected this argument. (SPA-11-13). Combs's convictions do not raise any concern under the First Amendment.

## A. Applicable Law

### 1. First Amendment

In addressing an as-applied First Amendment challenge, this Court must first determine whether the defendant's conduct "constituted expressive conduct, permitting him to invoke the First Amendment in challenging his conviction." *Texas v. Johnson*, 491 U.S. 397, 403 (1989). First Amendment protection applies "only to conduct that is inherently expressive." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006). In determining whether conduct is inherently expressive, the Supreme Court has "asked whether an intent to convey a particularized message was present, and whether the likelihood was great that the message would be understood by those who viewed it." *Johnson*, 491 U.S. at 404.

If the "conduct was expressive," this Court next determines whether the statute at issue "is related to the suppression of free expression." *Johnson*, 491 U.S. at 403. If, as here, the statute "is not related to expression, then the less stringent standard" in *United States v. O'Brien*, 391 U.S. 367 (1968), "for regulations of noncommunicative conduct controls." *Johnson*, 491 U.S. at 403. The *O'Brien* test is satisfied if: (1) the government has the "constitutional power" to enact the statute; (2) the statute "furthers an important or substantial government interest"; (3) that "interest is unrelated to the suppression of free expression"; and (4) the restriction on alleged First Amendment freedoms is "no greater than is essential to further the government interest." *City of Erie v. Pap's A.M.*, 529 U.S. 277, 296-301 (2000).

### 2. Standard of Review

The standard of review is set forth in Point II.A.2, *supra*.

## B. Discussion

The District Court held that Combs's conduct is not protected by the First Amendment, and that, even if it were, his convictions do not violate it under the *O'Brien* test. (SPA-11-13). Both holdings are correct and provide independent bases to affirm.

### 1. Combs's Conduct Does Not Implicate the First Amendment

Combs's conduct in transporting others across state lines to have sex for money "is not inherently

62

expressive." *Rumsfeld*, 547 U.S. at 66. That is so even if, in effectuating the transport, Combs intended to later consume and produce pornography by watching and filming the sex acts. *See O'Brien*, 391 U.S. at 376 ("We cannot accept the view that an apparently limitless variety of conduct can be labeled 'speech' whenever the person engaging in the conduct intends thereby to express an idea."). "Though film is an expressive medium protected by the First Amendment, 'at some point, it must certainly be true that otherwise illegal conduct is not made legal by being filmed.'" (SPA-11 (quoting *California v. Freeman*, 488 U.S. 1311, 1313 (1989) (O'Connor, J., in chambers)). Similarly, Combs's intent to watch the sex sessions live cannot bring his interstate transportation of others to have sex for money within the First Amendment's protection. Were it otherwise, any defendant who transported others to engage in prostitution could escape liability simply by watching or filming the sex. *See generally United States v. Roeder*, 526 F.2d 736, 738-39 (10th Cir. 1975) ("the making of the movie does not serve to purge the transaction of its Mann Act character," and "the First Amendment does not constitute a license to violate the law").[20]

---

[20] Combs's argument that the District Court "ignored" his "argument that his First Amendment rights were violated as a *consumer* of the sexual performances that took place during freak-offs and hotel nights" (Br. 69 (emphasis in original)) flatly misstates the record. The District Court specifically considered, and correctly rejected, that argument. (SPA-11 ("[T]he

63

Ultimately, Combs's claim to First Amendment protection hinges on his depiction of himself as an "amateur pornographer." (Br. 64). Combs cites state cases that declined to extend state prostitution laws to pornographers based, at least in part, on First Amendment concerns (Br. 63-64). But the defendants in those cases paid, or offered to pay, individuals for the sole and express purpose of starring in pornographic films. *See State v. Theriault*, 960 A.2d 687, 688 (N.H. 2008) (defendant offered to pay to videotape sex between other people); *People v. Freeman*, 758 P.2d 1128, 1129 (Cal. 1988) (defendant "hired and paid actors to perform in a nonobscene commercial film which portrayed sexually explicit acts"); *see also Paulino*, 2005 N.Y. Misc. LEXIS 3430, at *12 (noting that prosecuting adult film distributors would "pose[] thorny First Amendment issues"); *Greene*, 441 N.Y.S.2d at 638 (noting concern with construing a prostitution statute to "prohibit the production of plays, movies, and materials traditionally protected from Government interference by the First Amendment").

