# 25-2623-cr

*To be Argued by:*
ALEXANDRA A.E. SHAPIRO

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

UNITED STATES OF AMERICA,

*Appellee,*

– v. –

SEAN COMBS, AKA Puff Daddy,
AKA P. Diddy, AKA Diddy, AKA PD, AKA Love,

*Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR DEFENDANT-APPELLANT

ALEXANDRA A. E. SHAPIRO
THEODORE SAMPSELL-JONES
CHRISTOPHER D. JOHNSON
SHAPIRO ARATO BACH LLP
1140 Avenue of the Americas,
    17th Floor
New York, New York 10036
(212) 257-4880

*Attorneys for Defendant-Appellant*

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................. ii

INTRODUCTION ............................................................................. 1

ARGUMENT .................................................................................... 3

I.    USING ACQUITTED CONDUCT TO INCREASE COMBS'S
SENTENCE WAS UNLAWFUL AND UNJUST ........................ 3

    A.    The District Court Misinterpreted The Acquitted Conduct
Guideline .................................................................... 3

    B.    The Enhancements Don't Apply If §1B1.3(c) Is
Interpreted Correctly .................................................... 7

        1.    Fraud/Coercion.............................................................. 7

        2.    Leadership .................................................................... 11

        3.    Grouping .................................................................... 12

    C.    The District Court Violated Statutory And Constitutional
Law By Using Acquitted Conduct To Impose A Draconian
Sentence .................................................................... 13

    D.    The Guidelines Determinations Were Not Harmless......................... 18

    E.    The Unlawful Use Of Acquitted Conduct Rendered The
Sentence Substantively Unreasonable.............................. 20

II.    THE STATUTE CANNOT BE APPLIED TO VOYEURISM ................. 20

    A.    The Government's 'Plain Meaning' Argument Conflicts
With Supreme Court Precedent.......................................... 20

    B.    Constitutional Avoidance Requires A Narrow Interpretation .......... 24

III.    COMBS'S CONVICTION VIOLATED THE FIRST
AMENDMENT ................................................................ 28

CONCLUSION ................................................................ 32

## TABLE OF AUTHORITIES

**Case**                                                     **Page(s)**

*Aetna Life Ins. Co. v. Big Y Foods, Inc.*,
52 F.4th 66 (2d Cir. 2022) ....................................................................24

*Alleyne v. United States*,
570 U.S. 99 (2013) ...................................................... 15, 16, 17, 20

*Arcara v. Cloud Books*,
478 U.S. 697 (1986) .................................................................31

*BedRoc Ltd., LLC v. United States*,
541 U.S. 176 (2004) .................................................................23

*Blakely v. Washington*,
542 U.S. 296 (2004) ...................................................... 15, 16, 17

*Caminetti v. United States*,
242 U.S. 470 (1917) ...................................................... passim

*Carcieri v. Salazar*,
555 U.S. 379 (2009) .................................................................23

*Ciminelli v. United States,*
596 U.S. 306 (2023) .................................................................26

*Clark v. Martinez*,
543 U.S. 371 (2005) .................................................................25

*Cleveland v. United States*,
329 U.S. 14 (1946) ...................................................... 2,22, 23, 24

*Desnick v. Am. Broadcasting Cos.*,
44 F.3d 1345 (7th Cir. 1995).................................................29

*Harris v. United States*,
536 U.S. 545 (2002) .................................................................17

*Hurst v. Florida*,
577 U.S. 92 (2016) .................................................................16

*Jones v. United States*,
574 U.S. 948 (2014) .................................................................20

*Kisor v. Wilkie*,
    588 U.S. 558 (2019) .................................................................................13

*McClinton v. United States*,
    143 S. Ct. 2400 (2023) ....................................................................... 1, 17

*McMillan v. Pennsylvania*,
    477 U.S. 79 (1986) ............................................................................. 16, 17

*Molina-Martinez v. United States*,
    578 U.S. 189 (2016) .................................................................................19

*Musacchio v. United States*,
    577 U.S. 237 (2016) .................................................................................21

*Nawara v. Cook Cnty.*,
    132 F.4th 1031 (7th Cir. 2025)................................................................23

*People v. Freeman*,
    758 P.2d 1128 (Cal. 1988)....................................................... 29, 30, 31

*People v. Greene*,
    110 Misc.2d 40 (N.Y. Crim. Ct. 1981) .................................................30

*People v. Paulino*,
    2005 N.Y. Misc. LEXIS 3430 (N.Y. Sup. Ct. Aug. 4, 2005) ....................... 26, 30

*Pepper v. United States*,
    562 U.S. 476 (2011) .................................................................................14

*Perrin v. United States*,
    444 U.S. 37 (1979) ...................................................................................21

*PETA, Inc. v. North Carolina Farm Bureau Fed.*,
    60 F.4th 815 (4th Cir. 2023)....................................................................29

*Poore v. United States* (25-227)................................................................13

*Rita v. United States*,
    551 U.S. 338 (2007) .................................................................................20

*State v. Theriault*,
    960 A.2d 687 (N.H. 2008)....................................................... 29, 30, 31

*Texas v. Johnson*,
    491 U.S. 397 (1989) .................................................................................31

*Turner v. Lieutenant Driver*,
    848 F.3d 678 (5th Cir. 2017)...............................................................29

*United States v. Bennett*,
    839 F.3d 153 (2d Cir. 2016)...............................................................19

*United States v. Bitty*,
    208 U.S. 393 (1908) ...........................................................................22

*United States v. Booker*,
    543 U.S. 220 (2005) ...........................................................................15

*United States v. Cole*,
    158 F.4th 113 (2d Cir. 2025)...............................................................18

*United States v. Esteras*,
    102 F.4th 98 (2d Cir. 2024).................................................................12

*United States v. Feldman*,
    647 F.3d 450 (2d Cir. 2011)...............................................................19

*United States v. Gomez*,
    877 F.3d 76 (2d Cir. 2017).................................................................10

*United States v. Guerrero*,
    910 F.3d 72 (2d Cir. 2018).................................................................19

*United States v. James*,
    151 F.4th 28 (2025).............................................................................18

*United States v. Johnson*,
    507 F.3d 793 (2d Cir. 2007).........................................................16, 17

*United States v. Litvak*,
    808 F.3d 160 (2d Cir. 2015)..................................................................5

*United States v. Martinez*,
    525 F.3d 211 (2d Cir. 2008)...............................................................16