By contrast, Combs did not "engage in anything resembling" the conduct of an adult film producer. (SPA-12). Daniel Phillip, an escort paid to have sex with Ventura while Combs watched on multiple occasions, estimated that Combs filmed the encounters only once or twice. (A-141, 144). And Sharay Hayes, another

─────────

same goes for the desire to view a pornographic performance—at some point, illegal activity can't be laundered into constitutionally protected activity just by the desire to watch it.")).

64

escort whom Combs paid to have sex with Ventura multiple times, was *never filmed* by Combs at all. (SA-101). Moreover, unlike any adult film producer, Combs did not provide advance notice that he would film, or seek the participants' consent to be filmed. (A-188, 277). In fact, some participants affirmatively did *not* want to be filmed. Ventura testified that Combs started filming Freak Offs without asking her, and that she found it "[h]umiliating" and "[d]egrading" that Combs kept videos of Freak Offs. (A-188-89). And during a Hotel Night with Jane, an escort specifically told Combs that he did not want to be filmed after Combs took out a camera. (A-272). Finally, Combs masturbated and sometimes sexually participated during Freak Offs and Hotel Nights, "suggesting that the purpose was his immediate sexual gratification." (SPA-11). This case is thus far afield from the pornographer state cases on which Combs relies. *See Theriault*, 960 A.2d at 690 ("[T]here was no evidence or allegation that the defendant acted with the purpose of sexual arousal or gratification."); *Freeman*, 758 P.2d at 1131 ("There is no evidence that defendant paid the acting fees for the purpose of sexual arousal or gratification, his own or the actors'. Defendant, of course, did not himself participate in any of the sexual conduct.").[21]

---

[21] Contrary to Combs's characterization of *Freeman* (Br. 68), *Freeman* recognized that the defendant's own sexual participation (or lack thereof) is a relevant consideration in the First Amendment inquiry. *See* 758 P.2d at 1134-35 (distinguishing a Mann Act case

65

The District Court correctly analogized this case to *Arcara v. Cloud Books, Inc.*, 478 U.S. 697 (1986), which held that enforcement of a regulation to shut down an adult bookstore to combat prostitution on its premises did not implicate the First Amendment, notwithstanding that there was "some effect on the First Amendment activities of those subject to sanction." *Id.* at 706. The Supreme Court explained that it had "subjected such restrictions to scrutiny only where it was conduct with a significant expressive element that drew the legal remedy in the first place . . . or where a statute based on a nonexpressive activity has the inevitable effect of singling out those engaged in expressive activity." *Id.* at 706-07. Neither was the case in *Arcara*, and the Supreme Court concluded that "the First Amendment is not implicated by the enforcement of a public health regulation of general application against the physical premises in which respondents happen to sell books." *Id.* at 707.

Combs attempts to distinguish *Arcara* by arguing that the prostitution inside the adult bookstore did not resemble the "undisputedly expressive and creative act of filming [a Freak Off]." (Br. 67). But Combs overlooks that the conduct that "drew the legal remedy in the first place" in this case was Combs's transportation of commercial sex workers to have sex for money, which has no "significant expressive element." *Arcara*,

_____

on the ground that "[t]here the defendant film producer actually participated in the sexual conduct in the film, for which he transported the woman across state lines").