*United States v. Martinez*,
    110 F.4th 160 (2d Cir. 2024)...............................................................18

*United States v. Mi Sun Cho*,
    713 F.3d 716 (2d Cir. 2013)............................................................8, 28

*United States v. Olmeda*,
    894 F.3d 89 (2d Cir. 2018).................................................................18

iv

*United States v. Prater*,
   518 F.2d 817 (7th Cir. 1975)................................................................27

*United States v. Rainford*,
   110 F.4th 455 (2d Cir. 2024)...............................................................12

*United States v. Roeder*,
   526 F.2d 736 (10th Cir. 1975).............................................................30

*United States v. Seabrook*,
   968 F.3d 224 (2d Cir. 2020)...............................................................19

*United States v. Singh*,
   877 F.3d 107 (2d Cir. 2017)...............................................................19

*United States v. Skys*,
   637 F.3d 146 (2d Cir. 2011)...............................................................12

*United States v. Stinson*,
   508 U.S. 36 (1992) ................................................................... 12, 13

*United States v. Texidor*,
   164 F.4th 248 (3d Cir. 2026)..............................................................14

*United States v. Vaughn*,
   430 F.3d 518 (2d Cir. 2005)........................................................ 16, 17

*United States v. Ware*,
   141 F.4th 970 (8th Cir. 2025).............................................................14

*United States v. Watts*,
   519 U.S. 148 (1997) ........................................................ 13, 14, 15, 16

*United States v. Wernick*,
   691 F.3d 108 (2d Cir. 2012)...............................................................19

*Waterkeeper Alliance, Inc. v. EPA*,
   399 F.3d 486 (2d Cir. 2005)...............................................................23

*Williams v. New York*,
   337 U.S. 241 (1949) ..........................................................................16

*Wooten v. Superior Ct.*,
   113 Cal. Rptr. 2d 195 (Cal. Ct. App. 2001) .......................................26

*Yee v. City of Escondido*,
   503 U.S. 519 (1992) ............................................................................5

**Statutes**

18 U.S.C. §3553 ................................................................ 13, 14

18 U.S.C. §3661 ................................................................ 13, 14

**Other Authorities**

1997 U.S. Attorneys' Manual ...............................................23

Black's Law Dictionary (6th ed. 1990) ................................10

The American Heritage Dictionary of the English Language (3rd ed. 1992) .........10

U.S. Commission on Civil Rights,
   *Sex Bias in the U.S. Code* ................................................24

USSG §1B1.3 ................................................................ 3, 4, 6, 7

USSG §2G1.1 ................................................................ 10, 11

**Rule**

Fed. R. Evid. 401 ............................................................5

## **INTRODUCTION**

The government has extraordinary power to take away a person's liberty. The most important check on that power is the right to jury trial—what John Adams called "the heart and lungs of liberty." When twelve fellow citizens declare someone "not guilty," he is not guilty. Period. "With an acquittal, the jury as representative of the community has been asked by the State to authorize punishment…and has refused to do so."[1]

That's what happened here. The jury refused to authorize *any* punishment for coercive sex or conspiracy—because the evidence showed there was none. The jury only authorized punishment for "prostitution." It never authorized a sentence four times the typical sentence for that crime.

But the district court imposed one anyway. It ignored the Sentencing Commission's decision to prohibit the pernicious practice of acquitted-conduct sentencing. It ignored the criticism from multiple Supreme Court Justices, federal judges, lawyers, and academics that led to the new guideline. It defied a quarter-century of Supreme Court jurisprudence holding that facts authorizing higher sentences must be found by a jury beyond a reasonable doubt.

---

[1] *McClinton v. United States*, 143 S. Ct. 2400, 2402 (2023) (Sotomayor, J.). Unless otherwise noted, citations omit quotation marks, footnotes, and alterations.

The result was a perversion of justice. What is the point of a jury trial if you are vindicated on the most serious charges, but your sentence is driven by what you were acquitted of doing?

That is the question at the heart of this appeal.

The government has no answer. It doesn't even pretend to offer one. Instead, it offers up unpersuasive and hypertechnical arguments, misrepresents the record, cites outdated law, and ignores the elephant in the room—that it is both illegal and wrong to imprison a man for conduct he was acquitted of committing.

The government's defense of the convictions fares no better. To avoid multiple constitutional problems, the Mann Act should be narrowly construed to exclude paying for voyeurism. In response, the government principally claims the Supreme Court overruled *Caminetti*, which interpreted prostitution as any sex outside marriage, in *Cleveland*, even though *Cleveland* expressly said it was *not* overruling *Caminetti*. Moreover, as the government admits in its brief, Combs almost always filmed freak-offs and hotel nights. He paid entertainers to create "sexy scenes," and he and his girlfriends used role-playing, mood lighting, candles, costumes and props. This amateur porn is protected by the First Amendment, and the government's arguments conflict with precedent. Indeed, pornography is everywhere today and produced and consumed by hundreds of millions through popular websites and social media.

2

Combs should be released. His convictions should be reversed, or the case at least remanded for resentencing.

## ARGUMENT

### I. USING ACQUITTED CONDUCT TO INCREASE COMBS'S SENTENCE WAS UNLAWFUL AND UNJUST

#### A. The District Court Misinterpreted The Acquitted Conduct Guideline

1. The Sentencing Commission declared: "Not guilty means not guilty" and forbade the use of acquitted conduct in guidelines calculations unless it "also establishes, in whole or in part, the instant offense of conviction." USSG §1B1.3(c). As Amici Law Professors explain, this exception was designed to cover mixed verdicts on charges with overlapping elements. LPB11-12.[2] If the jury convicts on a charge requiring proof of a specific element, we know the jury found that element—even if it also acquitted on a different charge that required proof of the same element. This could occur, for example, with wire and mail fraud counts based on the same scheme. In such cases, conduct proving the element (in that example, the scheme to defraud) is both acquitted conduct *and* offense conduct and fits §1B1.3(c)'s exception.

---

[2] Amici include Hon. John Gleeson, a Commissioner at the time of the amendment, and Douglas Berman, the nation's leading sentencing scholar.

Put another way, the exception allows judges to consider acquitted conduct "*if and only if the conduct is* ***'also'*** *convicted conduct*"—i.e., if and only if the conduct "establishes an element of the offense of conviction, which the jury necessarily found proven beyond a reasonable doubt." LPB11. The exception, in short, doesn't allow consideration of acquitted conduct "unless the jury also used the same conduct to convict." LPB5; *see also* OB28.