66

478 U.S. at 706. Combs's later viewing and occasional filming of the sex cannot bring his conduct within the purview of the First Amendment. *See Rumsfeld*, 547 U.S. at 66 ("If combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it."); *Arcara*, 478 U.S. at 705 ("[W]e underscored the fallacy of seeking to use the First Amendment as a cloak for obviously unlawful public sexual conduct by the diaphanous device of attributing protected expressive attributes to that conduct.").[22]

## 2. Even If Combs's Conduct Implicated the First Amendment, His Convictions Do Not Violate It

Even if Combs's conduct implicated the First Amendment, the Mann Act "is not related to expression" and thus the "the less stringent" *O'Brien* test applies. *Johnson*, 491 U.S. at 403. Combs challenges only the second prong of the *O'Brien* test: whether the Mann Act furthers "an important or substantial governmental interest." (Br. 64). That prong is plainly satisfied in this case.

---

[22] Nor does Combs's characterization of Freak Offs and Hotel Nights as "creative," "elaborate," and "highly staged" (Br. 61) bring them any closer to implicating the First Amendment. Were it otherwise, brothels offering elaborate and staged scenes for individuals to have sex with women for payment could claim First Amendment protection.

67

The Government "has a strong interest in controlling prostitution within its jurisdiction." *Freeman*, 488 U.S. at 1313 (O'Connor, J., in chambers); *accord Killgore v. City of S. El Monte*, 3 F.4th 1186, 1192 (9th Cir. 2021). The Government's "specific and legitimate" reasons for criminalizing prostitution "include discouraging human trafficking and violence against women, discouraging illegal drug use, and preventing contagious and infectious diseases." *Erotic Serv. Provider Legal Educ. & Rsch. Project v. Gascon*, 880 F.3d 450, 457 (9th Cir. 2018), *amended*, 881 F.3d 792 (9th Cir. 2018); *see also Paulino*, 2005 N.Y. Misc. LEXIS 3430, at *13 ("[P]rostitution brings with it a host of ills including AIDS, venereal diseases, drugs, pimping, loan sharking, physical abuse and rape.").

Contrary to Combs's contention, the Government plainly had a "legitimate interest" in this Mann Act case (Br. 64), as Combs's "own activities implicated many of [the] concerns" animating the Government's need to curtail prostitution: "While paying for sex, [Combs] enabled commercial prostitution, distributed illegal drugs, and was physically violent." (SPA-13).[23] In fact, Combs admitted much of this conduct at trial (defeating his efforts to depict it as "acquitted" (Br. 68)): Combs admitted to violence against Ventura and Jane before, during, and after Freak Offs. (*See, e.g.*, A-370 ("[I]f he was charged with domestic violence

---

[23] The record thus flatly belies Combs's suggestion that the District Court "misapplied" the second *O'Brien* prong by analyzing it only as a general matter and not as applied in this case. (*See* Br. 68).

68

we wouldn't all be here having a trial because he would have pled guilty—because he did that.")). Combs admitted to illegal drug use, insisting only that it was "personal use." (*See, e.g.*, SA-257-58 ("There's no doubt that he had personal-use drugs. . . . These are things that he did with his girlfriends. They did them together.")). And Combs did not dispute Ventura's and Jane's testimony that Combs had them participate in Freak Offs and Hotel Nights even when they had painful infections. (*See, e.g.*, SA-93, 209). On these facts, there can be no serious dispute that the Government had a substantial interest in prosecuting the Mann Act violations in this case.

69

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:      New York, New York
            February 20, 2026

                        Respectfully submitted,

                        JAY CLAYTON,
                        *United States Attorney for the*
                        *Southern District of New York,*
                        *Attorney for the United States*
                        *of America.*

MEREDITH C. FOSTER,
EMILY A. JOHNSON,
CHRISTY SLAVIK,
MADISON REDDICK SMYSER,
MITZI S. STEINER,
OLGA I. ZVEROVICH,
      *Assistant United States Attorneys,*
            *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

On February 12, 2026, this Court granted the Government leave to file an oversized brief of not more than 16,000 words. Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation set by the Court in its February 12, 2026 order. As measured by the word processing system used to prepare this brief, there are 15,992 words in this brief.

JAY CLAYTON,
*United States Attorney for the*
*Southern District of New York*

By: OLGA I. ZVEROVICH,
*Assistant United States Attorney*