The government previously offered a far broader interpretation of the exception. It argued at sentencing that §1B1.3(c) permits consideration of any acquitted conduct "relevant" to the offense of conviction. *See* Dkt.516.at.47. The district court adopted that formulation, saying: "As to what establishes in whole or in part means, it's best understood as a relevancy test." A-779. This relevancy test would nullify the amendment by allowing courts to consider the very conduct the amendment was intended to exclude. OB30.

The government has no answer to this problem, so it no longer defends the relevancy test. Instead, it strains to argue that the district court did not actually adopt a relevancy test, and that its test aligns with Combs's own arguments below. GB23-24. But the record clearly refutes these claims.

As noted, the district court stated that "establishes in whole or in part" is "best understood as a relevancy test" encompassing "conduct relevant to establishing the offense." A-779. Its phrasing was broad. And when discussing

4

enhancements, the court focused on whether acquitted conduct established the offenses *in any respect*, not whether it established the offense's *elements*. The way it applied the exception shows it understood relevance in the broad, Rule 401 sense of "ha[ving] any tendency" to make a fact more or less probable, not some narrower sense tied to particular elements. For example, the court said it was "squarely permissible to consider" purportedly coercive "threats" "even if [they] counted as acquitted conduct," A-789—without mentioning any Mann Act element or explaining why the jury necessarily found this conduct proven.

Nor did the court apply Combs's proposed test, as the government suggests. GB24. Combs has consistently argued that the exception only covers conduct that *proves an element* of the offense. *See* Dkt.510.at.65-68; Dkt.525.at.7, 11; OB28-29. Combs also explained that courts must determine what conduct the jury necessarily found—as they routinely do when evaluating collateral estoppel claims. *See* Dkt.510.at.83-85; Dkt.525.at.13; OB26-27.

Thus, the government's waiver contention, GB24, like its other efforts to evade appellate review, GB28-29, 33, 35, n.11-13, is baseless. Its hairsplitting ignores well-settled law establishing that where a "claim is properly presented, a party can make any argument in support of that claim" on appeal and is "not limited to the precise arguments…made below." *Yee v. City of Escondido*, 503 U.S. 519, 534 (1992); *accord United States v. Litvak*, 808 F.3d 160, 175 n.17 (2d

5

Cir. 2015). Combs's claim on appeal—that using acquitted conduct to increase his sentence was illegal—is the same claim he raised below.

2. The government also asserts that the district court "careful[ly]" and "surgically" applied its test, especially as to the rape cross-reference. GB22-23, 25-26. The suggestion is that the court was trying not to improperly rely on acquitted conduct, and that should be good enough.

If anything, however, the court's discussion of the cross-reference confirms it read §1B1.3(c)'s exception too broadly. The court never said it wasn't applying the cross-reference because it couldn't use acquitted conduct. It said the opposite: that it *could* consider the acquitted conduct it used to apply the coercion enhancement, despite the acquittals. The court acknowledged this "counts as acquitted conduct," but once again found it satisfied §1B1.3(c)'s exception because it also "established" the Mann Act offenses. *See* A-783-84. In other words, the court was consistent when it analyzed fraud/coercion and the cross-reference. In both cases, it erroneously concluded it could find coercion based on acquitted conduct, because it interpreted the exception to cover any "relevant" conduct.

Indeed, the court found insufficient evidence for the cross-reference only because the alleged coercion did not "meet[] the technical definition" of the rape statute. A-784.

\*　\*　\*

6

The Commission sought to end a decades-long practice that makes a mockery of the jury system and due process and engenders disrespect for the law. It carved out a narrow exception for situations where acquitted conduct overlaps with convicted conduct because it also proves an element of the offense of conviction. The exception's text is clear. But even if ambiguity existed, it would have to be resolved in Combs's favor to avoid the serious constitutional problems identified by so many jurists and discussed in Combs's and the amici's briefs. The government has no real response to any of this, so it resorts to the nitpicky points refuted above.

The Commission has spoken. The result here—a sentence driven by acquitted conduct and four times the average for the offense—is exactly what it sought to prevent.

### B. The Enhancements Don't Apply If §1B1.3(c) Is Interpreted Correctly

#### 1. *Fraud/Coercion*

a. The government contends that even if two alleged threats (to release Ventura's videos and withhold Jane's rent payments) are acquitted conduct, they "establish" the Mann Act's intent element and justify the coercion enhancement. GB29-30. But neither incident was also convicted conduct, so they may not be considered under §1B1.3(c)'s exception as correctly interpreted.

7

First, the alleged threats wouldn't "establish" any Mann Act element. The government told the jury it could convict under the Act even if neither threat was proven. The government argued that these "threats" were "totally separate" from the Mann Act counts, because the Act does not require coercion. A-366. This was legally accurate and consistent with the instructions: Consent, or lack thereof, is "immaterial" to the Mann Act. *United States v. Mi Sun Cho*, 713 F.3d 716, 721-22 (2d Cir. 2013) (per curiam).

Second, the record shows the jury didn't buy the government's threats argument. In closing, the government emphasized that under the jury instructions "one occasion" of threats or coercion sufficed for sex trafficking. A-348, 396; Dkt.608 (Trial.Tr.7632, 7674). It then highlighted six specific incidents, including the two alleged threats, calling them "clear-cut," "crystal clear" evidence of *sex trafficking*. A-349, 361; *see* A-352-54 (arguing threats to withhold Jane's rent caused her to participate in "sobriety party" hotel night), 362-64 (arguing Ventura participated in freak-off after Cannes trip following threats to release videos). The acquittals thus show that the jury necessarily disagreed and concluded neither alleged threat induced any freak-off or hotel night.

And the jury's findings are fully consistent with the record, which doesn't show any sex prompted by a threat. The government misleads the Court.

For example, none of the dozens of appendix pages it cites to claim Combs threatened to stop paying Jane's rent if she refused to do the "sobriety party" (GB30) shows any such thing. None of the cited evidence contains any threat by Combs whatsoever—the only cited statements by Combs about the house are requests to enter it, unconnected to the sobriety party. SA-210-11, 429-32. Moreover, Jane testified she "agreed" to the "sobriety party" and "couldn't say no to [Combs]" because of "how much [she] loved him," Dkt.584 (Trial.Tr.5642-44)—not because of threats.

Nor does any evidence corroborate Ventura's testimony claiming blackmail on a May 2012 flight from Cannes led to a freak-off. The government's summary chart contains no flight record, hotel record, or communication documenting any freak-off that month. *See* SA-263-85. Ventura's story about Combs playing the videos on a commercial flight with other passengers present also defies belief. Combs took pains to keep the videos secret. *See* Dkt.564 (Trial.Tr.1187-88, 1193).[3]

---

[3] Contrary to the government's argument, GB28-29, 33, 35, Combs does not concede any enhancement was proven by a preponderance. But it doesn't matter, because acquitted conduct is out-of-bounds. And the government's brief contains other distortions and exaggerations. For example, it falsely suggests both Combs's relationships were infected with violence. *See* GB4-9. But Combs never instigated *any* violence with Jane. The only alleged violence occurred nearly three years into their relationship, after Jane started a fight by throwing lit candles at Combs and slamming his head into a marble countertop. *Compare* GB8-9 *with*

b. The government separately claims these incidents are not acquitted conduct anyway and suggests the jury may have found coercion as defined under the enhancement, but not the sex-trafficking statute. GB31-32. But the district court "did not reach" this issue, GB31, and this Court generally "does not consider an issue not passed upon below," *United States v. Gomez*, 877 F.3d 76, 92 (2d Cir. 2017).

Regardless, the two definitions are substantively equivalent, and it's clear the jury rejected coercion however defined. The enhancement doesn't define coercion; the application note defines it as "conduct that negates the voluntariness of the victim." USSG §2G1.1 n.2. At the time of enactment, "negate" meant nullify or render ineffective, and "voluntary" meant intentionally or willfully. *See, e.g.*, *Negate*, Black's Law Dictionary (6th ed. 1990); *Voluntary*, The American Heritage Dictionary of the English Language (3rd ed. 1992). Under the enhancement, therefore, to "negate the voluntariness" of means to nullify or render a person's will ineffective. This is indistinguishable from the sex-trafficking statute's definition—i.e., conduct "sufficient in kind or degree *to overcome the will* of an ordinary person." A-393-94 (emphasis added). There is no universe in which the jury could have separated these two concepts.

---

Dkt.586 (Trial.Tr.5803-08) *and* Dkt.630 (Trial.Tr.5180-81) (Jane's testimony). This incident was not convicted conduct anyway, as it involved no interstate travel.

Nor can coercion be conceptually separated from sex for purposes of either the enhancement or the statute. For both, the question is whether coercion somehow induced commercial sex acts—there has to be some causal connection between the two. The government contends the enhancement does not require coercion as to particular sex acts, but the application note says it *must* occur "as part of the offense." §2G1.1 n.2.

For similar reasons, the jury could not have found coercion that didn't "'cause' the commercial sex acts." GB32. The two were inextricably intertwined in the jury instructions. Coercion was defined in terms of whether Combs "*caus[ed]* a reasonable belief that there was no reasonable choice except to engage in a commercial sex act," or "intended to *cause* the alleged victim to believe that if…she did not engage in a commercial sex act,…she would suffer serious harm." A-393-94 (emphasis added). The government's case thus focused on showing Combs engaged in "illegal actions *that caused* Cassie and Jane to have sex with paid escorts." A-346-47 (closing). When the jury acquitted on sex-trafficking, it necessarily rejected coercion just as much as it rejected causation.

### 2. *Leadership*

The RICO acquittal conflicts with deeming Combs the "leader" or "organizer" of a conspiracy to violate the Mann Act, since the two Mann Act convictions would have established a RICO "pattern" had the government proved a

11

conspiracy.  This precluded the role enhancement.  *See, e.g.*, *United States v. Esteras*, 102 F.4th 98, 109-11 (2d Cir. 2024).

The government disregards this dispositive point and instead focuses on the criminal "participants" (i.e., coconspirators).  GB33-34.  But any evidence suggesting Kristina Khorram was a participant is clearly acquitted conduct given her central role in the alleged enterprise.  Nor could the Cowboys4Angels employees have been participants when they were merely doing their jobs for a legitimate business and therefore lacked "knowledge that [their] conduct was criminal."  *United States v. Skys*, 637 F.3d 146, 157-58 (2d Cir. 2011).  Similarly, Ventura and Jane could not have been participants when the government wasn't even alleging they were culpable.

### 3.  Grouping

The government concedes the plain meaning of "victim" is one harmed or injured, citing a Second Circuit case defining victim this way.  GB36 (citing *United States v. Rainford*, 110 F.4th 455, 483 (2d Cir. 2024)).[4]  However, the government asks this Court, under *United States v. Stinson*, to defer to commentary defining "victim" more broadly.  But *Stinson* bars deference when, as here, the

---

[4] Unlike this case, *Rainford* had real victims who were "duped," "injured," "subjected to hardship" by sham surgeries, and had their "economic vulnerability" exploited.  *Id.* at 483-84.

commentary is "inconsistent with, or a plainly erroneous reading of" the guideline. 508 U.S. 36, 38 (1992).

*Stinson* will likely be overruled soon anyway. The Supreme Court is poised to resolve the entrenched circuit split over whether *Kisor v. Wilkie*, 588 U.S. 558 (2019) modified or replaced *Stinson*. OBn.12; *e.g.*, *Poore v. United States* (25-227) (cert petition relisted 6 times).

### C. The District Court Violated Statutory And Constitutional Law By Using Acquitted Conduct To Impose A Draconian Sentence

The government concedes the district court relied overwhelmingly on acquitted conduct when balancing the §3553(a) factors but doesn't even try to explain how this was at all fair or just. Instead, it defends the sentence based on 18 U.S.C. §3661 and *United States v. Watts*, 519 U.S. 148 (1997) (per curiam), and its progeny. GB20-21, 38-40. But neither the statute nor *Watts* authorized the judge to use acquitted conduct to drive a sentence in this manner. The district court and government's interpretation of §3661 would raise serious constitutional and lenity problems. Those problems should be avoided by holding that a defendant's sentence may not be increased based on acquitted conduct unless the jury also used that same conduct to convict.

1. The government contends §3661 allows use of acquitted conduct because it permits consideration of "information concerning the background, character, and conduct of a person convicted of an offense…for the purpose of imposing an

13

appropriate sentence." But that ignores §3553(a), which dictates what "Factors [Are] To Be Considered in Imposing a Sentence" and instructs district courts *how* to fashion "an appropriate sentence."

As Amici explain, §3553(a) directs courts to focus on "the offense" of conviction when fashioning sentences. LPB17-20 (quoting §3553(a)(1)-(4), (6)(7)). For example, §3553(a)(6) directs courts to avoid "unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." There would be no point of assessing disparity by reference to sentences of others "found guilty" of similar offenses if courts were allowed to impose sentences based on acquitted conduct.

The claim that §3661 confers virtually unbounded discretion to sentencing courts ignores that their "discretion under §3661 is subject to constitutional constraints." *Pepper v. United States*, 562 U.S. 476, 489 n.8 (2011); *see* NACDLB8. As explained, there are serious constitutional problems with interpreting §3661 to permit increasing a person's sentence based on judicial findings that conflict with a jury's acquittal on more serious charges. *See* OB34-39; LPB24-29; NACDLB7-14.[5]

---

[5] *United States v. Texidor*, 164 F.4th 248, 254 (3d Cir. 2026) and *United States v. Ware*, 141 F.4th 970, 974 n.2 (8th Cir. 2025) (cited GB42), do not help the government. Neither discusses the statutory issue or explains how *Watts* survives recent *Apprendi* jurisprudence. Further, the district court didn't rely on acquitted conduct "in *any* aspect of Texidor's sentencing," 164 F.4th at 255, and *Ware*

14

2.   The government's principal response to the constitutional problems is *Watts*.  But neither *Watts* nor the government's other cases controls.  *Watts* pre-dated *Apprendi* and, as the Supreme Court subsequently emphasized, "presented a very narrow question regarding the interaction of the Guidelines with the Double Jeopardy Clause, and did not even have the benefit of full briefing or oral argument."  *United States v. Booker*, 543 U.S. 220, 240 n.4 (2005).  There was no "contention that the sentencing enhancement had exceeded the sentence authorized by the jury verdict in violation of the Sixth Amendment."  *Id.* at 240.  *Watts* did not decide how the constitutional rights to jury trial and beyond-a-reasonable-doubt findings impact sentencing.

Subsequent controlling cases addressing *those* constitutional limits—from *Apprendi* to *Blakely* to *Booker* to *Alleyne*—have repeatedly held that facts "increas[ing] the penalty for a crime…must be submitted to the jury and found beyond a reasonable doubt."  *Alleyne v. United States*, 570 U.S. 99, 103 (2013).  Allowing judges to deprive a person of liberty based on "facts" a jury found *not* proven beyond a reasonable doubt violates *Apprendi*.  *Watts* should therefore be limited to the "very narrow" issue it actually addressed, not used to end-run the important constitutional principles *Apprendi* vindicated.

---

involved acquitted conduct that overlapped substantially with the convicted conduct.

15

*Watts* also relied heavily on other precedents abrogated by *Apprendi*. For example, *Williams v. New York* found no Sixth Amendment problem where a trial judge overrode the jury's life-sentence recommendation and imposed a death sentence. 337 U.S. 241 (1949). Such a sentence would be unconstitutional today under *Apprendi*. *See, e.g., Hurst v. Florida*, 577 U.S. 92, 94 (2016). Similarly, another case *Watts* cited, *McMillan v. Pennsylvania*, 477 U.S. 79 (1986), was overruled by *Alleyne*.

Nor do the government's Second Circuit cases applying *Watts*, GB21, 38-40, control here. *United States v. Vaughn* directed district courts to "consider the jury's acquittal when…determining a reasonable sentence." 430 F.3d 518, 527 (2d Cir. 2005) (Sotomayor, J.). So did *United States v. Johnson*, 507 F.3d 793, 797 (2d Cir. 2007). The district court never did that here. Instead, it jacked up the sentence without considering the "weight and quality" of the evidence the jury rejected. *Id.* (quoting *Vaughn*). And there was no acquittal in *United States v. Martinez*, 525 F.3d 211 (2d Cir. 2008) (per curiam).

Most importantly, Supreme Court "precedents make clear…that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict*." *Blakely v. Washington*, 542 U.S. 296, 303 (2004). Moreover, *Vaughn* and its progeny were decided before the Supreme Court held in *Alleyne* that *Apprendi* applies to any

16

facts that can increase a sentence, not just facts that increase the maximum sentence. *Alleyne* held it unconstitutional to increase the minimum sentence based on a judicial finding that the defendant brandished a weapon, because the jury didn't make such a finding. 570 U.S. at 103-04, 117. What happened here was analogous even though no minimum was involved—the judge added years to Combs's sentence because of acquitted conduct, which the verdict "d[id] not allow." *Blakely*, 542 U.S. at 304.[6]

The government also argues that judges "may find facts relevant to sentencing—as opposed to elements of the offense—by a preponderance of the evidence." GB21, 38. That is irrelevant. The problem here does not concern some random "fact[] relevant to sentencing"—such as criminal history or personal background. The problem is the judge imposed a much lengthier sentence than usual because of his own view as to an *element* the jury necessarily found unproven. The judge disagreed with the jury's view about what "really happened," A-921, and his view drove—and dramatically increased—the sentence.

---

[6] *Alleyne* overruled not only *McMillan*, but also *Harris v. United States*, 536 U.S. 545 (2002), a post-*Apprendi* decision that didn't require juries to find facts triggering mandatory minimum sentences. Both *Vaughn* (at 528) and *Johnson* (n.6) discuss and rely on *Harris*. And the author of *Vaughn*, after subsequently becoming a Supreme Court Justice, expressed grave constitutional doubts about acquitted-conduct sentencing in *McClinton*.

17

3. The government also urges the Court not to "speculat[e]" about whether the jury found or rejected certain facts. GB31-32, 34. But no speculation is needed to infer that the jury necessarily rejected the government's case on coercion. That was the only disputed element for sex trafficking but was not required for the Mann Act.

And courts must make precisely these kinds of factual inferences when conducting collateral estoppel analysis and must reject "implausible" and "hypertechnical" theories like those the government resorts to here to explain the acquittals. *See*, *e.g.*, *United States v. Cole*, 158 F.4th 113, 123-25 (2d Cir. 2025). *United States v. Martinez*, 110 F.4th 160, 174, 179 (2d Cir. 2024) (cited GB31-32) only affirmed this logic by instructing courts to accept facts "necessarily implicit" in the verdict—unlike what the district court did here.

### D. The Guidelines Determinations Were Not Harmless

Guidelines errors are not harmless unless it is "clear" the district court would have imposed the same sentence regardless. *United States v. James*, 151 F.4th 28, 47 (2025). This is particularly true when "in the absence of an error, the defendant's Guidelines range would have been substantially lower." *United States v. Olmeda*, 894 F.3d 89, 94 (2d Cir. 2018) (per curiam). Accordingly, guidelines errors usually require resentencing even when the district court imposed a below-guidelines sentence—which "may have been explicitly selected with what was

18

thought to be the applicable Guidelines range as a frame of reference." *United States v. Guerrero*, 910 F.3d 72, 78 (2d Cir. 2018); *see also, e.g.*, *Molina-Martinez v. United States*, 578 U.S. 189, 198-201 (2016).

This case is no different. The court's erroneous interpretation of the acquitted conduct amendment led to three enhancements that nearly doubled Combs's offense level (14 to 27) and multiplied the bottom of his guidelines range fivefold and the top fourfold (15-to-21 months to 70-to-87 months). Had the court calculated Combs's guidelines range correctly, it is extremely unlikely to have taken the extraordinary step of varying upward by 29 months from 21 to 50. *See, e.g.*, *United States v. Seabrook*, 968 F.3d 224, 234-35 (2d Cir. 2020); *United States v. Singh*, 877 F.3d 107, 116-22 (2d Cir. 2017); *United States v. Wernick*, 691 F.3d 108, 117-18 (2d Cir. 2012).

Nor could the court inoculate its rulings from appellate review merely by calling the acquitted conduct issue "narrow" and "inconsequential," especially when it also described the issue as "foundational." A-778, 780. Similarly, the court's rote statements that it "would impose the same sentence" without the enhancements, A-790-92, are the kinds of "simple incantation[s]" this Court does not take at face value, *United States v. Feldman*, 647 F.3d 450, 458-60 (2d Cir. 2011); *see also, e.g.*, *Seabrook*, 968 F.3d at 233-34; *United States v. Bennett*, 839 F.3d 153, 162-63 (2d Cir. 2016).

19

### E. The Unlawful Use Of Acquitted Conduct Rendered The Sentence Substantively Unreasonable

Coercion fits *Apprendi*'s definition of an element that must be found by the jury beyond a reasonable doubt: it "alter[ed] the legally prescribed punishment so as to aggravate it." *Alleyne*, 570 U.S. at 114-15. Without the judge's coercion findings, Combs's 50-month sentence plainly "would have been substantively unreasonable and therefore illegal." *Jones v. United States*, 574 U.S. 948, 948 (2014) (Scalia, J., dissenting from certiorari denial, joined by Thomas, J., Ginsburg, J.); *accord Rita v. United States*, 551 U.S. 338, 371-72 (2007) (Scalia, J., joined by Thomas, J., concurring). That is obvious because this sentence was quadruple the average Mann Act sentence for defendants with the same criminal history and base offense level—including even defendants who received the coercion enhancement. Indeed, many such defendants receive no jail time. *See* Dkt.510, Ex.68.

## II. THE STATUTE CANNOT BE APPLIED TO VOYEURISM

### A. The Government's 'Plain Meaning' Argument Conflicts With Supreme Court Precedent

1. Combs's claim that the Mann Act, properly interpreted, does not cover the conduct of conviction presents a question of statutory interpretation: What does the statutory term "prostitution" mean, and what does it mean to "engage in prostitution"? According to the government, the question can be resolved based on

the term's plain meaning. GB46-47, 52. The government argues prostitution means any sex for money, and that plain meaning dissolves all constitutional concerns about the Mann Act.[7]

The difficulty for the government is how to arrive at that supposedly plain meaning. Turns out it takes a lot of work and some wild assumptions.

In its post-trial briefing below, the government relied on 21st-century dictionaries defining "prostitution" as sex for money. Dkt.493.at.17-18. That argument had two obvious problems.

First, plain meaning analysis turns on the meaning "at the time Congress enacted the statute." *Perrin v. United States*, 444 U.S. 37, 42 (1979). Because words' meanings change over time, you can't look at 2025 dictionaries (Dkt.493.at.17-18) to determine the meaning of a 1910 statute.

More importantly, the Supreme Court has held that the plain meaning of "prostitution" in the Mann Act does *not* simply mean sex for money. It held that "prostitution" means "indiscriminate intercourse," "for hire or without hire." *Caminetti v. United States*, 242 U.S. 470, 486 (1917). That was the *ordinary* meaning a century ago, as reflected in contemporaneous dictionaries, and the well-

---

[7] The government notes Combs acceded to the standard instruction, GB44, but does not dispute that his sufficiency claim is subject to plenary review based on the proper interpretation of the statute (not the jury instructions), as the district court explained. *See* SPA-3-4 (citing *Musacchio v. United States*, 577 U.S. 237 (2016) and Second Circuit precedents).

21

settled *legal* meaning of the term, as attested by courts around the country, including the Supreme Court in *United States v. Bitty*, 208 U.S. 393, 401 (1908).

The government's dictionary-based plain meaning argument failed.

2. So now, on appeal, the government abandons that argument and tries a new tack. It concedes "prostitution" had a broader meaning when the statute was enacted. But it argues the Supreme Court narrowed the meaning in *Cleveland v. United States*, 329 U.S. 14 (1946), and that Congress implicitly adopted that narrower definition when it amended another provision of the statute in 1986. GB47.

The new argument fares no better than the old argument.

*Cleveland* did not overrule *Caminetti* and *Bitty*—it expressly reaffirmed those prior holdings regarding the Act's broad scope. "That was the view taken by the Court in the *Bitty* and *Caminetti* cases. We do not stop to re-examine the *Caminetti* case to determine whether the Act was properly applied to the facts there presented." 329 U.S. at 18. And while *Cleveland* said the word "prostitution" by 1946 was "normally" used to suggest sex for hire, *id*. at 17, it never suggested that was the *only* meaning.

The government's argument does not even make sense. The government acknowledges *Cleveland* "didn't explicitly overturn *Caminetti*," GB48 (quoting SPA-5), but then says *Cleveland* "offered a narrower definition of 'prostitution.'"

22

What does that even mean?  The core holding of *Caminetti* was that prostitution means illicit sex with or without hire.  How could *Cleveland* abrogate that definition without overruling *Caminetti*?  Moreover, *Cleveland* held that Mormon polygamists could be prosecuted under the Act.  If it is true, as the government says (GB48-49), that the holding was based solely on "debauchery," then anything the Court said about the meaning of "prostitution" was dicta.

Thus, the government's position appears to be that *Cleveland*, in dicta, overruled *Caminetti*'s core holding, even though *Cleveland* explicitly said it was *not* overruling *Caminetti*.  That is a creative reading, to say the least, in which imagined subtext trumps the actual text of the opinion.

It is also an entirely novel reading.  In the 80 years since *Cleveland* was decided, no one has suggested that *Cleveland* overruled *Caminetti*.  The Supreme Court has repeatedly cited *Caminetti*.  *E.g.*, *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009); *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 187 n.8 (2004).  So has this Court.  *E.g.*, *Waterkeeper Alliance, Inc. v. EPA*, 399 F.3d 486, 506 (2d Cir. 2005).  So have other circuits.  *E.g.*, *Nawara v. Cook Cnty.*, 132 F.4th 1031, 1035 (7th Cir. 2025).  There are literally hundreds such citations, not one of which is followed by: *overruled by Cleveland v. United States*, 329 U.S. 14 (1946).  The Department of Justice itself routinely cited *Caminetti* as good law throughout the last 80 years.  *E.g.*, 1997 U.S. Attorneys' Manual at 9-79.100.

23

3.   Against this background, the government's claim that Congress in 1986 "adopted" *Cleveland's* narrower definition, GB47, is fanciful.  The government notes Congress is "presumed to be aware" of judicial interpretations of statutes when it re-enacts a statute.  *Aetna Life Ins. Co. v. Big Y Foods, Inc.*, 52 F.4th 66, 75 (2d Cir. 2022).  But that presumption cuts against its argument.  If anything, Congress was aware of the actual and very well-known *holding* of *Caminetti*.  There is no reason to think Congress was "aware" that *Cleveland*, in dicta, had quietly overruled *Caminetti* while overtly professing fealty to it.

Nor is there any legislative history suggesting Congress meant to overturn *Caminetti*.  Congress sought to address the concerns raised by Ruth Bader Ginsburg's famous report, *Sex Bias in the U.S. Code*, prepared for the U.S. Commission on Civil Rights.  The amendment had nothing to do with the meaning of "prostitution."  The government's claim that the 1986 amendment altered the term's plain meaning is a theory without any support in text, history, or case law.

## B.    Constitutional Avoidance Requires A Narrow Interpretation

1.  The government's plain meaning argument fails because prostitution's meaning was already determined by *Caminetti*.  But *Caminetti's* interpretation conflicts with modern constitutional law.

The government mischaracterizes Combs's constitutional arguments as an as-applied challenge.  GB50-51.  Combs is not contending the statute is

24

unconstitutional as applied to his conduct. He is arguing that the statute must be construed narrowly under the constitutional avoidance canon—which the government, like the district court, "misconceives—and fundamentally so." *Clark v. Martinez*, 543 U.S. 371, 381 (2005). As Justice Scalia explained in *Clark*, the avoidance canon "allows courts to *avoid*…constitutional questions"—not decide them. *Id*. The issue is not whether Combs's own conduct can constitutionally be criminalized; it is whether the government's interpretation of the statute should be rejected because it would "raise[] serious constitutional doubts." *Id.*

And the constitutional problems—beginning but not ending with vagueness—are indeed serious. Congress has never defined prostitution, nor otherwise clearly indicated what conduct the statute covers. It didn't give a clear (or any) definition in 1910 or 1986. The word "prostitution" is inherently vague, morally laden, and has morphed over time. And the *Caminetti* interpretation is indefensible under modern constitutional norms.

2. The government barely grapples with the overbreadth problems presented by its own proposed interpretation. For example, it appears to concede that paying an OnlyFans performer to have sex with another should not be covered. GB48n.15. But it never explains why. All the government does is quote the statute and italicize a few words—it does not dispute that under its construction,

OnlyFans performances constitute "prostitution" and that the hundreds of millions of OnlyFans viewers are thus "prostitution" customers.[8]

In a world where amateur porn has proliferated exponentially—because of cell phones, social media, and ubiquitous porn websites where anyone can upload—the government's interpretation would cover a vast array of conduct. And it would infringe on areas best left to state regulation. The government waves away federalism concerns by claiming the statute regulates interstate conduct. GB58. But the Mann Act's interstate hook does not solve the problem—there are similar elements in the mail and wire fraud statutes, which the Supreme Court has likewise invoked federalism to interpret narrowly. *E.g.*, *Ciminelli v. United States*, 596 U.S. 306, 315-16 (2023).

3. A narrower construction is needed to avoid the constitutional problems. A sensible solution would be to follow modern state courts that have adopted a straightforward definition: prostitution means "trading of sexual conduct with another person for a fee where the sexual conduct is performed on the person who pays the fee." *People v. Paulino*, 2005 N.Y. Misc. LEXIS 3430, at *9 (N.Y. Sup. Ct. Aug. 4, 2005); *accord Wooten v. Superior Ct.*, 113 Cal. Rptr. 2d 195, 202 (Cal. Ct. App. 2001) (prostitution "requires touching between the prostitute and the

---

[8] According to public filings, OnlyFans had 377.5 million "fan" accounts and 4.6 million "creator" accounts at the end of 2024.

customer, even if the customer is simply an observer of sexual acts"); *see also* OB54-55.

The government dismisses these cases as "inapposite" because they have different "fact pattern[s]" and statutes. GB55-56. Obviously, the facts are somewhat different, like the facts of any two cases. What matters is the legal principle those cases adopt: One who merely watches others engage in sexual acts, even if paid, does not engage in prostitution. For this reason, the government's attempt to divide-and-conquer the individual state cases—like the district court's similar effort—is fundamentally misguided. GB55-57, n.18. None of the factual or textual distinctions the government discusses undermines the principle for which Combs is citing those decisions. The same is true for the analogous federal caselaw that supports the same principle. *See United States v. Prater*, 518 F.2d 817, 820 (7th Cir. 1975) (strip tease is not "prostitution" under the Mann Act).

The government's other arguments similarly misunderstand the import of these state cases. Combs is not contending they should be "integrate[d]" into the Act's text or that the cases somehow "de-fang[]" the Act. GB51-53. Rather, Combs seeks a limiting construction because of vagueness concerns based on not just recent state caselaw, but also prostitution's changing meaning over time and the Act's failure to define the term.

The government contends Combs's proposed construction would "narrow prostitution almost out of existence" by "exclud[ing] any situation in which a person pays a third party (like a brothel) to have sex with an employee." GB49 (citing *Mi Sun Cho*). Whatever the government is contemplating with this ambiguous hypothetical is covered by the Mann Act. If a person pays a brothel to have sex with one of the brothel's employees, the employee is engaging in prostitution by having sex with a paying customer. If, by contrast, a person pays a brothel for sex with one of the person's employees, the employee is effectively the customer, and the payor is soliciting a prostitute at the brothel on his behalf. And contrary to the government's suggestion, the *Mi Sun Cho* defendant obviously could be prosecuted in either scenario: she was a pimp who placed prostitutes at brothels.[9]

## III.   COMBS'S CONVICTION VIOLATED THE FIRST AMENDMENT

1. The government does not dispute that the sexual performances during freak-offs and hotel nights warrant First Amendment protection. Rather, it argues

---

[9] The government argues that Combs's conviction should stand even under his proposed limiting construction because he was not acting as a true voyeur, but instead "directly participated" in the sex acts at issue. GB54, 59-60. But the government cannot dispute that Combs never had sex with any of the male entertainers. *See* OB57-58. The government merely points to evidence that Combs had sex with his girlfriends during these nights.

28

Combs's conduct of transporting others for these nights was not expressive. GB61-62, 65-66. This misunderstands basic First Amendment law.

The First Amendment protects not just speech itself, but also activities necessary for producing and disseminating speech. The leading decisions have thus squarely rejected arguments that the production of pornographic films can be regulated without implicating the producer's free speech rights. *See People v. Freeman*, 758 P.2d 1128, 1132 (Cal. 1988) ("untenable" to distinguish between "speech (e.g., a film)…and conduct (the making of the film)"); *State v. Theriault*, 960 A.2d 687, 691 (N.H. 2008) ("illogical" to look only at production). Other courts have rejected similar attempts to regulate First Amendment activity adjacent to speech. *See, e.g.*, *Turner v. Lieutenant Driver*, 848 F.3d 678, 688-90 (5th Cir. 2017) (filming the police); *Desnick v. Am. Broadcasting Cos.*, 44 F.3d 1345, 1355 (7th Cir. 1995) (Posner, C.J.) (producing a broadcast); *PETA, Inc. v. North Carolina Farm Bureau Fed.*, 60 F.4th 815, 828-29 (4th Cir. 2023) (newsgathering activities). This Court should do the same here, where Combs (who had also produced other films) transported his girlfriends and male entertainers to produce and direct the sexual performances.

The government also claims Combs's conduct is not protected because he acted in part for sexual arousal rather than "the sole and express purpose" of producing porn. GB63-64. But the government offers no support for this bizarre

29

theory (nor did the district court). And *Freeman* held that the pornographer's First Amendment rights would have been violated even if he'd had the requisite *mens rea*. 758 P.2d at 1131. Combs is indistinguishable from the adult film producer in *Freeman* even though he was merely an amateur pornographer, like the defendant in *Theriault*.[10]

The government denies Combs was producing amateur porn, citing certain testimony from entertainers Sharay Hayes and Daniel Phillip. GB63-64. But neither of them participated in any Mann Act offenses—they didn't travel interstate. Those who did travel expressly consented to—and indeed assisted in—having the sex filmed. Jane testified she was "OK with [hotel nights] being filmed," A-311, and Ventura actively facilitated recording of freak-offs, *e.g.*, A-208-09.

Accordingly, this case is distinguishable from *United States v. Roeder*, where the defendant transported an individual across state lines to engage in sexual

---

[10] The government mischaracterizes Combs's other cited cases as involving defendants who paid individuals "for the sole and express purpose of starring in pornographic films." GB63. Neither *Paulino* nor *People v. Greene* suggested First Amendment protection was limited to such a narrow category of pornography producers. Both cases instead emphasized the First Amendment problems with enforcing prostitution laws against directors *and voyeurs* of sexual performances. Also, neither defendant was an adult film producer: Paulino ran a brothel, 2005 N.Y. Misc. LEXIS 3430, at *1-3, and Greene propositioned an undercover cop, 110 Misc.2d 40 (N.Y. Crim. Ct. 1981).

acts *with her*, 526 F.2d 736, 737-38 (10th Cir. 1975), and *Arcara v. Cloud Books*, where prostitutes solicited customers at an adult bookstore, 478 U.S. 697, 698-99 (1986).  Nor should the Court be troubled by the government's hypothetical involving brothels "offering elaborate and staged scenes" solely for customers' sexual pleasure, GBn.22, which is nothing like *Freeman*, *Theriault* and similar scenarios involving porn production.

2.  The government also argues that even if Combs's conduct is protected, this prosecution is constitutionally permissible because it furthers an "important or substantial government interest."  GB66-68.  It does not.

Like the district court, the government relies on its general interests in regulating prostitution, GB67, which do not address the proper inquiry—i.e., the government's interests in prosecuting this particular case, *see, e.g.*, *Texas v. Johnson*, 491 U.S. 397, 407-10 (1989).  The government does attempt to identify such interests: "enabl[ing] commercial prostitution, distribut[ing] illegal drugs, and…physical[] violen[ce]."  GB67.  But Combs plainly had no commercial interest in the alleged "prostitution," and neither of the two other interests have anything to do with the Mann Act.  At most, they pertain to the RICO conspiracy (drugs) and sex-trafficking (violence) charges.  But Combs was acquitted of these charges, because the jury found that the incidents of violence arose from jealousy of other lovers and were unconnected to sex with entertainers.

31

## **CONCLUSION**

This Court should order Combs's immediate release and grant a judgment of acquittal or at least vacate and remand for resentencing.

Dated:  March 13, 2026
        New York, New York

<div style="margin-left:40%">

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro
Theodore Sampsell-Jones
Christopher D. Johnson
SHAPIRO ARATO BACH LLP
1140 Ave. of the Americas, 17th Fl.
New York, New York 10036
(212) 257-4880
ashapiro@shapiroarato.com
tsampselljones@shapiroarato.com
cjohnson@shapiroarato.com

*Attorneys for Defendant-Appellant
Sean Combs*

</div>

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that:

1.  This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(g) and Local Rule 32.1 because it contains 6,971 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font of Times New Roman.

Dated:  March 13, 2026

<div style="text-align: right;">

/s/ Alexandra A.E. Shapiro
Alexandra A.E. Shapiro

</div>